No. __23-1064__

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

NEW JERSEY CONSERVATION FOUNDATION,
*et al.*,

*Petitioners,*

v.

FEDERAL ENERGY REGULATORY
COMMISSION,

*Respondent.*

---

## JOINT PETITION FOR REVIEW

---

Jennifer Danis
D.C. Circuit Bar No. 60108
Megan C. Gibson
Niskanen Center
820 First St, NE, Suite 675
Washington, DC 20002
(202) 810-9260
jdanis@niskanencenter.org
mgibson@niskanencenter.org

*Attorneys for Petitioners New Jersey*
*Conservation Foundation, et al.*

Pursuant to Section 19(b) of the Natural Gas Act, 15 U.S.C. § 717r(b), and Federal Rule of Appellate Procedure 15(a), New Jersey Conservation Foundation, New Jersey League of Conservation Voters, Aquashicola Pohopoco Watershed Conservancy, and affected landowner Catherine Folio ("Petitioners") hereby petition this Court for review of the following Federal Energy Regulatory Commission ("FERC") orders: (1) Order Issuing Certificate and Approving Abandonment, *Transcontinental Gas Pipe Line Company, LLC*, 182 FERC ¶ 61,006 (Jan. 11, 2023) ("Certificate Order"); and (2) Notice of Denial of Rehearing by Operation of Law and Providing for Further Consideration, *Transcontinental Gas Pipe Line Company, LLC*, 182 FERC ¶ 62,146 (2023), entered on March 13, 2023 ("Rehearing Order"). The Certificate and Rehearing orders are attached as Exhibits A and B, respectively. In accordance with Federal Rule of Appellate Procedure 15(c), the list of parties served with copies of this Joint Petition is attached as Exhibit C.

All Petitioners were intervenors in FERC's proceedings below. Petitioners timely filed a request for rehearing of the certificate order, which was denied in the Rehearing Order attached as Exhibit B. This petition for review is timely filed within 60 days of the Commission's denial of rehearing in accordance with 15 U.S.C. § 717r(b).

2

Dated: March 13, 2023

Respectfully submitted,

*/s/ Jennifer Danis*
Jennifer Danis
Megan Gibson
Niskanen Center
820 First St, NE, Suite 675
Washington, DC 20002
(202) 810-9260
jdanis@niskanencenter.org
mgibson@niskanencenter.org

*Attorneys for Petitioners New Jersey*
*Conservation Foundation, et al.*

## EXHIBITS

A. Order Issuing Certificate and Approving Abandonment, *Transcontinental Gas Pipe Line Company, LLC*, 182 FERC ¶ 61,006 (Jan. 11, 2023)

B. Notice of Denial of Rehearing by Operation of Law and Providing for Further Consideration, *Transcontinental Gas Pipe Line Company, LLC*, 182 FERC ¶ 62,146 (March 13, 2023)

C. Service list of Federal Energy Regulatory Commission Docket Nos. CP21-94-000, CP21-94-001

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

|  |  |  |
|---|---|---|
| NEW JERSEY CONSERVATION FOUNDATION, *et al.,* | ) ) ) ) | |
| *Petitioners,* | ) ) | |
| v. | ) ) | **Docket No.** _23-1064_ |
| FEDERAL ENERGY REGULATORY COMMISSION | ) ) ) | |
| *Respondent.* | ) ) ) | |

## PETITIONERS' CORPORATE DISCLOSURE STATEMENT

New Jersey Conservation Foundation (NJCF) is a 501(c)(3) not-for-profit organization founded in New Jersey for the purpose of preserving land and natural resources throughout New Jersey. NJCF has no parent companies, and there are no publicly owned corporations that have a ten-percent or greater ownership interest in NJCF.

New Jersey League of Conservation Voters Education Fund (NJLCV) is a 501(c)(3) not-for-profit organization founded in New Jersey for the purpose of environmental advocacy and conservation. It is part of a family of organizations, including New Jersey League of Conservation Voters, Inc., which is a 501(c)(4); New Jersey LCV Political Action Committee, which is a political action committee

("PAC"); and NJLCV Victory Fund, which is a super PAC. NJLCV has no parent

companies, and there are no publicly held corporations that have a ten-percent or

greater ownership interest in NJLCV.

Aquashicola Pohopoco Watershed Conservancy (APWC) is a 501(c)(3)

not-for-profit organization founded in Pennsylvania for the purpose of

environmental advocacy and conservation. APWC has no parent companies, and

there are no publicly held corporations that have a ten-percent or greater ownership

interest in APWC.


Dated: March 13, 2023

Respectfully submitted,

*/s/ Jennifer Danis*
Jennifer Danis
Megan C. Gibson
Niskanen Center
820 First St, NE, Suite 675
Washington, DC 20002
(202) 810-9260
jdanis@niskanencenter.org
mgibson@niskanencenter.org
kschroeder@niskanencenter.org


*Attorneys for Petitioners New Jersey*
*Conservation Foundation, et al.*

## <u>CERTIFICATE OF SERVICE</u>

In accordance with Federal Rule of Appellate Procedure 15(c), I hereby certify that on March 13, 2023, a copy of the foregoing Joint Petition for Review, Corporate Disclosure Statement, and Exhibits was served by email to all parties admitted to the Federal Energy Regulatory Commission proceeding Docket No. CP21-94, as listed in Exhibit C.

In accordance with D.C. Cir. Rule 15(a), I further certify that I emailed a copy of the foregoing to the following:

> Robert Solomon
> Solicitor
> Federal Energy Regulatory Commission
> 888 First Street, NE
> Washington, DC 20426
> Robert.solomon@ferc.gov

*/s/ Jennifer Danis*
Jennifer Danis

# EXHIBIT A

182 FERC ¶ 61,006
UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Before Commissioners:  Willie L. Phillips, Acting Chairman;
James P. Danly, Allison Clements,
and Mark C. Christie.

| | |
|---|---|
| Transcontinental Gas Pipe Line Company, LLC | Docket No. CP21-94-000 |

ORDER ISSUING CERTIFICATE AND APPROVING ABANDONMENT

(Issued January 11, 2023)

1.      On March 26, 2021, Transcontinental Gas Pipe Line Company, LLC (Transco) filed an application, pursuant to sections 7(b) and 7(c) of the Natural Gas Act (NGA)[1] and Part 157 of the Commission's regulations,[2] requesting authorization to construct and operate the Regional Energy Access Expansion (REAE or project).  The proposed REAE project consists of the abandonment and replacement of existing, less energy efficient compression facilities and the construction of new pipeline facilities in Luzerne and Monroe Counties, Pennsylvania, and a new compressor station in Gloucester County, New Jersey; the expansion of existing compressor stations in Somerset County, New Jersey, and Luzerne County, Pennsylvania; modifications to the certified capacity of compressor stations in York and Chester Counties, Pennsylvania, and Middlesex County New Jersey; and modifications to various tie-ins, regulators, and delivery meter stations in Pennsylvania, New Jersey, and Maryland.  Transco states that the purpose of the REAE project is to provide an additional 829,400 dekatherms per day (Dth/d) of firm transportation service for its shippers.  For the reasons discussed below, the Commission grants the requested certificate and abandonment authorizations subject to conditions.

I.      **Background and Proposal**

2.      Transco, a limited liability company formed and existing under the laws of the State of Delaware, is a natural gas company as defined by section 2(6) of the NGA[3] and operates natural gas transportation facilities that extend from Texas, Louisiana, and the offshore Gulf of Mexico area, through Mississippi, Alabama, Georgia, South Carolina,

---

[1] 15 U.S.C. § 717f(b), (c).

[2] 18 C.F.R. pt. 157 (2021).

[3] 15 U.S.C. § 717a(6).

Document Accession #: 20230111-3069          Filed Date: 01/11/2023
Docket No. CP21-94-000                                                                    2

North Carolina, Virginia, Maryland, Pennsylvania, and New Jersey, to its termini in the
New York City metropolitan area.

### A.      Regional Energy Access Expansion Project

3.      The REAE is an incremental expansion of Transco's existing pipeline system that
consists of two components:  (1) modernization of certain compression facilities; and
(2) the construction of new facilities to provide 829,400 Dth/d of firm transportation
service from northeastern Pennsylvania to multiple delivery points in New Jersey,
Pennsylvania, and Maryland.

4.      To provide this additional service, Transco proposes to construct and operate
approximately 22.3 miles of 30-inch-diameter lateral pipeline (the Regional Energy
Lateral) and 13.8 miles of 42-inch-diameter loop pipeline (the Effort Loop) in
Pennsylvania; one new compressor station in New Jersey; modifications to five existing
compressor stations in Pennsylvania and New Jersey; modifications to existing pipeline
tie-ins, valves, regulators, and meter regulating stations in Pennsylvania, New Jersey, and
Maryland; the addition of ancillary facilities such as regulation controls, valves, cathodic
protection, communication facilities, and pig launchers and receivers in Pennsylvania;
and abandonment and replacement of certain existing compression facilities with higher
horsepower compression at Compressor Stations 505 and 515, as detailed below.

5.      Transco requests authorization to abandon eight gas-fired reciprocating engine
driven compressor units (totaling approximately 16,000 horsepower (HP) of
compression) at Station 505 in Somerset County, New Jersey, and five gas-fired
reciprocating engine-driven compressors (totaling approximately 17,000 HP) from
Station 515 in Luzerne County, Pennsylvania, and to install four new gas-fired turbine
driven compressor units, two each at existing Stations 505 and 515.  The replacement
units will have a combined 30,810 and 58,684 of site-rated HP at Stations 505 and 515,
respectively.  Transco also proposes to modify three existing compressors units at
Station 515.  Transco contends that its customers will benefit from the increased
reliability of replacement equipment, resulting in fewer maintenance outages, less
downtime, decreased air emissions, less fuel consumption and costs, and lower operation
and maintenance costs.

6.      Transco states that the project will enhance access to natural gas supply and
further diversify fuel supply access.  Further, Transco states that the project will provide
overall reliability and diversification of energy infrastructure in the Northeast by easing
locational constraints currently caused by limited pipeline takeaway capacity.  Transco
contends that the project is designed to help benefit the public by promoting competitive

Document Accession #: 20230111-3069     Filed Date: 01/11/2023

markets and enhancing the security of natural gas supplies to major delivery points serving the Northeast.[4]

7.     Transco held an open season for the project on March 8, 2019, a supplemental open season from April 28, 2020 to May 28, 2020, and a reverse open season from April 24, 2020 to May 25, 2020.[5]  Additionally, Transco conducted a supplemental open season in May 2021 for a portion of the firm transportation capacity that was not offered in Transco's previous open seasons for the project.  As a result of the open seasons, Transco executed binding precedent agreements for the full project capacity with the following eight project shippers for primary terms ranging from 15 to 17 years.

| Intended Use of the Natural Gas (Dth/d1) by Customer for Regional Energy Access[6] | | | | | | | |
|---|---|---|---|---|---|---|---|
| Customer | Power Generation | Residential | Commercial | Industrial | Other | Total | Location (by State) of End-Use |
| New Jersey Natural Gas Company | — | 296,520 | 56,480 | — | — | 353,000 | New Jersey (100%) |
| Williams Energy Resources | 30,000 | 45,000 | 45,000 | 10,000 | 20,000 | 150,000 | Delaware (9%)<br><br>Maryland (9%)<br><br>New Jersey (57%)<br><br>New York (17%)<br><br>Pennsylvania (9%) |

---

[4] Transco Application at 5-6.

[5] As part of the open season, Transco solicited turnback capacity from its existing customers.  Transco received a binding offer to permanently relinquish 41,400 Dth per day of firm transportation capacity from Transco's Station 200 in Chester County, Pennsylvania, to the Marcus Hook Meter and Regulation Station, located in Delaware County, Pennsylvania (Zone 6 relinquished capacity), and 19,665 Dth per day of firm transportation capacity from the Marcus Hook Meter and Regulation Station to the Post Road Meter Station, located in Delaware County, Pennsylvania, under one existing service agreement.  The relinquished capacity was utilized in designing the project.

[6] Transco December 10, 2021 Response to Environmental Information Request at 45-46.

Docket No. CP21-94-000                                                          4

| | | | | | | |
|---|---|---|---|---|---|---|
| PECO Energy Company | — | 67,000 | 33,000 | — | — | 100,000 | Pennsylvania (100%) |
| South Jersey Resources, LLC | 46,400 | — | 5,000 | 20,000 | — | 71,400 | Delaware (21%) New Jersey (79%) |
| PSEG Power LLC | — | 44,400 | 14,400 | 1,200 | — | 60,000 | New Jersey (100%) |
| Baltimore Gas and Electric Company | — | 37,600 | 2,400 | — | — | 40,000 | Maryland (100%) |
| Elizabethtown Gas Company | — | 22,500 | 7,500 | — | — | 30,000 | New Jersey (100%) |
| South Jersey Gas Company | — | 17,500 | 7,500 | — | — | 25,000 | New Jersey (100%) |

8.     As reflected in the above table, the majority of the project's capacity (approximately 56%) is subscribed by New Jersey LDCs:  New Jersey Natural Gas Co., South Jersey Gas Co., PSEG Power LLC, and Elizabethtown Gas Co., LLC.  PECO Energy Company, a Pennsylvania LDC, and Baltimore Gas and Electric Company, a Maryland LDC, have contracted for 12% and five percent, respectively, of the project capacity.  The remaining project capacity is subscribed by Williams Energy Resources, LLC (18%),[7] a natural gas marketer with a portfolio of various types of customers and South Jersey Resources, LLC (nine percent), a natural gas marketer operating primarily in New Jersey but with wholesale customers throughout the region.[8]

9.     Transco states that all project shippers elected to pay a negotiated rate for service on the project facilities.

---

[7] Both Williams Energy Resources, LLC and Transco are affiliates of Williams Energy Company.  The other seven shippers are not affiliated with Transco.

[8] South Jersey Resources stated that it serves power plants, refineries, and retail customers and has over 100,000 Dth/day of firm commitments off Transco's system but only 71,400 Dth/day of firm capacity to deliver gas to its customers.  The company plans to use the 30,000 Dth/day of subscribed project capacity to meet its firm obligations year-round.  South Jersey Resource Group, LLC April 30, 2021 Motion to Intervene at 5.

Document Accession #: 20230111-3069     Filed Date: 01/11/2023

## II.    **Procedural Matters**

### A.    **Notice, Comments, Interventions, and Protests**

10.    Notice of Transco's application was issued on April 9, 2021, and published in the *Federal Register* on April 16, 2021, with interventions, comments, and protests due on April 30, 2021.[9]

11.    The New Jersey Department of Environmental Protection (NJDEP) filed a timely notice of intervention.[10]    Numerous parties filed timely motions to intervene, and are listed in Appendix A.  Timely, unopposed motions to intervene are granted automatically pursuant to Rule 214 of the Commission's Rules of Practice and Procedure.[11]  The New Jersey League of Conservation Voters and New Jersey Conservation Foundation filed timely,[12] opposed[13] motions to intervene, which were granted by notice.[14]  Untimely motions to intervene were filed by:  Columbia Gas of Virginia, Inc.; UGI Utilities Inc; Slade Sizemore; Constellation Energy Generation, LLC; New Jersey Board of Public Utilities and New Jersey Division of Rate Counsel; Reading Blue Mountain and Northern Railroad Company (Reading Railroad); and Catherine Folio and have been granted by notice.[15]  1.5C LLC, a nonprofit advocating for policies to reduce climate change impacts, filed an untimely motion to intervene that was denied by notice.[16]  On July 11, 2022, the New Jersey Board of Public Utilities (NJ BPU) and the New Jersey

---

[9] 86 Fed. Reg. 20,132 (Apr. 16, 2021).

[10] Timely notices of intervention are granted by operation of Rule 214(a)(2) of the Commission's Rules of Practice and Procedure.  18 C.F.R. § 385.214(a)(2) (2021).

[11] 18 C.F.R. § 385.214(c).

[12] New Jersey League of Conservation Voters and New Jersey Conservation Foundation filed motions to intervene on April 25, 2022, within the comment period of the draft environmental impact statement, which are deemed timely pursuant to the Commission's regulations. 18 C.F.R. § 380.10(a)(i) (2021) (citing 18 C.F.R. § 385.214).

[13] These two interventions were opposed by Transco.

[14] *See* Secretary's September 7, 2022 Notice Granting Intervention.

[15] *See* Secretary's September 8, 2022 Notice Granting Late Intervention; Secretary's November 14, 2022 Notice Granting Late Intervention.

[16] *See* Secretary's September 22, 2022 Notice Denying Late Intervention.

Document Accession #: 20230111-3069     Filed Date: 01/11/2023

Division of Rate Counsel (NJ Rate Counsel) (jointly, New Jersey Agencies) filed an unopposed motion to intervene out of time and on November 18, 2022, the Aquashicola-Pohopoco Watershed Conservancy filed an untimely motion to intervene that was opposed by Transco.  Both the New Jersey Agencies and Aquashicola-Pohopoco Watershed Conservancy have demonstrated that they each have an interest in this proceeding and granting the untimely motion will not delay, disrupt, or otherwise prejudice this proceeding.  Thus, we will grant the New Jersey Agencies and Aquashicola-Pohopoco Watershed Conservancy's untimely motions to intervene pursuant to Rule 214(d) of the Commission's Rules of Practice and Procedure.[17]

12.     Over 200 individuals and groups filed comments and protests regarding various issues, including project purpose and need; alternatives; water resources; wetland impacts; fish, wildlife, and protected species; impacts on recreation; visual impacts; air quality; noise; socioeconomic impacts; environmental justice; cumulative impacts; safety; greenhouse gases (GHG); and climate change.  These concerns are addressed in the final Environmental Impact Statement (EIS) and/or below.

## B.     Prohibited Answers

13.     On November 2, 2022, Transco filed a timely Answer to Catherine Folio's October 18, 2022 Motion to Intervene, stating it did not oppose her request for intervention, but sought to clarify certain representations.  On November 10, 2022, Ms. Folio filed an answer to Transco's November 2, 2022 Answer.  Although the Commission's Rules of Practice and Procedure do not permit answers to answers,[18] we will accept Ms. Folio's answer because it provides information that has assisted in our decision making.

## C.     Request for Evidentiary Hearing

14.     On September 6, 2022, the New Jersey Conservation Foundation filed a motion for an evidentiary hearing for this project to determine the question of need.[19]  On September 21, 2022, Transco filed an answer to the motion.[20]  On September 28, 2022,

---

[17] 18 C.F.R. § 385.214(d).

[18] 18 C.F.R. § 385.213(a)(2) (2021) (prohibiting answers to answers unless ordered by the decisional authority).

[19] New Jersey Conservation Foundation September 6, 2022 Motion for Evidentiary Hearing.

[20] Transco September 21, 2022 Answer.

Document Accession #: 20230111-3069          Filed Date: 01/11/2023

the New Jersey Conservation Foundation filed a motion for leave to answer Transco's answer. The Commission's Rules of Practice and Procedure do not permit answers to answers, and we therefore will not consider New Jersey Conservation Foundation's filing, which does not provide information that assists our decision making.[21] Although our regulations provide for a hearing, neither section 7 of the NGA nor our regulations require that such a hearing be a trial-type evidentiary hearing. When the written record provides a sufficient basis for resolving the relevant issues, it is our practice to provide for a paper hearing.[22] That is the case here. We have reviewed the request for a hearing and conclude that all issues of material fact relating to Transco's proposal, including on the issue of need, are capable of being resolved on the basis of the written record, which contains substantial evidence on this issue. Accordingly, we will deny the request for a formal hearing.

## III.    <u>Discussion</u>

15.    Because the proposed facilities for the REAE project will be used to transport natural gas in interstate commerce, subject to the jurisdiction of the Commission, the proposal is subject to the requirements of sections (c) and (e) of section 7 of the NGA.[23] In addition, Transco's abandonment of facilities is subject to the requirements of section 7(b) of the NGA.[24]

### A.    <u>Abandonment</u>

16.    Section 7(b) of the NGA provides that an interstate pipeline company may abandon jurisdictional facilities or services only if the abandonment is permitted by the present or future public convenience or necessity.[25] In deciding whether a proposed abandonment is warranted, the Commission considers all relevant factors, but the criteria

---

[21] *See supra* n.16.

[22] *See*, e.g.*, Moreau v. FERC*, 982 F.2d 556, 568 (D.C. Cir. 1993) ("[the Commission] need not conduct such [an evidentiary] hearing if [the issues at hand] may be adequately resolved on the written record."); *Tenn. Gas Pipeline Co., LLC*, 158 FERC ¶ 61,110, at P 11 (2017).

[23] 15 U.S.C. §§ 717f(b), (c), (e).

[24] *Id.* § 717f(b).

[25] *Id.*

vary with the circumstances of the particular proposal.[26] Continuity and stability of existing services are the primary considerations in assessing whether the public convenience or necessity allow the abandonment.[27] If the Commission finds that an applicant's proposed abandonment will not jeopardize continuity of existing natural gas transportation services, it will defer to the applicant's business judgment to abandon the facilities.[28]

17.     Transco states that the abandonment component of the REAE project would allow Transco to enhance its existing interstate system by abandoning and replacing obsolete compression units with more reliable and efficient units, reducing system transmission plant costs significantly.[29] Thus, because Transco is replacing the units being abandoned, the abandonment will not jeopardize service to existing customers, will improve operational and maintenance inefficiencies, and increase reliability. Accordingly, we find that the proposed abandonment is permitted by the public convenience or necessity.

## B.    Certificate Policy Statement

18.     The Certificate Policy Statement provides guidance for evaluating proposals to certificate new construction.[30] The Certificate Policy Statement establishes criteria for determining whether there is a need for a proposed project and whether the proposed project will serve the public interest. The 1999 Certificate Policy Statement explains that, in deciding whether and under what terms to authorize the construction of major new natural gas facilities, the Commission balances the public benefits against the potential adverse consequences. The Commission's goal is to give appropriate consideration to the enhancement of competitive transportation alternatives, the possibility of overbuilding, subsidization by existing customers, the applicant's responsibility for unsubscribed capacity, the avoidance of unnecessary disruptions of the

---

[26] *El Paso Nat. Gas Co.*, 148 FERC ¶ 61,226, at P 11 (2014) (*El Paso*).

[27] *Nat'l Fuel Gas Supply Corp.*, 160 FERC ¶ 61,050, at P 17 (2017) (citing *El Paso*, 148 FERC ¶ 61,226 at P 12).

[28] *Id.* (citing *Trunkline Gas Co., LLC*, 145 FERC ¶ 61,108, at P 65 (2013)) (additional citation omitted).

[29] *Id.*

[30] *Certification of New Interstate Nat. Gas Pipeline Facilities*, 88 FERC ¶ 61,227, *corrected*, 89 FERC ¶ 61,040 (1999), *clarified*, 90 FERC ¶ 61,128, *further clarified*, 92 FERC ¶ 61,094 (2000) (Certificate Policy Statement).

Document Accession #: 20230111-3069     Filed Date: 01/11/2023

environment, and the unneeded exercise of eminent domain in evaluating new pipeline construction.

19.     Under this policy, the threshold requirement for applicants proposing new projects is that the applicant must be prepared to financially support the project without relying on subsidization from its existing customers.  The next step is to determine whether the applicant has made efforts to eliminate or minimize any adverse effects the project might have on the applicant's existing customers, existing pipelines in the market and their captive customers, and landowners and communities affected by the route of the new pipeline facilities.[31]  If residual adverse effects on these interest groups are identified after efforts have been made to minimize them, the Commission will evaluate the project by balancing the evidence of public benefits to be achieved against the residual adverse effects.  This is essentially an economic test.  Only when the benefits outweigh the adverse effects on economic interests will the Commission proceed to complete the environmental analysis where other interests are considered.

## 1.     <u>No Subsidy Requirement</u>

20.     As discussed above, the threshold requirement for pipelines proposing new projects is that the applicant must be prepared to financially support the project without relying on subsidization from its existing customers.  The Commission has determined that, in general, where a pipeline proposes to charge incremental rates for new construction serving new incremental load, the pipeline satisfies the threshold requirement that the project will not be subsidized by existing shippers.[32]  Transco proposes to establish an initial incremental recourse reservation rate for firm service using the incremental capacity created by the REAE project.  Its proposed incremental rate is designed to recover the full cost of the expansion facilities, and is higher than Transco's applicable system rate.  Therefore, we find that Transco's existing shippers will not subsidize the expansion project.  Further, as detailed in the Rates section below, Transco has properly allocated the cost of the replacement horsepower at compressor stations 505 and 515 to both project shippers and existing customers.

---

[31]  In 2021, the Commission established the Office of Public Participation (OPP) to support meaningful public engagement and participation in Commission proceedings. OPP provides members of the public, including environmental justice communities, with assistance in FERC proceedings—including navigating Commission processes and activities relating to the Project.

[32]  *See*, e.g*., Transcontinental Gas Pipe Line Corp.*, 98 FERC ¶ 61,155 (2002).

## 2.    **Project Need**

21.    Transco has entered long-term precedent agreements with shippers for 100% of the project's capacity.  Shippers also separately stated their support and need for the project.  South Jersey Gas Company and Elizabethtown Gas Company indicated the "[p]roject will support overall reliability and diversification of energy infrastructure in the Northeast, decreasing peak day constraints caused by limited pipeline takeaway capacity."[33]  The South Jersey Resources Group stated that the project is needed to address "current challenges…including increased natural gas prices during the winter months for consumers in the Northeast, and limited power generation supplies in some regions that hinder the ability to respond to extreme weather events."[34]  New Jersey Natural Gas similarly wrote that the project will allow it to "improve reliability, ensure competitive pricing and price stability, and enhance operating flexibility."[35]  Exelon, the parent company of BGE and PECO, has indicated that the project's firm service will allow it to lessen its need for short-term contracts and more reliably meet winter demand.[36]  PSEG also states that the project will allow it to "meet growing firm demand among its high-priority customers and to address projected peak-day deficits."[37]  Transco also submitted a study, prepared by Levitan and Associates (Transco Levitan Study),[38] which assessed the pipeline capacity available to the six LDC shippers in New Jersey, Pennsylvania, and Maryland that have entered into precedent agreements for Transco's REAE.  The goal of the study was to compare each LDC's forecasted customer requirements under design day criteria to the existing pipeline capacity and on-system storage available to meet those requirements over the study period.[39]  As detailed below,[40] the study finds that the project's capacity is needed to remedy shortfalls in

---

[33] South Jersey Gas Company and Elizabethtown Gas Company Apr. 30, 2021 Motion to Intervene and Comments at 5-6.

[34] South Jersey Resources Group LLC November 9, 2022 Letter.

[35] New Jersey Natural Gas November 9, 2022 Letter.

[36] Exelon April 28, 2021 Comments in Support of Application at 3.

[37] PSEG April 30, 2021 Comments at 2.

[38] Transco April 22, 2022 Response to Additional Information Request at attach. 1D (Transco Levitan Study).

[39] Transco Levitan Study at 7.

[40] *See infra* PP 30-31.

capacity to meet design day requirements[41] and to alleviate constraints in meeting natural gas-fired generation demand during extreme cold events.[42]  Five parties filed comments supporting Transco's need study.[43]

22.      Commenters, including the NJ BPU and the NJ Rate Counsel argue that the project capacity is not needed by the New Jersey LDCs.  The NJ BPU accepted in a decision on June 29, 2022, the findings of a study commissioned from the London Economics International Group (NJ Agencies Study) on "New Jersey's transforming energy system and the future role of its domestic natural gas industry."[44]  The New Jersey

---

[41] The 'design day' is the basis for planning gas capacity requirements.  The design day therefore reflects the highest gas demand an LDC expects to be obligated to serve on an extremely cold winter day.  The peak day is a historical value of gas demand that is adjusted for expected load growth over time and used in estimating a design day.  Each LDC uses its own criteria to define design day, but which is generally defined in a similar, but not uniform way.  The coldest day in 30 years is a commonly used design day standard.  In a recent American Gas Association survey of U.S. natural gas utilities: four percent used a 1-in-50 year risk of occurrence, 36% employed a 1-in-30 year, six percent used a 1-in-20, two LDCs used a 1-in-15, four a 1-in-10 occurrence probability. Fourteen companies utilized an alternative period criterion, ranging from 20 years to 1-in-90 years and 16 companies used other methodologies including multilinear regression, design day weather standard, historical peak and severe weather event.  *American Gas Association*, Energy Analysis:  LDC Supply Portfolio Management during the 2018-2019 Winter Heating Season at 14 (Dec. 2019), https://www.aga.org/wp-content/uploads/2019/12/whs-2018-2019-report-final-12-20 2019-.pdf .

[42] Transco Levitan Study at 52.

[43] Pennsylvania Manufacturer's Association (Karl A. Marrara), New Jersey Natural Gas Company, Exelon Corporation (PECO), South Jersey Gas and Elizabethtown Gas (Timothy W. Rundall), and the American Petroleum Institute (API) all filed comments arguing the Commission should adopt the Transco Levitan Study.

[44] New Jersey Agencies July 11, 2022 Motion to Intervene and Lodge at 4.  The NJ Agencies Study was commissioned in 2020 as part of the NJ BPU stakeholder proceeding initiated in 2019 on whether there is sufficient gas capacity to meet New Jersey's customers' needs, prospectively.  In that proceeding, New Jersey Natural Gas Company submitted a 2019 study by Levitan and Associates, Inc. to the NJ BPU and Environmental Defense Fund and the New Jersey Conservation Fund (NJCF) filed an affidavit from Greg Lander, President of Skipping Stone.  Ultimately, the NJ BPU issued an order on June 6, 2022 (June 2022 BPU Order) accepting the NJ Agencies Study findings.  *Id.*

Agencies Study, discussed in more detail below, concludes the state's LDCs "can easily meet firm demand under [] normal winter weather conditions, [] in cases of colder-than-normal weather on a scale experienced in the past, and [] in the case of a design day through 2030 using existing pipeline capacity."[45]  The NJ BPU decision also directed the gas distribution utilities to consider non-pipeline alternatives identified in the report to ensure sufficient gas capacity.[46]

23.    The New Jersey Conservation Foundation urges the Commission to adopt the NJ Agencies Study conclusion that the project capacity is unneeded and also submitted a study (NJCF Skipping Stone Study) that reaches the same conclusion.[47]  Other commentors also emphasize that the New Jersey Board of Public Utilities "has found that additional gas capacity is not needed in light of the state's emission reduction requirements and current pipeline capacity."[48]

24.    Other commenters also share the New Jersey Agencies' view that the additional natural gas infrastructure is unnecessary.  Some argue that the project is not needed because the region should instead transition to alternative sources of energy to combat climate change.[49]  Sierra Club argues that the project will hinder Pennsylvania's and New Jersey's stated goals to reduce greenhouse gas (GHG) emissions.[50]  Diana Dakey argues that the project is unneeded regional domestic pipeline capacity that is being built to provide producers in the Marcellus region with market access.[51]  Food and Water Watch asserts that the project will become prematurely obsolete and a stranded asset as the country implements policy changes to meet GHG reduction targets.[52]

---

[45] *Id.* at 4-5.

[46] NJ BPU June 29, 2022 Decision at 11.

[47] New Jersey Conservation Foundation July 22, 2022 Motion to Lodge at attach. B (NJCF Skipping Stone Study).

[48] *See* e.g., Food and Water Watch August 29, 2022 Motion to Lodge at 2.

[49] Sierra Club April 30, 2021 Motion to Intervene at 4; Delaware Riverkeeper Network April 30, 2021 Comments at 3-4.

[50] Sierra Club April 30, 2021 Motion to Intervene at 4.

[51] Diana Dakey September 15, 2022 Comments at 1.

[52] Food and Water Watch April 30, 2021 Comments at 3-4.

25.     As discussed below, in considering all evidence in the record, including each of the studies and the binding precedent agreements for 100% of the project capacity, the Commission finds that the construction and operation of the project will provide more reliable service on peak winter days and will increase supply diversity.

### a.     Transco Levitan Study

26.     The Transco Levitan Study finds that, after accounting for firm delivery rights of downstream customers, existing firm capacity in the region would fall short of the LDCs' design day demand of LDC-served customers in New Jersey and Southeastern Pennsylvania during the 2022/23 winter heating season by 345.2 thousand dekatherms per day (MDth/d), and the shortfall would increase to 774 MDth/d by the 2029/30 winter heating season.  By the 2038/39 winter heating season, the shortfall would range between 774.4 MDth/d to 1,345.6 MDth/d, depending on three demand scenarios analyzed in the study.[53]  The study also finds that the project will alleviate constraints that hamper Transco's ability to serve natural gas-fired generation demand in the region during extreme cold events.[54]  To reach these conclusions, the study relied on public market data, state regulatory filings, and assessed low, medium, and high demand growth scenarios.[55]

27.     The study assumes the accuracy of the LDCs' design day demand forecasts,[56] which, by design, are oriented to conservatively ensure reliability.  The study did not examine the degree to which the demand forecasts reflected New Jersey's Energy Master Plan and other energy efficiency and energy policy targets, thus potentially overstating future demand.  Another limitation of the study is that it discounted the availability of any firm capacity held by natural gas wholesalers with primary (but not only) delivery points downstream of New Jersey, as some of this "downstream" capacity has been available to New Jersey shippers in the past through short-term peaking contracts, and may be available in the future on the same short-term basis.[57]  The study does, however, factor in

---

[53] Transco Levitan Study at 2-3.  After 2029/30, the study evaluates three scenarios "Low Demand," which assumes no demand growth after 2029/30, "High Demand," which assumes that demand continues to grow at the same average annual rate, and "Average Demand," which assumes demand grows at the average of the rates in the High Demand and Low Demand scenarios.

[54] Transco Levitan Study at 11.

[55] Transco Levitan Study at 8.

[56] *See supra* n.34.

[57] *See infra* P 28 (discussing the NJ Agencies Study's consideration of

competing demand for natural gas from electric generators, which more accurately
reflects overall future demand for natural gas in the study area than a study focused only
on LDC demand.  This is important because during peak winter days when the demand
for natural gas for heating is highest, delivery requirements of natural gas-fired
generators often also peak.[58]  Generally, the Transco Levitan Study appears consistent
with traditional LDC supply planning.

## b.     NJ Agencies Study and NJ BPU Decision

28.     The NJ Agencies Study finds that new pipeline capacity into the state of
New Jersey is unnecessary because sufficient capacity already exists to serve the state's
LDCs, and will continue to be sufficient if gains in energy efficiency are realized and
non-pipeline alternatives are made available.[59]  We note that the NJ Agencies Study is
relevant only for the 56% of project capacity subscribed by New Jersey LDCs, and is not
reflective of the shipper need for the remaining 44% of the project capacity.  The NJ
Agencies Study uses a 'demand outlook scenario' that reflects the minimum efficiency
gains required by the NJ BPU as of June 10, 2020, and includes assumptions projecting
the efficiency gains from 2025 to 2030.[60]  The NJ Agencies Study argues that the
New Jersey LDCs' expectations of regular, peak, and design day demand are in excess of
the LDCs' own modeling of expected demand growth in those markets.[61]  The study uses

---

"downstream" capacity held by gas wholesalers).

[58] Transco Levitan Study at 7, 77, 92.

[59] NJ Agencies Study at 79.  Five conditions were considered:  (1) a Normal
Winter Day (2,547 thousand dekatherms per day or MDth/d); (2) a Historical Peak Day
(3,967 MDth/d); (3) a Winter Design Day (5,469 MDth/d); (4) a 1- in-90 Design Day
(5,896 MDth/d); and (5) a Perfect Storm of high demand and a large supply disruption
(5,321 MDth/d).  Under the probability scenario of a Winter Design Day, which is the
standard that the natural gas capacity system is built to supply to ensure reliability, LEI
concluded that there would be a surplus of 274 MDth/d.  The risk assessments
determined the only potential natural gas supply shortfall was found during a very rare
"1-in-90 design day" and/or a "perfect storm."  For a 1-in-90 design day, there would be
a shortfall of 153 MDth/d.  A "perfect storm" occurs when there is a pipeline outage on a
design day.  During a perfect storm scenario, LEI predicted a shortfall of 525 MDth/d.

[60] NJ Agencies Study at 23 (citing *New Jersey Board of Public Utilities*, Order
Directing the Utilities to Establish Energy Efficiency and Peak Demand Reduction
Programs (June 10, 2020)).

[61] NJ Agencies Study at 48.

Document Accession #: 20230111-3069    Filed Date: 01/11/2023

LDCs' design day demand forecasts for one set of scenarios, and compares those to another set of scenarios using lower demand forecasts based on historical averages.[62] The study's assumptions differ from the LDCs' demand assumptions by projecting higher energy efficiency[63] gains and fewer oil-to-natural gas conversions for heating purposes, both of which would lead to lower demand for natural gas.[64]  These projections are based on the assumption that New Jersey will achieve its targets with respect to energy efficiency gains and electrification of heating loads.[65]  Further, the NJ Agencies Study concludes that New Jersey LDCs overstate demand growth for design day due to slightly exaggerating historical trends (1.02% versus .95%), assuming energy efficiencies are not gained, and relying on customers switching from oil to natural gas for a portion of demand growth, even though this type of fuel switching will likely slow given state policies which encourage electrification of heating systems.

29.     In addition, the NJ Agencies Study concludes that, while LDCs in New Jersey will need to compete with one another to access firm "downstream" pipeline capacity, i.e., capacity through New Jersey contracted on a firm basis to users with primary delivery points downstream of New Jersey (e.g., in New York and New England), some downstream capacity will be available to New Jersey LDCs.[66]  Specifically, the NJ Agencies Study relied on data from the LDCs of total past volumes of peaking

---

[62] NJ Agencies Study at 12.

[63] Efficiency programs include rebates designed to incentivize efficiency, educational campaigns, energy audits, and retrofit projects.

[64] NJ Agencies Study at 48.  Under the NJ Agencies Study's analysis, including modest efficiency gains but not building electrification or successful implementation of non-pipeline alternatives, the surplus pipeline capacity on a Winter Design Day, considering only firm demand, is five percent.  According to the NJ Agencies Study, insufficient pipeline capacity can occur due to extreme weather, which they term "1-in-90-year" weather, particularly if a major transcontinental pipeline into New Jersey also fails during the weather event (i.e., a "perfect storm" event).  The non-pipeline alternatives studied were:  energy efficiency; voluntary demand response; direct load control; building electrification; renewable natural gas; green hydrogen; liquefied natural gas/compressed natural gas, and advanced leak detection.  *New Jersey Board of Public Utilities*, Exploration of Gas Capacity and Related Issues at 4-5 (June 29, 2022).

[65] NJ Agencies Study at 11.

[66] NJ Agencies Study at 88.

capacity for which they have contracted.[67]  For example, the study assumes that New Jersey Natural Gas Company will contract for 200 MDth/d going forward, based on its past contracting practice, even though New Jersey Natural Gas Company's projected off-system peaking resource use declines from 230.7 MDth/d in 2020/21 to 80.0 MDth/d in 2021/22, and to zero thereafter.  For the winter heating season in years 2025/26 and later, the study projected total off-system peaking resources at a constant 619 MDth/d;[68] i.e., the study assumes that amount of off-system peaking resources from already contracted-for firm "downstream" pipeline capacity can be used by New Jersey LDCs when needed.

30.    The NJ BPU accepted the study's findings that gas demand could be met using non-pipeline alternatives and best practices during supply constraints.  The NJ BPU directed its Division of Reliability and Security to develop a Best Practices Guide and Playbook for capacity related emergencies, with input from the LDCs it regulates, and directed those LDCs to consider the feasibility of non-pipeline alternatives identified in the study to reduce demand.[69]  The NJ BPU June 29, 2022 Decision noted that "[t]his consideration shall include evaluating [non-pipeline alternatives], both currently and as technology develops, to determine if the [non-pipeline alternatives] are cost effective and appropriate for their respective distribution systems."[70]

31.    We recognize that the State of New Jersey has a policy goal to achieve certain environmental targets,[71] and that, as noted above, the state has directed LDCs to consider the feasibility of non-pipeline alternatives in meeting peak-day demand, consistent with those environmental goals.  Nevertheless, there is no requirement under New Jersey law that LDCs adopt non-pipeline alternatives and, moreover, the record suggests that LDCs may decline to adopt non-pipeline alternatives where, for example, they are technically feasible, but not economic.  As such, we find that the record does not support the conclusion that sufficient non-pipeline alternatives will necessarily be in place to eliminate the need for REAE project.  That is particularly so in light of the considerable

---

[67] NJ Agencies Study at 94.

[68] NJ Agencies Study at 98.

[69] NJ BPU June 29, 2022 Decision at 11.

[70] *Id.*

[71] According to its website, the New Jersey Energy Master Plan sets forth a strategic vision for the production, distribution, consumption, and conservation of energy in the State of New Jersey.  No evidence has been submitted in this record as to what tools have been provided to achieve this vision.

uncertainty surrounding forecasts for future penetration of non-pipeline alternatives such as renewable natural gas and green hydrogen given infrastructure, economic, safety, and feedstock-related challenges.  Here, LDC shippers state that the REAE project is needed to ensure supply during a 'design day' to gas heating loads in the multi-state area,[72] and potentially to generators that would provide power for electric heating loads in the same area.  In addition, the NJ Agencies Study is focused on firm demand and thus omits from its analysis interruptible natural gas generator and industrial demand, even though, as the NJ Agencies Study acknowledges, generator and industrial loads are the largest source of growth in natural gas demand in New Jersey.[73]  We find that the weight of the record supports a need for the REAE project, notwithstanding the potential for non-pipeline alternatives at some point in the future.

### c.    NJCF Skipping Stone Study

32.    The NJCF Skipping Stone Study asserts that the current natural gas system is overbuilt and identifies pipeline capacity that Skipping Stone believes is available for use in serving New Jersey.[74]  The study bases this conclusion on the assumption that large volumes of non-New Jersey LDC capacity contracts that pass through New Jersey should be counted as available to New Jersey LDCs even if the primary, firm delivery points of the gas are not in New Jersey.[75]  The NJCF Skipping Stone Study argued that, including secondary delivery points, there is another 1,792 MDth/d of capacity through Station 210 going south; and another 133.5 Dth/d going north.  Skipping Stone seems to imply by this

---

[72] *See*, e.g., South Jersey Resources Group LLC November 9, 2022 Letter; PSEG April 30, 2021 Comments at 2.

[73] NJ Agencies Study at 28-30.  We note that there may be additional uncertainties with the study's shortfall analysis related to interruptible demand.  The study assumes that third-party natural gas suppliers are interruptible customers without accounting for the fact that some commercial and industrial retail choice customers may have firm service contracts.  NJ Agencies Study at 28-30.  Furthermore, the study assumes all electric generator demand is served by interruptible capacity even though some may be served by firm capacity.  *See* NJ Agencies Study at 30 (characterizing supply to the power sector as generally interruptible).

[74] NJCF Skipping Stone Study at 12.  The study argues that current cumulative pipeline capacity in New Jersey is 10 Bcf/d, and exceeds the design day need by nearly 5,000,000 dth/day.  NJCF Skipping Stone Study at 3.

[75] *See* NJCF Skipping Stone Study at 4 (defining "in path stranded capacity" as capacity traversing New Jersey where the downstream location has more firm capacity delivering gas than capacity to take away gas or more market demand to accept the gas).

that there is much more capacity available to the LDCs.[76]  This assumption ignores the fact that if the downstream firm capacity customers exercise their rights to the capacity, then New Jersey LDCs will not be able to rely on it.

33.     In addition, the NJCF Skipping Stone Study did not address future reliability needs because it ignores 'design day' planning principles – i.e., it makes no effort to estimate the highest gas demand an LDC may be obligated to serve on an extremely cold winter day during the planning horizon.  Instead, it focused exclusively on historical peak demand from LDCs (which is less than design day demand) and ignored demand from other customers, including electric generators and industrials.  It emphasized the flexibility of supply options during times in which the system is not constrained, rather than examining supply options during times, such as design days, when the system is constrained.  Based on the foregoing, we find that this study significantly understates the need for additional pipeline capacity to meet possible extreme cold weather customer demand, including the demand for heating by residential customers under such conditions, rendering it unhelpful in determining project need under the Certificate Policy Statement.

### d.     Project Need Conclusions

34.     Both the NJ Agencies Study and the Transco Levitan Study provide valuable information for the Commission's consideration.  However, as detailed above, the studies use different inputs regarding Design Day projections, the availability to New Jersey shippers of existing contracted-for downstream capacity, and the timing of achieving energy efficiency gains and non-pipeline alternatives, which leads to the differences in each study's respective conclusion about the extent of a natural gas pipeline capacity deficit for New Jersey LDCs.  This difference in input assumptions may reflect differences in risk tolerance:  the Transco Levitan Study reflects a lower risk tolerance because LDCs have an obligation to serve their customers (both residential and industrial) even on extreme weather days, while the NJ Agencies Study reflects a higher risk tolerance, relying as it does on the achievement of future actions on energy efficiency and non-pipeline alternatives.  After due consideration of both studies and other evidence as discussed, the Commission finds that the construction and operation of the project will provide more reliable service on peak winter days and will provide cost benefits by increasing supply diversity.  However, we do note the New Jersey Agencies' concerns and emphasize that, as required in ordering paragraph (E), the project may not proceed unless Transco executes firm contracts for 100% of the project capacity for the same terms of service represented in signed precedent agreements.

---

[76] NJ Agencies Study at 92.

35.    Sierra Club's general argument that the project is not needed because of Pennsylvania's and New Jersey's commitments to reduce GHG emissions by 80% by 2050[77] is not sufficient to undermine our finding that Transco has demonstrated a need for the project.  Project shippers note that the project capacity offers a more cost-effective means to satisfy their statutory obligations to provide safe, reliable, affordable, and clean natural gas service to heat homes and businesses than continued reliance on third-party peaking services in the face of growing demand.[78]  Moreover, the expected end-use for gas to be transported by the project is not just in Pennsylvania and New Jersey, but throughout the Northeast, including Maryland, Delaware, and New York.

### 3.    Impacts on Existing Customers, Existing Pipelines and Their Customers, and Landowners and Surrounding Communities

36.    As discussed above, Transco's existing shippers will not subsidize the proposed project.  Further, the proposed project will have no adverse effect on Transco's existing customers because the proposed expansion facilities are designed to provide incremental service to meet the needs of the project shippers without degradation of service to Transco's existing customers.[79]  We also find that there will be no adverse impact on other pipelines in the region or their captive customers.  The project shippers will use the project's capacity to serve the incremental growth requirements of their markets, not to displace existing service providers.

37.    We are further satisfied that Transco has taken steps sufficient to minimize adverse impacts on landowners and surrounding communities.  The proposed facilities

---

[77] Sierra Club April 30, 2021 Comments at 2.

[78] South Jersey Gas Company and Elizabethtown Gas Company Apr. 30, 2021 Motion to Intervene and Comments at 5-6.  *See also* New Jersey Natural Gas Company Nov. 9, 2022 Comments (urging the Commission to approve the project stating that it will improve reliability, ensure competitive pricing and price stability, and enhance operating flexibility); South Jersey Resources Group LLC Nov. 9, 2022 Comments (asserting that the project will help address current challenges including increased natural gas prices during the winter months for consumers in the Northeast and limited power generation supplies in some regions that hinder the ability to respond to extreme weather events); and South Jersey Gas Company and Elizabethtown Gas Company Nov. 9, 2022 Comments (stating the REAE Project is critical to ensure reliable and affordable natural gas supply for New Jersey in both the near and long term).

[79] The project will improve reliability and efficiency through the abandonment and replacement of horsepower at compressor stations 505 and 515 with more modern, energy efficient compression units.  Application at 10-11.

were designed to use, to the extent practicable, existing rights-of-way and areas adjacent to existing rights-of-way.[80] The total acreage to be disturbed for construction of the project facilities is 792.3 acres, of which Transco would maintain 175.6 acres of the permanent pipeline right-of-way.[81] Transco would restore the remaining acreage and allow it to revert to preconstruction uses.[82] Transco states that it held stakeholder meetings in June and July of 2020, to inform the community of the project and solicit feedback from homeowners, landowners, and other stakeholders.[83] Transco also participated in the Commission's pre-filing process, and states that it has been working to address landowner and community concerns and will continue to do so.[84] Thus, we find that Transco has taken sufficient steps to minimize adverse impacts on landowners and surrounding communities for purposes of our consideration under the Certificate Policy Statement.

### 4.     Certificate Policy Statement Conclusion

38.     The proposed project will enable Transco to provide 829,400 Dth/d of firm transportation service as well as increase the reliability and efficiency of compression units on Transco's system, and is fully subscribed. Accordingly, we find that Transco has demonstrated a need for the project. Further, the project will not have adverse economic impacts on existing shippers of other pipelines and their existing customers and will have minimal impacts on the interests of landowners and surrounding communities. Therefore, we concluded that the project is consistent with the criteria set forth in the Certificate Policy Statement and analyze the environmental impacts of the project below.[85]

---

[80] Application at 18-19.

[81] July 29, 2022 Final EIS at 4-81.

[82] Final EIS at 4-81.

[83] Application at 19.

[84] *Id.* at 19-20. *See also* Transco November 1, 2022 Answer (stating that "Transco is committed to amicably negotiating the rights to land required by the project with affected landowners.").

[85] *See* Certificate Policy Statement, 88 FERC at 61,745-46 (explaining that only when the project benefits outweigh the adverse effects on the economic interests will the Commission then complete the environmental analysis).

### C.    Rates

39.    Transco estimates that the total cost of constructing the project is $950,047,254, of which $827,999,038 is allocated to the incremental service on the project and $122,048,216 is allocated to the compressor station replacement activities at Stations 505 and 515.[86]  Transco states that, consistent with criteria set forth in the 1999 Certificate Policy Statement,[87] the project costs are allocated between the incremental project shippers and the existing shippers based on the incremental HP and replacement HP, each represented as a percentage of the total HP.[88]  Incremental charges for the project reflect only costs associated with incremental service and do not include compressor station replacement costs at Stations 505 and 515.[89]

### 1.    Incremental Recourse Rates

40.    Transco proposes an incremental recourse rate under Rate Schedule FT for service using the capacity created by the project.  Transco proposes an incremental daily firm recourse reservation charge of $0.50550 per Dth/d, and an applicable usage charge of $0.00429 per Dth based on a 100% load factor.  Transco derived its proposed incremental firm recourse reservation charge based on a fixed first-year cost-of-service of $153,030,293[90] and an annual design capacity of 302,731,000 Dth.  Transco's proposed incremental charges are based on cost-of-service factors approved by the Commission including:  an onshore depreciation rate of 3.00% for Solar turbine compressors and

---

[86] Application at Exh. K.

[87] *See* Certificate Policy Statement, 88 FERC at 61,746 (explaining that "Projects designed to improve existing service for existing customers by replacing existing capacity, improving reliability or providing flexibility, are for the benefit of existing customers" and are permitted to be rolled in).

[88] Transco notes that the existing compressor units at Stations 505 and 515 are obsolete and that replacing the existing units as part of the Project will enable Transco to reduce the non-incremental (i.e., system) transmission plant costs, rather than replace the existing units in a standalone project.

[89] Application at Exh. K.

[90] The total fixed cost of service of $153,030,293 includes $1,918,795 related to the Zone 6 relinquished capacity costs.  Application at Exh. P, Page 1 of 2, Line No. 14.

2.50% for all other onshore transmission facilities, including negative salvage;[91] and a pre-tax return of 12.83%, which reflects a 12.5% return on equity.[92]

41.     Transco's proposed incremental charges and cost of service include $1,918,795 of costs related to the Zone 6 capacity relinquished in response to the reverse open season held from April 24, 2020, to May 25, 2020.  Commission policy requires that in an NGA section 7 proceeding, no costs associated with existing capacity that is used for an incremental project be included in the incremental project's cost of service for purposes of establishing initial rates; rather, the initial incremental recourse rates should be designed to reflect only the incremental costs associated with the project.[93]  Therefore, the costs associated with the existing Zone 6 relinquished capacity should be removed from the cost of service used in Transco's proposed incremental rate calculations.[94]  We direct Transco to recalculate its proposed initial incremental firm recourse reservation charge and usage charge under Rate Schedule FT to remove the $1,918,795 of Zone 6 relinquished capacity costs.

42.     Under the Commission's Certificate Policy Statement, there is a presumption that incremental rates should be charged for proposed expansion capacity if the incremental rate exceeds the maximum system recourse rate.[95]  Transco's proposed incremental daily reservation charge of $0.50550 per Dth/d plus the proposed usage charge of $0.00429 per Dth is higher than Transco's current Rate Schedule FT, Zone 6-6, system maximum daily

---

[91] Stated depreciation rates included in the Stipulation and Agreement (Settlement) approved by the Commission on March 24, 2020 in Docket No. RP18-1126-000, et al. *See Transcontinental Gas Pipe Line Co., LLC*, 170 FERC ¶ 61,245 (2020).

[92] Transco notes that use of a 12.83% pre-tax return includes the ROE and income tax rates approved in the Settlement approved by the Commission on March 24, 2020 in Docket No. RP18-1126-000, et al., and is consistent with its initial rates filed for its Leidy South Project, the first expansion project filed by Transco subsequent to its Settlement.

[93] *Tenn. Gas Pipeline Co., L.L.C.*, 161 FERC ¶ 61,265, at P 21 (2017); *Texas E. Transmission, LP*, 165 FERC ¶ 61,132, at P 19 (2018).

[94] While the Commission rejects Transco's proposal to include in the incremental recourse rates the costs associated with the relinquished capacity, this finding is without prejudice to Transco proposing in its next section 4 rate proceeding an incremental rate design that reallocates those costs, which are already include in Transco's currently effective system rates, to the rates for the subject services.

[95] Certificate Policy Statement, 88 FERC at 61,745.

reservation charge of $0.12698 per Dth/d plus the system maximum usage charge of $0.00416 per Dth. With removal of the costs associated with the relinquished capacity costs, we believe Transco's revised incremental rates will still be above the system rates and therefore we approve an incremental rate for this project. In addition, Transco is directed to charge the applicable system interruptible rate for the expansion capacity.

### 2. Pre-determination of Rolled-in Rates for Station 505 and Station 515 Compressor Units

43.    Transco proposes to abandon in place eight existing internal combustion engine-driven compressor units at Station 505 (approximately 16,000 HP) and five existing internal combustion engine-driven compressor units at Station 515 (approximately 17,000 HP), which currently serve Transco's existing system customers, and to replace these units with more modern, energy efficient equivalent horsepower. Transco states the existing units are obsolete, less energy efficient, less reliable, and costly to maintain and operate.[96] Of the total 30,810 HP being installed at Station 505, Transco states that it has allocated the costs associated with 51.93% (16,000 HP) of the compression to existing shippers and the remaining 48.07% of the costs are allocated to project shippers. Of the total 58,684 HP being installed at Station 515, Transco states that costs associated with 28.97% (17,000 HP) of the compression are allocated to existing shippers and the remaining 71.03% of the costs are allocated to project shippers.[97] Transco states that it used site-rated horsepower for the allocation instead of the ISO rating to better determine the horsepower used by the project shippers and Transco's existing customers. Transco estimates that the total cost of the replacement horsepower allocated to existing shippers will be $122,048,216 ($78,961,745 for Station 505 and $43,086,471 for Station 515).[98]

44.    To support a request for a predetermination that a pipeline may roll the costs of a project into its system-wide rates in its next NGA section 4 rate proceeding, a pipeline must demonstrate that rolling in the costs associated with the construction and operation of new facilities will not result in existing customers subsidizing the expansion. The Certificate Policy Statement recognizes the appropriateness of rolled-in rate treatment for projects constructed to improve the reliability of service to existing customers or to improve service by replacing existing capacity, rather to increase levels of service.[99] Here, Transco states the existing compressor units are obsolete, less energy efficient, less

---

[96] Application at 10.

[97] *Id.* at 11-12.

[98] *Id.* at Exh. K.

[99] Certificate Policy Statement, 88 FERC ¶ 61,227 at n.12.

Document Accession #: 20230111-3069          Filed Date: 01/11/2023

reliable, and costly to maintain and operate.  By replacing them, Transco and its customers will benefit from the increased reliability of the new equipment, resulting in fewer maintenance outages, less downtime, decreased air emissions, less fuel consumption and costs, and lower operation and maintenance costs.  Accordingly, we grant Transco a predetermination that it may roll the Station 505 and Station 515 replacement costs into its system rates in a future NGA section 4 rate case, absent a significant change in circumstances.

### 3.  Fuel

45.    Transco proposes to apply its generally applicable system fuel retention and electric power rates to the project.  Transco requests a predetermination of rolled-in rate treatment of project fuel.[100]  In support of its proposal, Transco provided a fuel study in Exhibit Z-1 to demonstrate that using the generally applicable system fuel retention percentage and electric power rates for the capacity created by the project will not result in existing shippers on the system subsidizing the project.

46.    Transco's fuel study demonstrates that the project will result in an overall reduction in system fuel use (gas fuel consumption plus the gas equivalent of electric power consumption) attributable to existing customers.  The fuel study uses a representative sampling of load profiles generated from actual system operating conditions during the annual period from July 1, 2019, to June 30, 2020.  Transco states that it chose 10 representative days from this period to assess the system impact of the project facilities over a wide range of system load factors.  Transco demonstrates that there is a negative 7.43% average change in fuel due to the project, demonstrating that the project facilities yield a net system fuel benefit to existing system customers.  Accordingly, we will approve Transco's proposal to charge its generally applicable system fuel retention percentage and system electric power rates for the project facilities.

### 4.  Reporting Incremental Costs

47.    Section 154.309 of the Commission's regulations includes bookkeeping and accounting requirements applicable to all expansions for which incremental rates are charged.  The requirements ensure that costs are properly allocated between pipelines' existing shippers and incremental expansion shippers.[101]  Therefore, we require Transco to keep separate books and accounting of costs and revenues attributable to the incremental capacity created by the project and internally for the replacement capacity for the Station 505 and Station 515 Compressor Units in the same manner as required by

---

[100] Application at Exh. Z-1 at 2.

[101] 18 C.F.R. § 154.309 (2021).

section 154.309 of the Commission's regulations.[102]  The books should be maintained with applicable cross-reference and the information must be in sufficient detail so that the data can be identified in Statements G, I, and J in any future NGA section 4 or 5 rate case, and the information must be provided consistent with Order No. 710.[103]

### 5.    <u>Negotiated Rates</u>

48.     Transco proposes to provide service to the project shippers under negotiated rate agreements.  Transco must file either its negotiated rate agreements or tariff records setting forth the essential terms of the agreements in accordance with the Alternative Rate Policy Statement[104] and the Commission's negotiated rate policies.[105]

### D.    <u>Environmental Analysis</u>

49.     On July 24, 2020, the Commission issued a Notice of Intent to Prepare an Environmental Assessment for the Planned Regional Energy Access Expansion Project, Request for Comments on Environmental Issues, and Notice of Public Virtual Scoping

---

[102] *Id.  See Gulf S. Pipeline Co., LLC*, 173 FERC ¶ 61,049, at P 6 (2020) (for projects that use existing system rates for the initial rates, the Commission's requirement for separate books and accounting applies only to internal books and records).

[103] *See Revisions to Forms, Statements, & Reporting Requirements for Nat. Gas Pipelines*, Order No. 710, 122 FERC ¶ 61,262, at P 23 (2008).  In *Gulf South*, the Commission clarified that a pipeline charging its existing system rates for a project is not required to provide books and accounting consistent with Order No. 710.  However, a pipeline is required to maintain its internal books and accounting such that it would have the ability to include this information in a future FERC Form No. 2 if the rate treatment for the project is changed in a future rate proceeding.

[104] *Alts. to Traditional Cost-of-Serv. Ratemaking for Nat. Gas Pipelines; Regul. of Negotiated Transportation Servs. of Nat. Gas Pipelines*, 74 FERC ¶ 61,076, *clarification granted*, 74 FERC ¶ 61,194, *order on reh'g and clarification*, 75 FERC ¶ 61,024, *reh'g denied*, 75 FERC ¶ 61,066, *reh'g dismissed*, 75 FERC ¶ 61,291 (1996), *petition denied sub nom. Burlington Res. Oil & Gas Co. v. FERC*, 172 F.3d 918 (D.C. Cir. 1998) (Alternative Rate Policy Statement).

[105] *Nat. Gas Pipelines Negotiated Rate Policies & Pracs.; Modification of Negotiated Rate Pol'y*, 104 FERC ¶ 61,134 (2003), *order on reh'g and clarification*, 114 FERC ¶ 61,042, *reh'g dismissed and clarification denied*, 114 FERC ¶ 61,304 (2006).

Document Accession #: 20230111-3069     Filed Date: 01/11/2023

Sessions (NOI), which was published in the Federal Register on July 30, 2020.[106]  Upon review of Transco's application filing on March 26, 2021, and the comments received in response to the Notice of Application on April 9, 2021, Commission staff determined that an environmental impact statement (EIS), rather than an environmental assessment, should be prepared.  On October 19, 2021, the Commission issued a Notice of Intent to Prepare an Environmental Impact Statement, Request for Comments on Environmental Issues, and Schedule for Environmental Review (EIS NOI), which was published in the Federal Register on October 28, 2021.[107]  The NOI and EIS NOI were mailed to the parties on the environmental mailing list, which included federal and state resource agencies; elected officials; environmental groups and non-governmental organizations; Native Americans Tribes; potentially affected landowners (as defined in the Commission's regulations[108]); local libraries and newspapers; and other stakeholders who had indicated an interest in the project.  Issuance of the NOI and EIS NOI opened separate 30-day formal scoping periods which expired on August 24, 2020, and November 19, 2021, respectively.  Prior to issuance of the draft EIS, the Commission received 22 oral comments at the three virtual public scoping sessions held during the pre-filing review process and 377 written comments, including about 250 form letters expressing opposition or support for the project.

50.     To satisfy the requirements of the National Environmental Policy Act (NEPA),[109] Commission staff issued on March 2, 2022, a draft EIS for the project, addressing all substantive environmental comments received prior to issuance.   The U.S. Environmental Protection Agency (EPA) and U.S. Army Corps of Engineers participated as cooperating agencies in the preparation of the EIS.  The draft EIS was filed with the EPA and a formal notice of availability was issued in the *Federal Register* on March 11, 2022,[110] establishing a 45-day comment period that ended on April 25, 2022.  The comment period provided opportunity for comments on the draft EIS either in the form of written comments and/or oral comments received at three separate public comment sessions conducted via teleconference.  In response to the draft EIS, we received 23 oral

---

[106] 85 Fed. Reg.  45,869 (July 30, 2020).  The Notice of Intent was issued during the Commission's pre-filing review process for Transco's project that began on June 18, 2020, in Docket No. PF20-3-000.

[107] 86 Fed. Reg. 59,707 (Oct. 28, 2021).

[108] 18 C.F.R. pt. 157.6(d) (2021).

[109] 42 U.S.C. §§ 4321 *et seq*.  *See also* 18 C.F.R. pt. 380 (2021) (Commission's regulations implementing NEPA).

[110] 87 Fed. Reg. 14,004 (Mar. 11, 2022)

Document Accession #: 20230111-3069    Filed Date: 01/11/2023
Docket No. CP21-94-000                                                    27

comments at the public comment sessions and 166 written comment letters.  Overall, comments concerned project purpose and need, alternatives, water resources, wetland impacts, fish, wildlife, protected species, impacts on recreation, visual impacts, air quality, noise, socioeconomic impacts, environmental justice, cumulative impacts, safety, greenhouse gas emissions (GHG), and climate change.

51.    Commission staff issued the final EIS on July 29, 2022, and published a notice of the availability in the *Federal Register* on August 4, 2022.[111]  The final EIS addresses: geology; soils; groundwater; surface water; wetlands; aquatic resources; vegetation and wildlife (including threatened, endangered, and other special-status species); land use and visual resources; cultural resources; socioeconomics (including environmental justice); air quality and noise; GHGs and climate change; reliability and safety; and alternatives. The final EIS addresses all substantive environmental comments received on the draft EIS and concludes that construction and operation of the project would result in some adverse environmental impacts.  However, the final EIS determined that most of these impacts would be temporary and would occur during construction (e.g., impacts on land use, traffic, and noise).  With the exception of potential impacts on climate change, the EIS concludes that impacts would be reduced to less than significant levels through implementation of Transco's proposed avoidance, minimization, and mitigation measures and Commission staff recommendations, which we have adopted herein as conditions.[112] The Commission received comments on the final EIS from U.S. Fish and Wildlife Service (FWS) and EPA, which are addressed below, as are environmental issues of concern, including climate change and impacts on environmental justice communities.[113]

### 1.    Threatened and Endangered Species

52.    In its comments on the final EIS, the FWS provided a response to Commission staff's request for concurrence regarding the effect of the project on federally listed endangered, threatened, and proposed species in Pennsylvania and New Jersey.  The FWS, Pennsylvania Field Office,  concurred with Commission staff's determination that the project may affect, but is not likely to adversely affect two federally listed endangered species, the Indiana bat (*Myotis sodalis*) and northeastern bulrush (*Scirpus ancistrochaetus*), and two species listed as threatened, the northern long-eared bat

---

[111] 87 Fed. Reg. 47,741 (Aug. 4, 2022).

[112] Final EIS at ES-11, 5-1.

[113] The Delaware River Keeper Network also filed a copy of its request to the Pennsylvania Department of Environmental Protection for an extension of time to comment on certain state permits pending at the Pennsylvania DEP.

(*Myotis septentrionalis*) and bog turtle (*Glyptemys muhlenbergii*).[114]  With this concurrence, Endangered Species Act consultation with the FWS is complete.  The final EIS had also recommended that Transco file final bat conservation measures and mitigation developed in coordination with the Pennsylvania Field Office of the FWS. Because Transco provided the FWS with the final bat conservation measures[115] and the FWS found these acceptable, we are not including the EIS' recommendation in Appendix B to this Order.

## 2.    Environmental Justice

53.    In conducting NEPA reviews of proposed natural gas projects, the Commission follows the instruction of Executive Order 12898, which directs federal agencies to identify and address "disproportionately high and adverse human health or environmental effects" of their actions on minority and low-income populations (i.e., environmental justice communities).[116]  Executive Order 14008 also directs agencies to develop "programs, policies, and activities to address the disproportionately high and adverse human health, environmental, climate-related and other cumulative impacts on disadvantaged communities, as well as the accompanying economic challenges of such impacts."[117]  Environmental justice is "the fair treatment and meaningful involvement of all people regardless of race, color, national origin, or income with respect to the

---

[114] *See* U.S. Fish and Wildlife Service September 1, 2022 Concurrence.

[115] *See* Transco September 12, 2022 Supplemental Information on Correspondence with U.S. Fish and Wildlife Service.

[116] Exec. Order No. 12,898, 59 Fed. Reg. 7629 (Feb. 16, 1994).  While the Commission is not one of the specified agencies in Executive Order 12898, the Commission nonetheless addresses environmental justice in its analysis, in accordance with our governing regulations and guidance, and statutory duties.  *See* 15 U.S.C. § 717f; *see also* 18 C.F.R. § 380.12(g) (2021) (requiring applicants for projects involving significant aboveground facilities to submit information about the socioeconomic impact area of a project for the Commission's consideration during NEPA review); FERC, *Guidance Manual for Environmental Report Preparation* at 4-76 to 4-80 (Feb. 2017), https://www.ferc.gov/sites/default/files/2020-04/guidance-manual-volume-1.pdf.

[117] Exec. Order No. 14,008, 86 Fed. Reg. 7619 (Feb. 1, 2021).  The term "environmental justice community" includes disadvantaged communities that have been historically marginalized and overburdened by pollution.  *Id.* at 7629.  The term also includes, but may not be limited to minority populations, low-income populations, or indigenous peoples.  *See* EPA, EJ 2020 Glossary (Aug. 18, 2022), https://www.epa.gov/environmentaljustice/ej-2020-glossary.

development, implementation, and enforcement of environmental laws, regulations, and policies."[118]

54.    Consistent with the Council on Environmental Quality (CEQ)[119] and EPA[120] guidance, the Commission's methodology for assessing environmental justice impacts

---

[118] EPA, *Learn About Environmental Justice*, https://www.epa.gov/environmentaljustice/learn-about-environmental-justice (Sep. 6, 2022).  Fair treatment means that no group of people should bear a disproportionate share of the negative environmental consequences resulting from industrial, governmental, and commercial operations or policies.  *Id.*  Meaningful involvement of potentially affected environmental justice community residents means:  (1) people have an appropriate opportunity to participate in decisions about a proposed activity that may affect their environment and/or health; (2) the public's contributions can influence the regulatory agency's decision; (3) community concerns will be considered in the decision-making process; and (4) decision makers will seek out and facilitate the involvement of those potentially affected.  *Id.*

[119] CEQ, *Environmental Justice:  Guidance Under the National Environmental Policy Act* 4 (Dec. 1997) (CEQ's *Environmental Justice Guidance*), https://ceq.doe.gov/docs/ceq-regulations-and-guidance/regs/ej/justice.pdf.  CEQ offers recommendations on how federal agencies can provide opportunities for effective community participation in the NEPA process, including identifying potential effects and mitigation measures in consultation with affected communities and improving the accessibility of public meetings, crucial documents, and notices.  There were opportunities for public involvement during the Commission's prefiling and environmental review processes (final EIS at 1-5).  *See also supra* P 48.  Transco states that it held in-person and virtual informational open houses in June and July 2020 in the county of each major Project component to inform the public about the project, enable the public to view maps of the Project, and provide the public an opportunity to ask questions about the Project.  Transco further states that it engaged with organizations that support low-income and minority communities to extend access to communities that may not be reachable through traditional means and worked with the Community Action Association of Pennsylvania to improve communication with low-income communities.  Additionally, Transco states that the Project website was translated into Spanish and that project materials in English and Spanish were placed in community gathering centers and local venues including discount or grocery stores, minority -owned businesses, and faith-based institutions.  See Final EIS at 4-131 and 4-132.

[120] *See generally* EPA, *Promising Practices for EJ Methodologies in NEPA Reviews* (Mar. 2016) (Promising Practices), https://www.epa.gov/sites/default/files/2016-

considers:  (1) whether environmental justice communities (e.g., minority or low-income populations)[121] exist in the project area; (2) whether impacts on environmental justice communities are disproportionately high and adverse; and (3) possible mitigation measures.  As recommended in *Promising Practices*, the Commission uses the 50% and the meaningfully greater analysis methods to identify minority populations.[122]  Specifically, a minority population is present where either:  (1) the aggregate minority population of the block groups in the affected area exceeds 50%; or (2) the aggregate minority population in the block group affected is 10% higher than the aggregate minority population percentage in the county.[123]

55.     CEQ's *Environmental Justice Guidance* also directs low-income populations to be identified based on the annual statistical poverty thresholds from the U.S. Census Bureau.  Using *Promising Practices'* low-income threshold criteria method, low-income populations are identified as block groups where the percent of a low-income population in the identified block group is equal to or greater than that of the county.

56.     To identify potential environmental justice communities during preparation of the EIS, Commission staff used 2019 U.S. Census American Community Survey data[124] for the race, ethnicity, and poverty data at the state, county, and block group level.[125]

---

08/documents/nepa_promising_practices_document_2016.pdf.

[121] *See generally* Exec. Order No. 12,898, 59 Fed. Reg. 7629 (Feb. 16, 1994).  Minority populations are those groups that include:  American Indian or Alaskan Native; Asian or Pacific Islander; Black, not of Hispanic origin; or Hispanic.

[122] *See Promising Practices* at 21-25.

[123] Here, Commission staff selected the counties as the reference communities to ensure that affected environmental justice communities are properly identified.  A reference community may vary according to the characteristics of the particular project and the surrounding communities.

[124] U.S. Census Bureau, American Community Survey 2019 ACS 5-Year Estimates Detailed Tables, File# B17017, Poverty Status in the Past 12 Months by Household Type by Age of Householder, https://data.census.gov/cedsci/table?q=B17017; File #B03002 Hispanic or Latino Origin By Race, https://data.census.gov/cedsci/table?q=b03002.

[125] For this project, we determined that a 1-mile radius around the proposed aboveground facilities was the appropriate unit of geographic analysis for assessing project impacts on the environmental justice communities.  A 1-mile radius is sufficiently broad considering the likely concentration and range of construction emissions, noise,

Additionally, in accordance with *Promising Practices*, staff used EJScreen, EPA's environmental justice mapping and screening tool, as an initial step to gather information regarding minority and low-income populations; potential environmental quality issues; environmental and demographic indicators; and other important factors.

57.     Once staff collected the block group level data, as discussed in further detail below, staff conducted an impacts analysis for the identified environmental justice communities and evaluated health or environmental hazards, the natural physical environment, and associated social, economic, and cultural factors to determine whether impacts were disproportionately high and adverse on environmental justice communities and also whether those impacts were significant.[126]  Commission staff assessed whether impacts to an environmental justice community were disproportionately high and adverse based on whether those impacts were predominately borne by that community, consistent with EPA's recommendations in *Promising Practices*.[127]  Identified project impacts and proposed mitigation measures are discussed below.

58.     As presented in the final EIS, 47 block groups out of 104 block groups near the project facilities exceed the defined thresholds for minority or low-income communities and are, therefore, environmental justice communities.[128]  Of those 47 block groups, 11 have a minority population that either exceeds 50% or is meaningfully greater than their respective counties, 11 have a low-income population that is equal to or greater than their respective counties, and 25 have both a minority population and a low-income population that exceed the respective thresholds.  Project work within the identified environmental justice communities includes the construction and operation of portions of the Regional Energy Lateral and the Effort Loop; construction and operation of the new

---

traffic impacts and visual impacts proximal to the proposed facilities.

[126] *See Promising Practices* at 33 (stating that "an agency may determine that impacts are disproportionately high and adverse, but not significant within the meaning of NEPA" and in other circumstances "an agency may determine that an impact is both disproportionately high and adverse and significant within the meaning of NEPA").

[127] *Id.* at 44-46 (explaining that there are various approaches to determining whether an action will cause a disproportionately high and adverse impact, and that one recommended approach is to consider whether an impact would be "predominantly borne by minority populations or low-income populations").  We recognize that EPA and CEQ are in the process of updating their guidance regarding environmental justice and we will review and incorporate that anticipated guidance in our future analysis, as appropriate.

[128] Final EIS Table 4.7.8-1 at 4-135.

Document Accession #: 20230111-3069     Filed Date: 01/11/2023
Docket No. CP21-94-000                                                                    32

Compressor Station 201; and modifications to existing Compressor Stations 195, 200, 207, and 505, Camden Meter and Regulating (M&R) Station, and the Lawnside M&R Station.  The Mt. Laurel M&R Station is not located within an environmental justice community, but there are environmental justice communities within a one-mile radius of the facility.  Neither Compressor Station 515 nor the Beaver Dam Meter Station are in proximity to an environmental justice block group.

59.     The final EIS disclosed impacts on the identified environmental justice communities in proximity to the project facilities including groundwater, visual, socioeconomic, traffic, and air and noise impacts from construction and operation. Environmental justice concerns are not present for other resource areas due to the minimal overall impact the project would have on them.

## a.     **Groundwater Impacts**

60.     Construction, including blasting, could cause physical damage to water wells or diminish the yield and water quality of wells and springs near the project facilities.  As discussed in the EIS, approximately 48 wells within 150 feet of the project facilities are located in environmental justice communities.[129]  To reduce potential for impact, Transco is required to implement Transco's *Upland Erosion Control, Revegetation and Maintenance Plan* and *Wetland and Waterbody Construction and Mitigation Procedures*, Transco's *Construction Spill Prevention and Response Procedures for Oil and Hazardous Materials*, Blasting Plan, and other best management practices designed to minimize erosion and protect environmental resources.[130]  Transco is also required to provide temporary water supply if a well or spring are impacted.[131]  With implementation of these mitigation measures, impacts on environmental justice communities associated with groundwater and well impacts would be less than significant.[132]  The final EIS found that environmental justice communities in the study area would not experience cumulative impacts on groundwater.[133]  We agree.

---

[129] Final EIS at 4-154.

[130] Final EIS at 4-154; *see also* Final EIS at 4-20, app. C (identifying and detailing impacts on water wells).

[131] Final EIS at 4-23, 4-155.

[132] Final EIS at 4-155.

[133] Final EIS at 4-208.

Document Accession #: 20230111-3069      Filed Date: 01/11/2023

### b.      Visual Impacts

61.      With respect to visual impacts on environmental justice populations, as described in the EIS, impacts on visual and/or aesthetic resources during the construction of the pipeline and aboveground facilities are expected to be temporary and minor.[134] Permanent visual impacts may exist along the pipeline rights-of-way and are expected to be minor.  As discussed in the EIS, short-term visual impacts on environmental justice communities near Compressor Station 201 would be significant and long-term visual impacts would be less than significant.[135]  To minimize permanent visual impacts on environmental justice communities from construction and operation of Compressor Station 201, Transco is required to provide tree plantings consistent with its visual screening plan.[136]  Visual impacts on environmental justice communities from modification of Compressor Station 505 would be less than significant and no visual impacts would occur from modification of Compressor Stations 195, 200, and 207.[137] Additionally, visual impacts from modification of Camden M&R Station would be less than significant and no visual impacts on environmental justice communities are anticipated from modification of the Mt. Laurel M&R Station and the Lawnside M&R Station.  Overall, visual impacts on environmental justice communities would be less than significant.  The final EIS found that environmental justice communities in the study area would also experience cumulative impacts on visual resources; however, these impacts would be less than significant.[138]  We agree.  The final EIS found that direct and cumulative visual impacts on residences adjacent to Compressor Station 201, which are located in an environmental justice community, would be significant in the short-term until the visual screening plan is fully implemented but that long term visual impacts would be less than significant.[139]

### c.      Socioeconomic and Traffic Impacts

62.      With respect to socioeconomic impacts, traffic delays and an increase in demand for public services may occur during the construction period.  As discussed in the final

---

[134] Final EIS at 4-155.

[135] Final EIS at 4-155.

[136] Final EIS at 4-155.

[137] Final EIS at 4-156.

[138] Final EIS at 4-209.

[139] Final EIS at 4-156, 4-209.

Docket No. CP21-94-000                                                                      34

EIS, a temporary influx of about 353 workers/contractors could increase the demand for housing, law enforcement, and medical care during construction.[140]  Transco would work with local law enforcement, fire departments, and emergency medical services prior to construction to coordinate for effective emergency response.[141]  Additionally, there would be an increase in the use of area roads by heavy construction equipment and associated vehicles, resulting in short term impacts on roadways, lasting the duration of construction.  Transco is required to implement its Traffic Management Plan to minimize project effects on local traffic and transportation systems during construction.[142]  Therefore, socioeconomic and traffic-related impacts on the population, including environmental justice communities, would be temporary and less than significant.[143]  The EIS concluded that environmental justice communities in the study area would also experience cumulative impacts on socioeconomics and traffic; however, these impacts would be less than significant.[144]  We agree.

### d.    Air Emissions

63.    Construction air emissions would result in short-term, localized impacts in the immediate vicinity of construction work areas, particularly Compressor Station 201, and would be below the National Ambient Air Quality Standards (NAAQS), which have been designated to protect public health, including sensitive and vulnerable populations.[145]  Transco is required to implement a Fugitive Dust Control Plan and mitigate exhaust emissions during construction by using construction equipment and vehicles that comply with EPA mobile and non-road emission regulations.  In addition, Transco is required to use commercial gasoline and diesel fuel products that meet specifications of applicable federal and state air pollution control regulations.

64.    Operational emission increases from the Project would occur from Compressor Station 505.  Transco's electric-driven compression at Compressor Stations 201, 207, and 195 would not generate combustion-related emissions and the connection at Compressor Station 200 would not generate combustion-related emissions.  Accordingly, the project

---

[140] Final EIS at 4-156.

[141] Final EIS at 4-124.

[142] Final EIS at 4-157.

[143] Final EIS at 4-156, 4-157.

[144] Final EIS at 4-209.

[145] Final EIS at 4-157.

Document Accession #: 20230111-3069          Filed Date: 01/11/2023
Docket No. CP21-94-000                                                                    35

and each compressor station would be in compliance with the NAAQS.  Although the
project would be in compliance with the NAAQS and the NAAQS are designated to
protect sensitive populations, the final EIS acknowledges that NAAQS attainment alone
may not ensure there is no localized harm to such populations due to project emissions of
volatile organic compounds, hazardous air pollutants, as well as issues such as the
presence of non-project related pollution sources, local health risk factors, disease
prevalence, and access (or lack thereof) to adequate care.[146]  The EIS concluded, and we
agree, that the air quality impacts from construction and the operation of project facilities
would not result in a significant impact on air quality in the region, including air quality
impacts on environmental justice communities.[147]  The EIS also concluded that
environmental justice communities in the study area would experience cumulative
impacts related to air quality; however, these impacts would be less than significant.[148]
We agree.

### e.     Noise Impacts

65.     The final EIS also concluded, and we agree that, because of the limited duration of
construction activities, distance to noise sensitive areas (NSA), and Transco's mitigation
measures, the project would not result in significant noise impacts on the surrounding
area, including environmental justice communities.[149]  With respect to noise levels during
construction activities for the proposed pipeline facilities, increase in noise levels at the
closest residences would be temporary, generally lasting approximately three to
four weeks.  Construction noise increases related to aboveground facilities would also be
temporary, lasting the duration of construction, approximately 13 months.  Additionally,
operation of the aboveground facilities and compressor stations, with Transco's noise
mitigation measures, would not result in significant noise impacts on the surrounding
community, including environmental justice communities.  The EIS also concluded that
environmental justice communities in the study area would experience cumulative
impacts on noise; however, these impacts would be less than significant.[150]  We agree.

---

[146] Final EIS at 4-157.

[147] Final EIS at 4-157.

[148] Final EIS at 4-209.

[149] Final EIS at 4-158.

[150] Final EIS at 4-210.

Document Accession #: 20230111-3069     Filed Date: 01/11/2023

### f.     Environmental Justice Conclusion

66.     As described in the final EIS, the proposed project will have a range of impacts on the environment and individuals living in the vicinity of the project facilities, including environmental justice communities.  The final EIS concludes that impacts from construction and operation of Compressor Stations 195, 200, 207, and 505, Camden M&R Station, and the Lawnside M&R Station, which are located within identified environmental justice communities, would be disproportionately high and adverse as impacts would be predominately borne by environmental justice communities.[151]  We agree.  The final EIS concludes that impacts from the Regional Energy Lateral and the Effort Loop would not be disproportionately high and adverse as impacts would not be predominately borne by environmental justice communities.[152]  We agree.  Impacts associated with groundwater, visual, socioeconomics, traffic, air quality, and noise from all these facilities would be less than significant.[153]  For Compressor Station 201, the final EIS concluded that, in the short term, direct and cumulative visual impacts on environmental justice communities associated with the construction of Compressor Station 201 would be significant.[154]  We agree.  Once the plantings associated with mitigation are established, long term visual impacts on environmental justice communities would be less than significant.[155]  Impacts associated with groundwater, socioeconomics, traffic, air quality, and noise for Compressor Station 201 would be less than significant.

### 3.     Greenhouse Gas Emissions and Climate Change

67.     The CEQ defines effects or impacts as "changes to the human environment from the proposed action or alternatives that are reasonably foreseeable," which include those effects "that occur at the same time and place" and those "that are later in time or farther removed in distance, but are still reasonably foreseeable."[156]  An impact is reasonably foreseeable if it is "sufficiently likely to occur such that a person of ordinary prudence

---

[151] Final EIS at 4-159, 4-160.

[152] Final EIS at 4-159.

[153] Final EIS at 4-154 through 4-158.

[154] Final EIS at 4-159 through 4-160.

[155] Final EIS at 4-160

[156] 40 C.F.R. § 1508.1(g) (2021).

would take it into account in reaching a decision."[157]  For this project, we find that the construction emissions, direct operational emissions, and the emissions from the downstream combustion of the gas transported by the project are reasonably foreseeable emissions.[158]

68.     The EPA recommends that Commission staff quantify upstream GHG emissions associated with the proposed project.[159]  That is not required here.  On May 26, 2021, Commission staff sent a data request to Transco asking for flow maps showing receipt points where gas from the Marcellus shale region would enter the Transco system. According to Transco, the project would receive gas from existing gathering infrastructure in the Marcellus Shale production area[160] via new connections with Williams Field Services Company, LLC, Regency NEPA, and UGI North.[161]  The environmental effects resulting from natural gas production are generally neither caused by a proposed pipeline project nor are they reasonably foreseeable consequences of our approval of an infrastructure project, as contemplated by CEQ regulations, where the supply source is unknown.[162]  Here, the specific source of natural gas to be transported

---

[157] *Id.* § 1508.1(aa).

[158] *See Food & Water Watch v. FERC*, 28 F.4th 277, 288 (D.C. Cir. 2022) ("Foreseeability depends on information about the 'destination and end use of the gas in question.'") (citation omitted); *Sierra Club v. FERC*, 867 F.3d at 1371 ("FERC should have estimated the amount of power-plant carbon emissions that the pipelines will make possible.").

[159] EPA Sept. 6, 2022 Comment on Final EIS at 2.

[160] Marcellus shale is a black shale geological formation containing natural gas reserves which are developed using horizontal drilling and hydraulic fracturing techniques.  The Marcellus shale formation extends deep underground from Ohio and West Virginia, northeast through Pennsylvania and southern New York with multiple producing intervals within the formation.  *See Dominion Transmission, Inc.*, 156 FERC ¶ 61,140, at n.32 (2016).

[161] Transco Response to May 26, 2021 Environmental Information Request at 1 (filed June 15, 2021) (Regarding Resource Report 1 – Project Description).

[162] *See*, e.g*., Cent. N.Y. Oil & Gas Co., LLC*, 137 FERC ¶ 61,121, at PP 81-101 (2011), *order on reh'g*, 138 FERC ¶ 61,104, at PP 33-49 (2012), *petition for review dismissed sub nom. Coal. for Responsible Growth v. FERC*, 485 F. App'x. 472, 474-75 (2d Cir. 2012) (unpublished opinion); *see also Kern River Gas Transmission Co.*, 179 FERC ¶ 61,121, at P 33 (2022); *Adelphia Gateway, LLC*, 169 FERC ¶ 61,220,

Docket No. CP21-94-000                                                              38

via the Regional Energy Access Expansion Project is currently unknown. Although the project's receipt points are at interconnections with large gathering systems in Northeastern Pennsylvania, the record does not indicate from whom the project shippers may source their gas– indeed the project's purpose is to diversify fuel supply access – further, the producers/gas suppliers that hold capacity on each of the connected gathering systems could change throughout the project's operation.

69.     The final EIS estimates that construction of the project may result in emissions of up to 48,013 tons (43,548 metric tons) of carbon dioxide equivalent ($CO_2e$) over the duration of construction.[163]  The project's estimated operational GHG emissions are 619,674 tons per year (562,044 metric tons per year) of $CO_2e$,[164] which was calculated based on the increased horsepower resulting from the new project facilities and assuming 100% utilization; i.e., it is assumed that the facilities are operated at maximum capacity for 365 days/year, 24 hours/day.[165]  The downstream GHG emissions from the project, assuming 100% utilization of the new incremental capacity of Transco's pipeline system, would result in up to 16.02 million metric tpy of $CO_2e$.

70.     As we have done in prior certificate orders, we compare estimated project GHG emissions to the total GHG emissions of the United States as a whole and at the state level.  This comparison allows us to contextualize the projected emissions of the project. At a national level, 5,222.4 million metric tons of $CO_2e$ were emitted in 2020 (inclusive of $CO_2e$ sources and sinks).[166]  Construction emissions from the project could potentially increase $CO_2e$ emissions based on the national 2020 levels by 0.0083%; in subsequent years, the operations and downstream GHG emissions could potentially increase emissions nationally by 0.32%. [167]

---

at P 243 (2019), *order on reh'g*, 171 FERC ¶ 61,049, at P 89 (2020).

[163] Final EIS at 4-175.

[164] Final EIS at 4-175.

[165] Final EIS at 4-175.  Additionally, the estimate includes reductions from abandoned units, fugitive emissions from compressor station equipment, piping, and ancillary facilities.  *Id.*

[166] EPA, *Inventory of U.S. Greenhouse Gas Emissions and Sinks:  1990-2020* at ES-4 (Table ES-2) (April 2022), https://www.epa.gov/system/files/documents/2022-04/us-ghg-inventory-2022-main-text.pdf.

[167] Although EPA's Affordable Clean Energy Rule, which repealed the national emissions reduction targets expressed in EPA's Clean Power Plan, was vacated in

71.     At the state level, the final EIS compares the project's GHG emissions to the Delaware, Maryland, New Jersey, New York, and Pennsylvania GHG inventories for their respective construction and operational/downstream volumes for each applicable state.[168]  The project would result in construction and operational emissions in Maryland, New Jersey, and Pennsylvania.  For purposes determining the percentage of the project's downstream GHG emissions attributable to each state, staff relied on Transco's estimates on the intended end-use of the gas to be transported by the project, which reflected end use of gas to be transported by the project in Delaware, Maryland, New Jersey, New York, and Pennsylvania.[169]  For each of these five states the energy related $CO_2$ emissions in 2019 were 13.6, 56.9, 100.8, 169, and 218.7 million metric tons, respectively.[170]  Accordingly, based on the project's aboveground facility locations and identified end use, estimated project GHG emissions compared to the state inventories are as follows.  For Delaware, project downstream emissions could potentially increase $CO_2e$ emissions based on the state's 2019 levels by 4.0%.  For Maryland, project construction could potentially increase $CO_2e$ emissions based on that state's 2019 levels by 0.002%; in subsequent years, project operation and downstream emissions could potentially increase emissions by 1.8%.  For New Jersey, project construction could potentially increase $CO_2e$ emissions based on the state's 2019 levels by 0.01%; in subsequent years, project operation and downstream emissions could potentially increase emissions by 11.8%.  In New York, project downstream emissions could potentially increase $CO_2e$ emissions based on the state's 2019 levels by 0.3%.  Last, for Pennsylvania, project construction could potentially increase $CO_2e$ emissions based on the state's 2019 levels by 0.02%; in subsequent years, project operation and downstream emissions could potentially increase emissions by 1.2%.

72.     When states have GHG emissions reduction targets, we will compare the project's GHG emissions to those state goals to provide additional context.  All five of these states have statewide goals for GHG emissions reduction targets and the final EIS discloses the

---

*Am. Lung Ass'n v. EPA*, 985 F.3d 914 (D.C. Cir. 2021), EPA has not yet issued a new rule prescribing new national emissions reduction targets.

[168] Final EIS at 4-176.

[169] Transco Response to Staff Dec. 1, 2021 Environmental Information Request at Response 27 (filed Dec. 10, 2021) (providing table of Intended Use of the Natural Gas (Dth/d1) by Customer).

[170] Final EIS at 4-176.

percentage that the project's GHG emissions would represent of each state's projected GHG emission levels, assuming the state meets its targeted reductions.[171]

73.    By adopting the climate impact analysis in the EIS, we recognize that the project may release GHG emissions that contribute incrementally to future global climate change impacts,[172] and have identified climate change impacts in the region.[173]  In light of this analysis, and because we are conducting a generic proceeding to determine whether and how to Commission will conduct significance determinations for GHG emissions going forward, the Commission is not herein characterizing these emissions as significant or insignificant.[174]

74.    Last, the EPA repeats its comments on the draft EIS that the Commission should consider and incorporate practicable mitigation measures to reduce the proposed action's GHG emissions into the proposed terms and conditions required as part of certificate issuance.[175]  As stated in the final EIS, Transco has not indicated any mitigation for GHG emissions.[176]

---

[171] Final EIS at 4-176 – 4-177.

[172] Final EIS at 4-175.

[173] Final EIS at 4-174.

[174] On February 17, 2022, the Commission issued the Updated Certificate Policy Statement and an Interim GHG Policy Statement.  *Certification of New Interstate Nat. Gas Facilities Consideration of Greenhouse Gas Emissions in Nat. Gas Infrastructure Project Reviews*, 178 FERC ¶ 61,197 (2022).  The Interim GHG Policy Statement established a NEPA significance threshold of 100,000 tons per year of carbon-dioxide-equivalent ($CO_2e$) as a matter of policy, which was meant to serve as interim guidance for project applicants and stakeholders and the Commission sought public comment on the statement.  On March 24, 2022, the Commission, upon further consideration, made both statements draft and stated that it would not apply either statement to pending or new projects until the Commission issues any final guidance after public comment.  Interim GHG Policy Statement, 178 FERC ¶ 61,197 at P 2.

[175] EPA Sept. 6, 2022 Comment on Final EIS at 2.

[176] Final EIS at 4-179

## 4. **Landowner Concerns**

75.     On October 17, 2022, Reading Blue Mountain and Northern Railroad Company (Reading Railroad) filed a motion to intervene out of time in which it questioned Transco's ability to exercise the right of eminent domain with respect to two proposed above-ground access road crossings over Reading Railroad's Main Line railroad.[177] Specifically, Reading Railroad asserts that the requested at-grade crossings are not necessary for completion of the project, were not included among the affected roadway or railroad properties listed in Transco's application to the Commission, and expressed concern about possibility that Transco will apply any Certificate issued by the Commission to condemn land for the two Main Line at-grade access road crossings.[178]

76.     In response to Reading Railroad's filing, Transco states that the two temporary surface crossings and one underground pipeline crossing for the REAE Project were identified in its March 26, 2021 certificate application.[179]  Transco asserts that it has followed Reading Railroad's procedures for obtaining surface licenses by applying, on April 14, 2022, for a Private Grade Crossing in accordance with Reading Railroad's "Railroad Private Grade Crossing Policy."  Transco further notes that it believes the key issue in the ongoing discussions concerning the temporary above-ground crossings is "determining a mutually acceptable amount of compensation, given certain characteristics of the railroad at the location of the proposed crossing and that this issue can be resolved through further negotiations."[180]

77.     The Commission urges companies to reach mutual negotiated easement agreements with all private landowners prior to construction.[181]  We encourage Transco

---

[177] Reading Railroad Oct. 17, 2022 Motion to Intervene at 1.

[178] *Id.* at 2-4.

[179] Transco November 1 Answer to Reading Blue Mountain and Northern Railroad Company's Motion to Intervene Out of Time at 2; *id.* at 3-4 (detailing the identification and specifications for the surface crossings in its alignment sheets that were submitted with its March 2021 Certificate Application).

[180] Transco November 1 Answer to Reading Blue Mountain and Northern Railroad Company's Motion to Intervene Out of Time at 1.

[181] *See*, e.g.*, Algonquin Gas Transmission, LLC*, 154 FERC ¶ 61,048, at P 241 (2016).

to continue negotiating with Reading Railroad in order to limit the need to obtain rights by way of eminent domain.

78.     Another landowner impacted by the project route, Catherine Folio, has expressed concerns regarding project construction.  On October 18, 2022, Ms. Folio filed a late motion to intervene and subsequently filed an answer to address Transco's "mischaracteriz[ation] of conversations with Ms. Folio, the adverse impacts of the proposed pipeline to Ms. Folio's land, and the relevant easement agreement."[182] Ms. Folio objects to Transco's claim that adverse impacts identified in Ms. Folio's Motion to Intervene were addressed "to the satisfaction of Ms. Folio."[183]  Ms. Folio states that, while she has entered into an easement agreement with Transco, she does not consider the easement agreement to be the "mutually agreeable settlement," and that she remains opposed to the project and continues to have serious concerns about impacts to her land from construction of the Transco pipeline.  We note that if, during construction, Ms. Folio, or any landowner, has issues related to the construction activities by the pipeline company, there are several avenues for recourse.[184]  Landowners can contact the Commission's Landowner Helpline at 877-337-2237 or at LandownerHelp@ferc.gov.[185] To ensure that landowner issues are promptly resolved, we have added environmental condition 9 to require that Transco develop, file, and implement project-specific environmental complaint resolution procedures prior to construction.  The procedures

---

[182] Catherine Folio's November 10, 2022 Answer to Transco's Response to Catherine Folio's Motion to Intervene.  Ms. Folio is represented by Niskanen Center, which also represents other affected landowners in this docket.

[183] Transco Nov. 2, 2022 Answer to Catherine Folio's Motion to Intervene Out of Time at 1.

[184] The mandatory environmental conditions contained in the Certificate Order provide a framework to ensure that the environment is protected during project construction and that instances of non-compliance are documented and remedied.  As explicitly prescribed in certificate orders, the Director of OEP has the authority to take whatever steps are necessary to ensure the protection of environmental resources during construction and operation of the project.  Thus, once the Director authorizes construction to proceed, Commission staff in OEP's Division of Gas — Environment and Engineering maintain oversight for the duration of the construction and restoration process to ensure that the pipeline and all aboveground facilities are constructed and installed in an environmentally-sound manner and consistent with the certificate requirements.

[185] The Landowner Helpline may assist with:  construction-related concerns and damages from certificated projects; land access disputes; executed easement disputes; land restoration disputes; and noise and vibration complaints.

must provide landowners with clear and simple directions for identifying and resolving their environmental mitigation problems or concerns during Transco's construction of the REAE Project and restoration of the impacted resources. Under this condition, Transco must mail the complaint procedures to each landowner and include in its filed biweekly construction status reports, required under environmental condition 8, both the landowner-identified complaint and the measures taken by Transco to satisfy the landowner's concerns.

79.     Further, Ms. Folio with her counsel, the Niskanen Center, objects to Transco's alleged communication directly with represented landowners without the knowledge and consent of those landowners' lawyers.[186] We remind Transco that we expect it to contact landowners with known legal representation only through those representatives.

80.     Last, we note that in August and September 2022,[187] landowners Erin Petrosky and Raymond Grove filed comments opposing Transco's Residential Construction Plan[188] for their property located at milepost (MP) 19.5 on the proposed Regional Energy Lateral, which comments were subsequently withdrawn on October 28, 2022.[189]

## 5.     Environmental Impacts Conclusion

81.     We have reviewed the information and analysis contained in the final EIS regarding potential environmental effects of the project, as well as the other information in the record. We are accepting the environmental recommendations in the final EIS as modified herein and are including them as conditions in Appendix B to this order. Based on our consideration of this information and the discussion above, we agree with the

---

[186] Catherine Folio November 10, 2022 Answer at 2-3.

[187] Erin Petrosky August 15, 2022 Public Comment at 1; Erin Petrosky and Raymond Grove, September 13, 2022 Comment.

[188] Transco generated site-specific Residential Construction Plans (RCP) for properties that would have occupied structures within 50 feet of the proposed construction workspace, in order to inform landowners of precise locations of project workspaces, identify measures to minimize disruption during construction, and to maintain access to the residences.

[189] Erin Petosky October 28, 2022 Comment Withdrawing Prior Filings; *see also* Transco November 1, 2022 Answer at 9 (emphasizing Transco's continuing efforts to negotiate with affected landowners and highlighting Ms. Petrosky's and Mr. Grove's withdrawal of comments).

Document Accession #: 20230111-3069          Filed Date: 01/11/2023

conclusions presented in the final EIS and find that the project, if implemented as described in the final EIS, is an environmentally acceptable action.

## IV.  **Conclusion**

82.     The proposed project will enable Transco to provide up to 829,400 Dth/d of firm transportation service from northeastern Pennsylvania to multiple delivery points in New Jersey, Pennsylvania, and Maryland.  We find that Transco has demonstrated a need for the Regional Energy Access Expansion Project, that the project will not have adverse economic impacts on existing shippers or other pipelines and their existing customers, and that the project's benefits will outweigh any adverse economic effects on landowners and surrounding communities.  We have analyzed the technical aspects of the project and conclude that it has been appropriately designed to achieve its intended purpose.  Based on the discussion above, we find under section 7 of the NGA that the public convenience and necessity requires approval of Transco's Regional Energy Access Expansion Project, subject to the conditions in this order.

83.     Compliance with the environmental conditions appended to our orders is integral to ensuring that the environmental impacts of approved projects are consistent with those anticipated by our environmental analysis.  Thus, Commission staff carefully reviews all information submitted.  Only when staff is satisfied that the applicant has complied with all applicable conditions will a notice to proceed with the activity to which the conditions are relevant be issued.  We also note that the Commission has the authority to take whatever steps are necessary to ensure the protection of environmental resources during abandonment, construction, and operation of the project, including authority to impose any additional measures deemed necessary to ensure continued compliance with the intent of the conditions of the order, as well as the avoidance or mitigation of unforeseen adverse environmental impacts resulting from project construction and operation.

84.     Any state or local permits issued with respect to the jurisdictional facilities authorized herein must be consistent with the conditions of this certificate.  The Commission encourages cooperation between interstate pipelines and local authorities. However, this does not mean that state and local agencies, through application of state or local laws, may prohibit or unreasonably delay the construction or operation of facilities approved by this Commission.[190]

---

[190]     *See* 15 U.S.C. § 717r(d) (state or federal agency's failure to act on a permit considered to be inconsistent with Federal law); *see also Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293, 310 (1988) (state regulation that interferes with FERC's regulatory authority over the transportation of natural gas is preempted) and *Dominion Transmission, Inc. v. Summers,* 723 F.3d 238, 245 (D.C. Cir. 2013) (noting that state and local regulation is preempted by the NGA to the extent it conflicts with federal

85.     In Order No. 871-B, the Commission adopted a policy of presumptively staying its NGA section 7(c) certificate orders during the 30-day rehearing period and pending Commission resolution of any timely requests for rehearing filed by landowners.[191] Because several affected landowners have intervened and protested, and Transco has not acquired all necessary property interests, we will stay the certificate during the 30-day rehearing period and pending Commission resolution of any timely requests for rehearing filed by the landowner, up until 90 days following the date that a request for rehearing may be deemed to have been denied under NGA section 19(a).[192]  Under Order No. 871-B, the project developer "may move to preclude, or lift, a stay based on a showing of significant hardship."[193]  The Commission will seek to act expeditiously on any such motion, should Transco pursue such relief.[194]

86.     The Commission on its own motion received and made a part of the record in this proceeding all evidence, including the application, as supplemented, and exhibits thereto, and all comments, and upon consideration of the record,

The Commission orders:

    (A)     A certificate of public convenience and necessity is issued authorizing Transco to construct and operate the Regional Energy Access Expansion Project, as described and conditioned herein, and as more fully described in the application and subsequent filings by the applicant, including any commitments made therein.

    (B)     Transco is granted permission and approval of the proposed abandonments, as described in this order and in the application.

    (C)     The certificate authority issued in Ordering Paragraphs (A) and (B) shall be

---

regulation, or would delay the construction and operation of facilities approved by the Commission).

    [191] See Limiting Authorizations to Proceed with Construction Activities Pending Rehearing, Order No. 871-B, 175 FERC ¶ 61,098 (2021).

    [192] Id. P 43.

    [193] Id. P 51.

    [194] As the Commission stated in Order No. 871-B, we note again that "a commitment by the pipeline developer not to begin eminent domain proceedings until the Commission issues a final order on any landowner rehearing requests will weigh in favor of granting such a motion." Id.

conditioned on the following:

1. applicant's completion of the authorized construction of the proposed facilities and making them available for service within three years from the date of this order, pursuant to section 157.20(b) of the Commission's regulations;

2. applicant's compliance with all applicable Commission regulations under the NGA including, paragraphs (a), (c), (e), and (f) of section 157.20 of the Commission's regulations; and

3. applicant's compliance with the environmental conditions listed in the Appendix to this order.

(D)     The certificate authority issued in Ordering Paragraphs (A) and (B) is stayed during the 30-day rehearing period and pending Commission resolution of any timely requests for rehearing filed by landowners, up until 90 days following the date that a request for rehearing may be deemed to have been denied under NGA section 19(a). If no request for rehearing is filed by landowners, the stay will automatically lift following the close of the 30-day period for seeking rehearing.

(E)     Transco shall file a written statement affirming that it has executed firm contracts for the capacity levels and terms of service represented in signed precedent agreements, prior to commencing construction.

(F)     Transco's proposed incremental rates, as revised and conditioned above, are approved for the project. Transco is directed to charge the applicable system interruptible rate for the expansion capacity.

(G)     Transco's proposal to charge its generally applicable system fuel percentage and system electric power rates to recover fuel and electric power costs associated with the project is approved.

(H)     A predetermination is granted for Transco to roll the Station 505 and Station 515 replacement costs into its system rates in a future NGA section 4 rate case, absent a significant change in circumstances.

(I)     Transco is directed to notify the Commission within 10 days of the abandonments.

(J)     Transco shall notify the Commission's environmental staff by telephone or e-mail of any environmental noncompliance identified by other federal, state, or local agencies on the same day that such agency notifies Transco. Transco shall file written

Document Accession #: 20230111-3069          Filed Date: 01/11/2023
Docket No. CP21-94-000                                                                    47

confirmation of such notification with the Secretary of the Commission within 24 hours.

     (K)    New Jersey Board of Public Utilities', New Jersey Division of Rate Counsel's, and Aquashicola-Pohopoco Watershed Conservancy's untimely motions to intervene are granted.

By the Commission.

( S E A L )


                            Debbie-Anne A. Reese,
                              Deputy Secretary.

**Appendix A**
**Intervenors**

American Petroleum Institute

Atlanta Gas Light Company, et. al.

Bernadette Maher

Cabot Oil and Gas Corporation

Carol Kuehn

Center for Liquified Natural Gas

Charles Adonizio

Chemistry Council of NJ

Chief Oil and Gas, LLC

Christopher Neumann

Deana Luchs

Delaware Riverkeeper Network

Duke Energy Carolinas, LLC, Duke
Energy Progress, LLC, and Duke Energy
Florida, LLC

Energy Services Company

Exelon Corp

Gary Frederick

James Spinola

International Union of Operating
Engineers Local 825

International Union of Operating
Engineers, Washington, DC

Judith Canepa

Kevin  Corcoran

Kirkman Frost

Laborers International Union of North
America

Laura Cisar

Maya van Rossum the Delaware
Riverkeeper

Michael Egenton

Natural Gas Supply Association (DC)

New Jersey Department of
Environmental Protection

New Jersey Laborers' Employers'
Cooperation and Education Trust

New Jersey Natural Gas Company

Pennsylvania Manufacturers Association

Philadelphia Gas Works

Piedmont Natural Gas Company, Inc.

PSEG Energy Resources & Trade LLC

Richard Stern

S. Pasricha

Sane Energy Project

Sara Gronim

Scott Salvigsen

Sierra Club

South Jersey Resources Group, LLC
South Jersey Gas Company and
Elizabethtown Gas Company

Southern Jersey Chamber of Commerce

Document Accession #: 20230111-3069     Filed Date: 01/11/2023

Southern New Jersey Development Council

Susan London

Symmetry Energy Solutions, LLC

United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry of the United States and Canada, AFL-CIO

## Appendix B
## Environmental Conditions

As recommended in the final environmental impact statement (EIS), this authorization includes the following conditions.

1.  Transcontinental Gas Pipe Line Company, LLC (Transco) shall follow the construction procedures and mitigation measures described in its application and supplements (including responses to staff data requests) and as identified in the EIS, unless modified by the Order. Transco must:

    a.  request any modification to these procedures, measures, or conditions in a filing with the Secretary of the Commission (Secretary);

    b.  justify each modification relative to site-specific conditions;

    c.  explain how that modification provides an equal or greater level of environmental protection than the original measure; and

    d.  receive approval in writing from the Director of the Office of Energy Projects (OEP), or the Director's designee, **before using that modification**.

2.  The Director of OEP, or the Director's designee, has delegated authority to address any requests for approvals or authorizations necessary to carry out the conditions of the Order, and take whatever steps are necessary to ensure the protection of environmental resources during construction and operation of the Project. This authority shall allow:

    a.  the modification of conditions of the Order;

    b.  stop-work authority; and

    c.  the imposition of any additional measures deemed necessary to ensure continued compliance with the intent of the conditions of the Order as well as the avoidance or mitigation of unforeseen adverse environmental impact resulting from Project construction and operation.

3.  **Prior to any construction**, Transco shall file an affirmative statement with the Secretary, certified by a senior company official, that all company personnel, environmental inspectors (EI), and contractor personnel will be informed of the EI's authority and have been or will be trained on the implementation of the

Document Accession #: 20230111-3069     Filed Date: 01/11/2023
Docket No. CP21-94-000                                                                49

environmental mitigation measures appropriate to their jobs **before** becoming
involved with construction and restoration activities

4.      The authorized facility locations shall be as shown in the EIS, as supplemented by
        filed alignment sheets.  **As soon as they are available, and before the start of
        construction**, Transco shall file with the Secretary any revised detailed survey
        alignment maps/sheets at a scale not smaller than 1:6,000 with station positions for
        all facilities approved by the Order.  All requests for modifications of
        environmental conditions of the Order or site-specific clearances must be written
        and must reference locations designated on these alignment maps/sheets.

        Transco's exercise of eminent domain authority granted under Natural Gas Act
        (NGA) section 7(h) in any condemnation proceedings related to the Order must be
        consistent with these authorized facilities and locations.  Transco's right of
        eminent domain granted under NGA section 7(h) does not authorize it to increase
        the size of its natural gas facilities to accommodate future needs or to acquire a
        right-of-way for a pipeline to transport a commodity other than natural gas.

5.      Transco shall file with the Secretary detailed alignment maps/sheets and aerial
        photographs at a scale not smaller than 1:6,000 identifying all route realignments
        or facility relocations, and staging areas, pipe storage yards, new access roads, and
        other areas that would be used or disturbed and have not been previously
        identified in filings with the Secretary.  Approval for each of these areas must be
        explicitly requested in writing.  For each area, the request must include a
        description of the existing land use/cover type, documentation of landowner
        approval, whether any cultural resources or federally listed threatened or
        endangered species would be affected, and whether any other environmentally
        sensitive areas are within or abutting the area.  All areas shall be clearly identified
        on the maps/sheets/aerial photographs.  Each area must be approved in writing by
        the Director of OEP, or the Director's designee, **before construction in or near
        that area**.

        This requirement does not apply to extra workspace allowed by the Commission's
        *Upland Erosion Control, Revegetation, and Maintenance Plan* and/or minor field
        realignments per landowner needs and requirements which do not affect other
        landowners or sensitive environmental areas such as wetlands.

        Examples of alterations requiring approval include all route realignments and
        facility location changes resulting from:

        a.      implementation of cultural resources mitigation measures;

Document Accession #: 20230111-3069     Filed Date: 01/11/2023

Docket No. CP21-94-000                                                              50

  b.  implementation of endangered, threatened, or special concern species mitigation measures;

  c.  recommendations by state regulatory authorities; and

  d.  agreements with individual landowners that affect other landowners or could affect sensitive environmental areas.

6. **Within 60 days of the acceptance of the authorization and before construction begins**, Transco shall file an Implementation Plan with the Secretary for review and written approval by the Director of OEP, or the Director's designee.  Transco must file revisions to the plan as schedules change.  The plan shall identify:

  a.  how Transco will implement the construction procedures and mitigation measures described in its application and supplements (including responses to staff data requests), identified in the EIS, and required by the Order;

  b.  how Transco will incorporate these requirements into the contract bid documents, construction contracts (especially penalty clauses and specifications), and construction drawings so that the mitigation required at each site is clear to onsite construction and inspection personnel;

  c.  the number of EIs assigned per spread, and how the company will ensure that sufficient personnel are available to implement the environmental mitigation;

  d.  company personnel, including EIs and contractors, who will receive copies of the appropriate material;

  e.  the location and dates of the environmental compliance training and instructions Transco will give to all personnel involved with construction and restoration (initial and refresher training as the Project progresses and personnel change), with the opportunity for OEP staff to participate in the training session(s);

  f.  the company personnel (if known) and specific portion of Transco's organization having responsibility for compliance;

  g.  the procedures (including use of contract penalties) Transco will follow if noncompliance occurs; and

Document Accession #: 20230111-3069          Filed Date: 01/11/2023
Docket No. CP21-94-000                                                                51

      h.     for each discrete facility, a Gantt or PERT chart (or similar project scheduling diagram), and dates for:

          (1)    the completion of all required surveys and reports;

          (2)    the environmental compliance training of onsite personnel;

          (3)    the start of construction; and

          (4)    the start and completion of restoration.

7.     Transco shall employ at least one EI per construction spread.  The EI shall be:

      a.     responsible for monitoring and ensuring compliance with all mitigation measures required by the Order and other grants, permits, certificates, or other authorizing documents;

      b.     responsible for evaluating the construction contractor's implementation of the environmental mitigation measures required in the contract (see condition 6 above) and any other authorizing document;

      c.     empowered to order correction of acts that violate the environmental conditions of the Order, and any other authorizing document;

      d.     a full-time position, separate from all other activity inspectors;

      e.     responsible for documenting compliance with the environmental conditions of the Order, as well as any environmental conditions/permit requirements imposed by other federal, state, or local agencies; and

      f.     responsible for maintaining status reports.

8.     Beginning with the filing of its Implementation Plan, Transco shall file updated status reports with the Secretary on a **biweekly** basis until all construction and restoration activities are complete.  On request, these status reports will also be provided to other federal and state agencies with permitting responsibilities. Status reports shall include:

      a.     an update on Transco's efforts to obtain the necessary federal authorizations;

  b.  the construction status of each spread, work planned for the following reporting period, and any schedule changes for stream crossings or work in other environmentally-sensitive areas;

  c.  a listing of all problems encountered and each instance of noncompliance observed by the EIs during the reporting period (both for the conditions imposed by the Commission and any environmental conditions/permit requirements imposed by other federal, state, or local agencies);

  d.  a description of the corrective actions implemented in response to all instances of noncompliance;

  e.  the effectiveness of all corrective actions implemented;

  f.  a description of any landowner/resident complaints which may relate to compliance with the requirements of the Order, and the measures taken to satisfy their concerns; and

  g.  copies of any correspondence received by Transco from other federal, state, or local permitting agencies concerning instances of noncompliance, and Transco's response.

9.  Transco shall develop and implement an environmental complaint resolution procedure, and file such procedure with the Secretary, for review and approval by the Director of OEP, or the Director's designee.  The procedure shall provide landowners with clear and simple directions for identifying and resolving their environmental mitigation problems/concerns during construction of the Project and restoration of the right-of-way.  **Prior to construction**, Transco shall mail the complaint procedures to each landowner whose property will be crossed by the Project.

  a.  In its letter to affected landowners, Transco shall:

   (1) provide a local contact that the landowners should call first with their concerns; the letter should indicate how soon a landowner should expect a response;

   (2) instruct the landowners that if they are not satisfied with the response, they should call Transco's Hotline; the letter should indicate how soon to expect a response; and

Docket No. CP21-94-000                                                                53

         (3) instruct the landowners that if they are still not satisfied with the response from Transco's Hotline, they should contact the Commission's Landowner Helpline at 877-337-2237 or at LandownerHelp@ferc.gov.

   b.   In addition, Transco shall include in its biweekly status report a copy of a table that contains the following information for each problem/concern:

         (1) the identity of the caller and date of the call;

         (2) the location by milepost and identification number from the authorized alignment sheet(s) of the affected property;

         (3) a description of the problem/concern; and

         (4) an explanation of how and when the problem was resolved, will be resolved, or why it has not been resolved.

10.   Transco must receive written authorization from the Director of OEP, or the Director's designee, **before commencing construction of any Project facilities.** To obtain such authorization, Transco must file with the Secretary documentation that it has received all applicable authorizations required under federal law (or evidence of waiver thereof).

11.   Transco must receive written authorization from the Director of OEP, or the Director's designee, **before placing the Project into service**. Such authorization will only be granted following a determination that rehabilitation and restoration of the right-of-way and other areas affected by the Project are proceeding satisfactorily.

12.   **Within 30 days of placing the authorized facilities in service**, Transco shall file an affirmative statement with the Secretary, certified by a senior company official:

   a.   that the facilities have been constructed in compliance with all applicable conditions, and that continuing activities will be consistent with all applicable conditions; or

   b.   identifying which of the conditions in the Order Transco has complied with or will comply with. This statement shall also identify any areas affected by the Project where compliance measures were not properly implemented, if not previously identified in filed status reports, and the reason for noncompliance.

13. All conditions attached to the water quality certificate issued by the Pennsylvania Department of Environmental Protection, except those that the Director of OEP, or the Director's designee, identify as waived pursuant to 40 C.F.R. § 121.9, constitute mandatory conditions of the Certificate Order. **Prior to construction**, Transco shall file, for review and written approval of the Director of OEP, or the Director's designee, any revisions to its Project design necessary to comply with the water quality certification conditions.

14. **As part of its Implementation Plan**, Transco shall file with the Secretary, for review and written approval by the Director of OEP, or the Director's designee, a *Laflin Municipal Park Restoration Plan* that is developed in conjunction with the Borough of Laflin and describes the measures and timeframes that Transco will implement to restore the park and ballfield to existing or better use conditions. *(Section 3.4.3)*

15. **Prior to construction**, Transco shall file with the Secretary, for review and written approval by the Director of OEP, or the Director's designee, evidence of landowner concurrence with the site-specific construction plans for construction workspace within 10 feet of a residence and any plans that include outbuilding removal, unless the workspace is part of the existing maintained right-of-way. If Transco is unable to obtain concurrence, Transco shall file revised site-specific construction plans that maintain a 10-foot buffer between the residence and the Project workspace and avoid outbuilding removal. *(Section 4.5.2.4)*

16. Transco shall file a noise survey with the Secretary **no later than 60 days** after placing the new Compressor Station 201 in service. If full load condition noise surveys are not possible, Transco shall provide an interim survey at the maximum possible horsepower load and provide the full load survey **within six months**. If the noise attributable to the operation of Compressor Station 201 under interim or full horsepower load conditions exceeds a day-night sound level ($L_{dn}$) of 55 A-weighted decibels (dBA) at any nearby noise sensitive areas (NSAs), Transco shall file a report on what changes are needed and install additional noise controls to meet that level **within one year** of the facility's in-service date. Transco shall confirm compliance with the $L_{dn}$ of 55 dBA requirements by filing a second noise survey with the Secretary **no later than 60 days** after it installs the additional noise controls. *(Section 4.9.3)*

17. Transco shall file noise surveys with the Secretary **no later than 60 days** after placing in service the authorized unit(s) and uprates at Compressor Stations 195, 207, 505, and 515. If full load condition noise surveys are not possible, Transco shall provide an interim survey at the maximum possible horsepower load and

provide the full load survey **within six months**.  If the noise attributable to operation of the modified stations under interim or full horsepower load conditions exceeds a $L_{dn}$ of 55 dBA at any nearby NSAs, Transco shall file a report on what changes are needed and install additional noise controls to meet that level **within one year** of the in-service date.  Transco shall confirm compliance with the $L_{dn}$ of 55 dBA requirement by filing a second noise survey with the Secretary **no later than 60 days** after it installs the additional noise controls.  *(Section 4.9.3)*

UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Transcontinental Gas Pipe Line Company, LLC          Docket No.  CP21-94-000

(Issued January 11, 2023)

DANLY, Commissioner, *concurring in part and dissenting in part*:

1.      I concur in the decision to grant Transcontinental Gas Pipe Line Company, LLC's (Transco) requested Natural Gas Act (NGA) section 7[1] authorizations.  As in other recent NGA section 7 issuances, there are a number of flaws in this order.  I have written about all of these problems extensively.[2]  Here, I will focus on three elements of today's order which require particular attention: (1) the order's assessment of project need; (2) its stay of the certificate; and (3) its unlawful grant of late interventions.

2.      *First*, I dissent from this order's reasoning in reaching its determination of project need.  This order departs from Commission policy in how we assess need when reviewing an NGA section 7 application.  The Commission states that "in considering all evidence in the record, including each of the studies and the binding precedent agreements for 100% of the project capacity, the Commission finds that the construction and operation of the project will provide more reliable service on peak winter days and will increase supply diversity."[3]  Yes, other evidence can be considered,[4] but under the Commission's current policy, precedent agreements are by far the most objective evidence that can be introduced concerning need.  I fear that this language could perhaps be read to imply that the precedent agreements for 100% of a project's capacity (by

---

[1] 15 U.S.C. § 717f.

[2] *See, e.g.*, *Gas Transmission Nw. LLC*, 180 FERC ¶ 61,056 (2022) (Danly, Comm'r, concurring in the judgment at P 2) (discussing the breadth of the public convenience and necessity standard under the NGA); *id.* (Danly, Comm'r, concurring in the judgment at PP 3-4) (stating that the Commission should repudiate the eye-ball test established in *Northern Natural Gas Company*, 174 FERC ¶ 61,189 (2021)); *id.* (Danly, Comm'r, concurring in the judgment at P 3) (explaining that there is no standard by which the Commission could, consistent with our obligations under the law, ascribe significance to a particular rate or volume of greenhouse gas emissions).

[3] *Transcontinental Gas Pipe Line Co., LLC*, 182 FERC ¶ 61,006, at P 25 (2023).

[4] *See, e.g.*, *Spire STL Pipeline LLC*, 181 FERC ¶ 61,232 (2022).

primarily *unaffiliated* shippers, no less) might, by themselves, be insufficient to demonstrate need or, perhaps more troubling, that other evidence proffered in the face of such precedent agreements, somehow tip the evidence against a finding of need. This would mark a departure from our longstanding precedent and application of the Certificate Policy Statement.[5] To the extent that this is what is intended, the order has a problem: the Commission has not even attempted to explain its departure—an obvious violation of the Administrative Procedure Act. As a reminder, "[a]n agency may not . . . depart from a prior policy *sub silentio* or simply disregard rules that are still on the books."[6]

---

[5] *See, e.g.*, *City of Oberlin, Ohio v. FERC*, 937 F.3d 599, 606 (D.C. Cir. 2019) ("[T]his Court has also recognized that 'it is Commission policy to not look behind precedent or service agreements to make judgments about the needs of individual shippers.'") (citation omitted); *Minisink Residents for Envtl. Pres. & Safety v. FERC*, 762 F.3d 97, 111 n.10 (D.C. Cir. 2014) ("Petitioners identify nothing in the policy statement or in any precedent construing it to suggest that it requires, rather than permits, the Commission to assess a project's benefits by looking beyond the market need reflected by the applicant's existing contracts with shippers. To the contrary, the policy statement specifically recognizes that such agreements 'always will be important evidence of demand for a project.'") (citation omitted); *see also Myersville Citizens for a Rural Cmty., Inc. v. FERC*, 783 F.3d 1301, 1311 (D.C. Cir. 2015) (explaining that "for a variety of reasons related to the nature of the market, 'it is Commission policy to not look behind precedent or service agreements to make judgments about the needs of individual shippers.' . . . In keeping with its policy, the Commission concluded that the evidence that the Project was fully subscribed was adequate to support the finding of market need.") (citations omitted). *But see Certification of New Interstate Natural Gas Pipeline Facilities*, 88 FERC ¶ 61,227, at 61,747, *corrected*, 89 FERC ¶ 61,040 (1999), *clarified*, 90 FERC ¶ 61,128, *further clarified*, 92 FERC ¶ 61,094 (2000) (Certificate Policy Statement) ("Rather than relying only on one test for need, the Commission will consider all relevant factors reflecting on the need for the project. These might include, but would not be limited to, precedent agreements, demand projections, potential cost savings to consumers, or a comparison of projected demand with the amount of capacity currently serving the market. The objective would be for the applicant to make a sufficient showing of the public benefits of its proposed project to outweigh any residual adverse effects discussed below.").

[6] *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (citation omitted).

3.    *Second*, I dissent from the Commission's decision to stay the certificate's effectiveness.[7]  The order stays the certificate under the policy established in Order No. 871-B, which provides that NGA section 7(c) certificates of public convenience and necessity will be presumptively stayed during the 30-day rehearing period and pending Commission resolution of any timely requests for rehearing filed by landowners, up until 90 days following the date that a qualifying request for rehearing may be deemed denied by operation of law.[8]  I dissent from this order's application of that policy, as a general matter, for the same reasons as stated in my dissents to Order No. 871-B[9] and Order No. 871-C[10] and in a number of prior separate statements.[11]

4.    In addition, I dissent from the decision to stay the effectiveness of the certificate based on the facts in this particular case.  I cannot understand why my colleagues did not ultimately decide that the circumstances here overcome the presumptive stay policy established under Order No. 871-B and Order No. 871-C.  If such a "presumption" cannot be overcome in these circumstances, when could they?

5.    As the order recognizes, this project will provide more reliable service to the local distribution companies which deliver a critical commodity that is needed for home heating and for electric generation throughout the region.[12]  Transco has explained that a

---

[7] *See Transcontinental Gas Pipe Line Co., LLC*, 182 FERC ¶ 61,006 at P 85 & Ordering Para. (D).

[8] *See Limiting Authorizations to Proceed with Constr. Activities Pending Rehearing*, 175 FERC ¶ 61,098, at P 46 (Order No. 871-B), *order on reh'g & clarification*, 176 FERC ¶ 61,062 (2021) (Order No. 871-C).

[9] *See* Order No. 871-B, 175 FERC ¶ 61,098 (Danly, Comm'r, dissenting).

[10] *See* Order No. 871-C, 176 FERC ¶ 61,062 (Danly, Comm'r, dissenting).

[11] *See, e.g.*, *N. Nat. Gas Co.*, 178 FERC ¶ 61,203 (2022) (Danly, Comm'r, concurring in part & dissenting in part); *Gulf S. Pipeline Co., LLC*, 181 FERC ¶ 61,145 (2022) (Danly, Comm'r, concurring in part & dissenting in part at P 2).

[12] *Transcontinental Gas Pipe Line Co., LLC*, 182 FERC ¶ 61,006 at P 35 ("Project shippers note that the project capacity offers a more cost-effective means to satisfy their statutory obligations to provide safe, reliable, affordable, and clean natural gas service to heat homes and businesses than continued reliance on third-party peaking services in the face of growing demand.") (citing South Jersey Gas Company and Elizabethtown Gas Company Apr. 30, 2021 Motion to Intervene and Comments at 5-6; New Jersey Natural Gas Company Nov. 9, 2022 Comments (urging the Commission to approve the project stating that it will improve reliability, ensure competitive pricing and price stability, and

delay in authorization could "threaten [their] ability to meet critical construction windows established to protect certain threatened and endangered species" and that "[m]issing those construction windows would delay construction and postpone the in-service date by up to 12 months, preventing this vital (and fully subscribed) natural gas pipeline capacity from being placed into service in time for the 2023-2024 winter heating season."[13]  For that reason, the Commission should have considered the factors that are normally considered in staying an order[14] and should have refused to implement the stay because such a stay would be contrary to the public interest.

6.      The project sponsor already indicated that if it misses "critical construction windows," it could result in a delay of up to 12 months for the project to go into service. As explained in the application, "[b]y increasing gas supply access along Transco's existing Leidy Line, the Project will support overall reliability and diversification of energy infrastructure in the Northeast, eliminating peak day constraints currently caused by limited pipeline takeaway capacity" and "the Project will benefit the public by promoting competitive markets and enhancing the security of natural gas supplies to major delivery points serving the Northeast."[15]  Additionally, I understand from Commission staff that Transco coordinated with the U.S. Fish and Wildlife Service Pennsylvania Field Office and the Pennsylvania Game Commission to develop project conservation measures to protect federally-listed and state-listed bat species and that these measures include a restriction that requires that tree clearing occur between

---

enhance operating flexibility); South Jersey Resources Group LLC Nov. 9, 2022 Comments (asserting that the project will help address current challenges including increased natural gas prices during the winter months for consumers in the Northeast and limited power generation supplies in some regions that hinder the ability to respond to extreme weather events); and South Jersey Gas Company and Elizabethtown Gas Company Nov. 9, 2022 Comments (stating the REAE Project is critical to ensure reliable and affordable natural gas supply for New Jersey in both the near and long term)).

[13] Transco November 8, 2022 Request for Commission Order for the Regional Energy Access Expansion Project at 1.

[14] *See, e.g.*, *Columbia Gas Transmission, LLC*, 152 FERC ¶ 61,131, at P 51 (2015) ("The Commission considers several factors when evaluating applications for stay, including: (1) if there will be irreparable injury if a stay is not granted; (2) if any interested party will be substantially harmed by the stay; and (3) if the stay is in the public interest.").

[15] Application at 6.

November 16 and March 31.[16]  Has the Commission, in staying the certificate, all but guaranteed that this project—one that the Commission has already found to be required by the public convenience and necessity—will not go into service in time for the 2023-2024 winter season and by the targeted in-service date of December 1, 2023?[17]  I remind the applicant that it is entitled under our stay policy to seek relief by requesting that the stay be lifted.  And such a request for relief need not await rehearing; they need merely file a motion.  Should they seek to avail themselves of their rights to challenge the stay, they would do well to consider filing such a request as soon as possible.[18]

7.      *Third*, and finally, I dissent as to the granting of late motions to intervene filed by the New Jersey Board of Public Utilities and the New Jersey Division of Rate Counsel and the Aquashicola-Pohopoco Watershed Conservancy.  In granting these interventions the Commission abandons its standard and states that the movants "have demonstrated that they each have an interest in this proceeding and granting the untimely motion will not delay, disrupt, or otherwise prejudice this proceeding."[19]  Notably missing from the determination to grant the late interventions is a finding that there was "good cause for failing to file the motion[s] within the time prescribed."[20]  These interventions were thus granted contrary to our regulations.

        For these reasons, I respectfully concur in part and dissent in part.

_____

James P. Danly
Commissioner

---

[16] *See* Transco July 1, 2021 Supplemental Information Filing.

[17] *See* Application at 13; New Jersey Natural Gas Company July 26, 2022 Supplementary Comments in Support of Transco Regional Energy Access Expansion Project at 2 ("Transco proposes to place the REAE Project in service by December 1, 2023 to meet the needs of consumers during the 2023/2024 winter heating season.").

[18] *See Transcontinental Gas Pipe Line Co., LLC*, 182 FERC ¶ 61,006 at P 85 ("the project developer 'may move to preclude, or lift, a stay based on a showing of significant hardship.'  The Commission will seek to act expeditiously on any such motion, should Transco pursue such relief.") (citations omitted).

[19] *Id*. P 11.

[20] 18 C.F.R. § 385.214(d)(1)(i).

UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Transcontinental Gas Pipe Line Company, LLC              Docket No.  CP21-94-000

(Issued January 11, 2023)

CLEMENTS, Commissioner, *concurring*:

1.      I concur with the decision to issue a certificate of public convenience and
necessity to Transcontinental Gas Pipe Line Company, LLC (Transco) for its Regional
Energy Access Expansion (REAE) project.[1]  I do so because the decision comports with
our 1999 Certificate Policy Statement.  However, I write separately to highlight the
inadequacies of the 1999 Certificate Policy Statement and our existing procedures for
eliciting and considering evidence pertaining to project need today, in 2023.  Twenty
years ago, the Commission was primarily concerned about assuring there would be
sufficient natural gas transportation capacity to serve growing demand for natural gas.
Now, a combination of market forces and federal, state, and local climate protection
policies may lead to flat or declining demand for natural gas over time.  The
circumstances impacting the need for new pipeline capacity are an order of magnitude
more complex than they were in 1999, but our policies and practices have not evolved to
address that complexity.  The Commission should draw on its experience in this
proceeding to update the 1999 Certificate Policy Statement – as well as our certificate
application review procedures – to ensure we fully evaluate all the important variables
affecting the need for each proposed new project.

2.      The Commission's 1999 Certificate Policy Statement calls on the Commission to
consider "all relevant factors reflecting on need for the project."[2]  This information
includes, but is not limited to, "precedent agreements, demand projections, potential cost
savings to consumers, or a comparison of projected demand with the amount of capacity
currently serving the market."[3]  The 1999 Certificate Policy Statement further provides
that "the evidence necessary to establish the need for the project will usually include a

---

[1] *Transcontinental Gas Pipe Line Co., LLC,* 182 FERC ¶ 61,006 (2023) (Order).

[2] *Certification of New Interstate Natural Gas Pipeline Facilities,* 88 FERC ¶
61,227, at p. 17 (1999), *clarified,* 90 FERC ¶ 61,128, *further clarified,* 92 FERC ¶ 61,094
(2000) (1999 Certificate Policy Statement).

[3] *Id.*

market study."[4]   Notwithstanding the plain language of the policy statement, over time, the Commission has come to rely almost exclusively on precedent agreements to establish project need.  Although the courts generally have deferred to the Commission's need determinations, failure to consider credible evidence contradicting the claimed need for a project violates both the Natural Gas Act and the Administrative Procedure Act.[5]

3.     In this case the Commission actually has done what it said it would do in the 1999 Certificate Policy Statement, and that is a meaningful step forward.  In addition to considering Transco's precedent agreements, we have also considered market studies and shipper submissions to determine that the proposed REAE project is needed.[6] Nevertheless, by denying an evidentiary hearing[7] and relying only on the paper record, we have left important questions unanswered.

4.     Perhaps the most glaring omission in the Commission's need analysis is any discussion of the weight the Commission should accord to the finding of the New Jersey Board of Public Utilities (NJ BPU) that no additional pipeline capacity is needed in New Jersey.  The state has set ambitious targets for reducing greenhouse gas emissions.[8]  The NJ BPU is one of the lead agencies in New Jersey responsible for achieving those goals. It is also the principal regulator of the four New Jersey local distribution companies (LDCs) that have entered into precedent agreements for a combined 56% of the REAE project's capacity.[9]  The NJ BPU conducted a stakeholder process and commissioned an

---

[4] *Id.* at p. 19.

[5] *See Envtl. Def. Fund v. FERC,* 2 F.4th 953, 975 (D.C. Cir. 2021) (vacating certificate order where Commission relied exclusively on single precedent agreement with pipeline affiliate and failed to consider credible allegations of self-dealing and evidence undermining claimed need).

[6] Order at PP 21-35.

[7] *Id.* at P 14.

[8] New Jersey seeks to reduce greenhouse gas emissions by 80% below 2006 levels by 2050 and to use 100% clean energy in the electric power, transportation, and building sectors by 2050.  *See* New Jersey Global Warming Response Act, N.J.S.A. 26:2C-37; New Jersey Governor Executive Order No. 274 (Nov. 10, 2021); State of New Jersey Energy Master Plan (available at https://nj.gov/emp/docs/pdf/2020_NJBPU_EMP.pdf). New Jersey's Clean Energy Act requires state-regulated electric utilities to reduce fossil fuel consumption by 2% and gas utilities to reduce consumption by 0.75%.  N.J.S.A. 34:1A-85, *et seq.*

[9] I recognize that the remaining 44% of the REAE project's capacity is under

Document Accession #: 20230111-3069   Filed Date: 01/11/2023
Docket No. CP21-94-000                                                  - 3 -

independent study by London Economics International Group (the NJ Agencies Study) to determine whether New Jersey needs additional natural gas pipeline capacity. Based in part on state plans to reduce the use of natural gas, the NJ BPU adopted the NJ Agencies Study and concluded, by order, that New Jersey does *not* require additional capacity.[10] Our decision accords no special weight to the NJ BPU's determination, instead treating the NJ Agencies Study and the NJ BPU's order as on a par with Transco's market study (discussed below). As more states adopt laws and policies like New Jersey's, we should expect more frequent and active participation by states and their utility regulators in our certificate proceedings.[11] Rather than improvising case-by-case, we should determine *as a matter of policy* how to consider and weigh relevant state laws, programs, and administrative determinations in future certificate proceedings.

5.      Transco commissioned its own market study, prepared by Levitan and Associates, which finds there will be a design day capacity shortfall without the REAE project. Reliability is always a key concern for the Commission, so the reliability issues the Levitan study identifies must be taken seriously. Yet, the Levitan study contradicts the findings of the NJ BPU, which is the agency responsible for assuring that New Jersey LDCs deliver reliable natural gas service. The Levitan study takes the LDCs' design day demand forecasts at face value; it does not ask what the bases for the forecasts are or the

---

contract. LDCs in other states have entered into precedent agreements for 17% of the project's capacity. An affiliated natural gas marketer contracted for another 18% and an unaffiliated marketer for 9%. Notably, the bulk of the marketers' business is in New Jersey. *See* Order at PP 7-8. If the New Jersey-related capacity were taken out of the equation, I doubt we could find that Transco had met its burden of establishing the REAE project is needed.

[10] *See* Order at P 22.

[11] New Jersey is not alone in adopting an ambitious climate program; many other state and local governments are implementing legislation and policies designed to reduce the use of fossil fuels, including natural gas. *See* Alexandra B. Klass, *Evaluating Project Need for Natural Gas Pipelines in an Age of Climate Change: A Spotlight on FERC and the Courts,* 39 Yale J. on Reg. 658, 675 (2022) (listing state and local enactments and programs). State regulators may lack the statutory authority or procedures to approve an LDC's proposed precedent agreement in advance, making the Commission's certificate proceeding their only avenue for preventing an LDC's execution of a precedent agreement the regulator deems unnecessary or otherwise imprudent. State regulators also may see after-the-fact prudence reviews as counterproductive because denying cost recovery to the LDC could impair its credit rating, thereby increasing its cost of capital, and ultimately its rates, which reflect the cost of capital.

Document Accession #: 20230111-3069     Filed Date: 01/11/2023
Docket No. CP21-94-000                                                              - 4 -

degree to which the forecasts reflect state energy policies and programs.[12]  Nor has the
Commission endeavored to answer those questions itself.

6.      Other important need-related questions include the timeline for, and likely efficacy
of, New Jersey's building electrification and other planned measures to reduce reliance
on natural gas.  Having confined itself to the paper record that the parties created, the
Commission cannot answer these questions.  Leaving the job half-done, the Commission
essentially dismisses the totality of New Jersey's efforts with the observation that the
"non-pipeline" alternatives addressed in the NJ BPU's order are not mandatory.[13]
Although this approach may be defensible under the 1999 Certificate Policy Statement, it
surely is not optimal.

7.      Some may ask why the Commission should concern itself with an LDC's actual
need for natural gas since the state utility regulator can decide the LDC imprudently
entered into the agreement.  The answer is simple.  The Commission is responsible for
making its own public interest determination under the Natural Gas Act, and the public
interest encompasses much more than the costs that may be unjustifiably imposed on the
LDC's ratepayers.  The Commission cannot avoid its statutory responsibilities through
reflexive reliance either on the views of state utility regulators or a project sponsor's
precedent agreements.  Nor can we whistle past the fact that the wider public ultimately
pays the price when the Commission allows construction of unneeded new capacity.
That price may include the permanent loss of land taken by eminent domain, other
property damage, disruption to environmental justice and other communities in the
project vicinity, and environmental damage.

8.      With so much at stake, and so many variables affecting future demand for natural
gas, the Commission's relatively superficial approach to evaluating project need will
become increasingly untenable, both legally and practically.  We should update our
Certificate Policy Statement to provide for the full evaluation of *all* relevant information
pertaining to need, including the effect of relevant federal, state, and local policies and
programs on demand for natural gas to be transported by the proposed project.  The
Commission also should clarify that data requests, independent Commission staff
analyses, and evidentiary hearings are appropriate tools to include in our need evaluation
toolbox.  In short, it is time for the Commission to implement policies and practices that
reflect today's realities.

---

[12] *See* Order at P 27.

[13] Order at P 31.  The Commission has not asked and therefore does not know
what progress New Jersey has made or likely will make implementing its nearly 300-
page Energy Master Plan, issued in 2020, which describes the measures the state will take
to meet its climate goals.

Document Accession #: 20230111-3069    Filed Date: 01/11/2023

For these reasons, I respectfully concur.


_____
Allison Clements
Commissioner

UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Transcontinental Gas Pipe Line Company, LLC            Docket No.        CP21-94-000

(Issued January 11, 2023)

CHRISTIE, Commissioner, *concurring*:

1.        I support granting the Motion to Intervene Out of Time and to Lodge ("Motion to Intervene and Lodge") jointly filed by the New Jersey Board of Public Utilities ("NJBPU") and the New Jersey Division of Rate Counsel.[1]   While the views of state officials are always due respectful consideration, in this case the position and views of the NJBPU are somewhat less than clear based on the history of this case.   The NJBPU did not timely intervene to oppose this specific project (hence, the need for the Motion to Intervene Out of Time and Lodge).  Nor does the NJBPU explicitly ask the Commission to *reject* this specific project, but only to accept a third-party study by London Economics[2] ("London Study") that, as the Motion puts it, "will *help the Commission determine whether New Jersey requires any* additional natural gas pipeline capacity."[3] While the NJBPU indicates it accepts the "findings" of the London Study, as best as I can determine, that study was a general study applicable statewide, not to this specific project.  But even assuming the NJBPU is implicitly opposed to the project, the record does not indicate that the NJBPU submitted any information explaining why the local gas distribution companies ("LDCs") in New Jersey, which entered into contracts to take natural gas supply from this pipeline — LDCs which the NJBPU regulates—were wrong to do so or could have obtained alternative sources of gas supply to serve their residential, commercial and industrial customers,[4] or would incur shipping costs that would be

---

[1] New Jersey Agencies' Motion to Intervene Out of Time and Motion to Lodge, Docket No. CP21-94-000 (filed Jul. 11, 2022).

[2] Analysis of Natural Gas Capacity to Serve New Jersey Firm Customers, London Economics International LLC (Nov. 5, 2021) (London Study), attached to *In the Matter of the Exploration of Gas Capacity and Related Issues*, Docket No. GO19070846 (Jun. 29, 2022) (NJ BPU Order) submitted with New Jersey Agencies' Motion to Intervene and Lodge, Docket No. CP21-94-000 (filed Jul. 11, 2022).

[3] Motion to Intervene and Lodge at 1 (emphasis added).

[4] As noted in the Order (*see* PP 28-31), the London Study considers several alternatives on both the demand and the supply sides that are merely theoretical.  It

Docket No. CP21-94-000                                                      - 2 -

unreasonable or imprudently incurred or would be unnecessary to provide reliable service to customers. And, as the Order notes, New Jersey constitutes only about half of the need for the project, so the need issue is broader than one state.[5]

2.     The London Study is one of three studies constituting part of the record in this case.[6] The London Study's conclusions are at variance with another study, offered by the Applicant,[7] also presented on the question of need.

3.     So the question is how much weight the third-party studies submitted herein should receive. I am aware that the Commission has encouraged the submission of such studies in certificate cases,[8] but, as I have noted before, a third-party study that has never been authenticated by a witness (such as the study's author) who could testify and be subject to cross-examination under oath would likely not be admitted into evidence under standard rules of evidence in any judicial proceeding.[9] We generally accept, however,

---

speculates, for example, that some of the NJ LDCs' need could be met with technologies and infrastructure that are not presently available. *See, e.g.*, London Study at 56 ("Green Hydrogen" is a potential solution that is "still in an early stage of development"); and 59 ("natural gas response programs are still in their infancy").

[5] Order at P 28.

[6] The other two studies are the Skipping Stone Study submitted by EDF and the NJ Conversation Fund and the Levitan Study submitted by Transco. Each of the three studies is discussed in the Order. *See* Order at PP 21-35.

[7] Transco April 22, 2022 Response to Additional Information Request at Attachment 1D (Transco Levitan Study).

[8] *See Certification of New Interstate Natural Gas Pipeline Facilities*, 88 FERC ¶ 61,227, p.61,748 (1999) (1999 Certificate Policy Statement) ("evidence necessary to establish the need for [a new] project will usually include a market study.")

[9] *See generally*, Fed. R. Evidence Rule 802. Earlier this year, I stated, "ideally, a third-party report without a witness who can authenticate it and be cross-examined on it would not even be admitted as evidence in any serious evidentiary proceeding." *Midcontinent Independent System Operator, Inc.*, 179 FERC ¶ 61,124 (May 18, 2022) (Christie, Concurring). I added, "I recognize that the Commission sometimes conducts paper hearings. However, in such proceedings, parties at least can submit competing testimony and evidence." *Id.* at n. 14.

this type of evidence in FERC proceedings like this one,[10] which is legislative in nature, not judicial.

4.　　Weighed against the evidence from third-party studies in this proceeding is uncontested evidence that several shippers — *unaffiliated* with the pipeline developer — freely executed agreements to take service on the facility.[11]  In fact, the precedent agreements cover 100% of the capacity of the REAE Project.  Several of these shippers are LDCs that serve residential and commercial customers in New Jersey and executed agreements because they need the gas supply to serve their customers.[12]  Meanwhile, as discussed in the Order, even while admitted to the record, each of the third-party studies suffers certain shortcomings that further limit their usefulness for aiding our decision-making.[13]  The third-party studies submitted in this proceeding are conflicting, are part of the record but, on balance, do not outweigh the persuasive evidence of need represented by the executed agreements to take service.

　　　　For these reasons, I respectfully concur.

_____

Mark C. Christie
Commissioner

---

[10] *See*, *e.g.*, *PJM Power Providers Grp. v. FERC*, 880 F.3d 559, 563 (D.C. Cir. 2018) (declining to convene a live hearing to adjudicate between competing experts is within FERC's discretion) (citing *Minisink Residents for Envt'l Pres. & Safety v. FERC*, 762 F.3d 97 114-15 (D.C. Cir. 2014) and *Blumenthal v. FERC*, 613 1142, 1144-45 (D.C. Cir. 2010)).

[11] *See* 1999 Certificate Policy Statement, 88 FERC ¶ 61,227 at p.61,748 (noting that precedent agreements will always "constitute significant evidence of demand," and that when a proposed project "has precedent agreements with multiple new customers [it] may present a greater indication of need than a project with only a precedent agreement with an affiliate.")

[12] *See* Order at P 21 (citing statements by various New Jersey LDCs supporting the need for the REAE Project in order to ensure reliability, promote operating flexibility, and provide rate stability to customers).  To repeat, it is worth bearing in mind, as the Order notes, that New Jersey constitutes only about half of the need the REAE Project is intended to meet.  *Id*. at P 28.

[13] Order at PP 21-35.

Document Content(s)

CP21-94-000.docx.........................................................1

# EXHIBIT B

182 FERC ¶ 62,146
UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Transcontinental Gas Pipe Line Company, LLC                Docket No. CP21-94-001

NOTICE OF DENIAL OF REHEARING BY OPERATION OF LAW AND
PROVIDING FOR FURTHER CONSIDERATION

(March 13, 2023)

Rehearing has been timely requested of the Commission's order issued on January 11, 2023, in this proceeding.  *Transcon. Gas Pipe Line Co., LLC*, 182 FERC ¶ 61,006 (2023).  In the absence of Commission action on a request for rehearing within 30 days from the date it is filed, the request for rehearing may be deemed to have been denied.  15 U.S.C. § 717r(a); 18 C.F.R. § 385.713 (2022); *Allegheny Def. Project v. FERC*, 964 F.3d 1 (D.C. Cir. 2020) (en banc).

As provided in 15 U.S.C. § 717r(a), the requests for rehearing of the above-cited order filed in this proceeding will be addressed in a future order to be issued consistent with the requirements of such section.  As also provided in 15 U.S.C. § 717r(a), the Commission may modify or set aside its above-cited order, in whole or in part, in such manner as it shall deem proper.

Debbie-Anne A. Reese,
Deputy Secretary.

# EXHIBIT C

### Service List for *Transcontinental Gas Pipe Line Company, LLC,* FERC Docket No. CP21-94

Kirkman Frost
58 Peoples Line Road
Somerset, NEW JERSEY 08873
UNITED STATES
kirkafrost@yahoo.com

Ms Carol P Kuehn
4291 Route 27
Princeton, NEW JERSEY 08540
UNITED STATES
carolkuehn@verizon.net

Judith Canepa
Rockaway Outreach Coordinator
716 E 11Th Street 2P
New York, NEW YORK 10009
UNITED STATES
jk@saneenergy.org

Laura Cisar
37 Outcalt Road
Edison, NEW JERSEY 08817
UNITED STATES
landr@optonline.net

Susan London
140 Picadilly Place
Somerset, NEW JERSEY 08873
UNITED STATES
s.london_8.7.3@verizon.net

George Crabtree

24C Thompson Ave
Bound Brook, NEW JERSEY 08805
UNITED STATES
gcrabtree@gmail.com

Barbara Cuthbert
260 Bunkerhill Road
Princeton, NEW JERSEY 08540
UNITED STATES
bcuthbert260@gmail.com

Deana Luchs
51 Patriots Way
Somerset, NEW JERSEY 08873
UNITED STATES
dluchs8@hotmail.com

Sara Gronim
35 Prospect Park West
13C
Brooklyn, NEW YORK 11215
UNITED STATES
sgronim@rcn.com

Charles Adonizio
1691 Westminster rd.
Wilkes-Barre
Pennsylvania, PENNSYLVANIA 18702
UNITED STATES
caatlas@aol.com

Michael Egenton
EVP
216 West State Street
Trenton, NEW JERSEY 08608

UNITED STATES
michael@njchamber.com

James Spinola
3257 Hillcrest Drive
SAYLORSBURG, PENNSYLVANIA 18353
UNITED STATES
cs_4@aeclinks.com

Gary Frederick
38 MILITIA HILL RD
FREEHOLD, NEW JERSEY 07728
UNITED STATES
gary.frederick3@gmail.com

Christopher Neumann
297 Kilgore Road
Delta, PENNSYLVANIA 17314
UNITED STATES
willowspringfarm88@gmail.com

Richard Stern
LMCT Administrator
1104 N. Kentucky Street
Arlington, VIRGINIA 22205
UNITED STATES
ibt42250@aol.com

Bernadette Maher
4 Norris Road
Somerset, NEW JERSEY 08873
UNITED STATES
BernDanErin@aol.com

S. Pasricha

12

18 DeVoes Ln
E. Brunswick, NEW JERSEY 08816
UNITED STATES
sinpas18@yahoo.com

Kevin Corcoran
46 Lavender Drive
Princeton, NEW JERSEY 08540
UNITED STATES
kevin.corcoran@cpa.com

Scott Salvigsen
Manager
310 buck blvd
White haven, PENNSYLVANIA 18661
UNITED STATES
Scottsalvigsen@yahoo.com

Slade Sizemore
1386 Brian lane
Effort, PENNSYLVANIA 18330
UNITED STATES
Slayed@gmail.com

david dahlem
Owner of 1.5C, LLC
165 LINDEN RD
PINEHURST, NORTH CAROLINA 28374
UNITED STATES
1point5C@gmail.com

Matthew Agen
Assistant General Counsel
American Gas Association
400 N CAPITOL ST NW STE 450

13

WASHINGTON, DISTRICT OF COLUMBIA 20001
UNITED STATES
magen@aga.org

Katherine M Herrera
Regulatory Policy Analyst
American Gas Association
400 North Capitol NW
Washington, DISTRICT OF COLUMBIA 2001
kherrera@aga.org

Ben Norris
Senior Counsel
AMERICAN PETROLEUM INSTITUTE
200 Massachusetts Ave., NW
Washington, DISTRICT OF COLUMBIA 20001
UNITED STATES
norrisb@api.org

Aquashicola Pohopoco Watershed Conservancy
Megan Gibson
820 1ST ST NE
WASHINGTON, DISTRICT OF COLUMBIA 20002
UNITED STATES
mgibson@niskanencenter.org

Aquashicola-Pohopoco Watershed Conservancy
Jennifer Danis
Senior Staff Attorney
Niskanen Center
820 1ST ST NE STE 675
WASHINGTON, DISTRICT OF COLUMBIA 20002
UNITED STATES
jdanis@niskanencenter.org

Atlanta Gas Light Company
Elizabeth Wade
Senior Counsel
Southern Company Gas
10 PEACHTREE PL NE
ATLANTA, GEORGIA 30309
UNITED STATES
ferclegal@southernco.com

Cabot Oil & Gas Corporation
Matthew Schreck
Partner
Corbett & Schreck, P.C.
9525 Katy Freeway
Suite 420
Houston, TEXAS 77024
UNITED STATES
matt@airmail.net

Catherine Folio
Jennifer Danis
Senior Staff Attorney
Niskanen Center
820 1ST ST NE STE 675
WASHINGTON, DISTRICT OF COLUMBIA 20002
UNITED STATES
jdanis@niskanencenter.org

Catherine Folio
Megan Gibson
820 1ST ST NE
WASHINGTON, DISTRICT OF COLUMBIA 20002
UNITED STATES
mgibson@niskanencenter.org

CENTER FOR LIQUEFIED NATURAL GAS
NGSA NGSA
NATURAL GAS SUPPLY ASSOCIATION
900 17th Street NW
Suite 500
Washington, DISTRICT OF COLUMBIA 20002
UNITED STATES
intervenor@ngsa.org

Chamber of Commerce Southern New Jersey
Hilary Chebra
Manager Government Affairs
Chamber of Commerce Southern New Jersey
220 Laurel Rd
Suite 203
Voorhees, NEW JERSEY 08043
UNITED STATES
hchebra@chambersnj.com

Chemistry Council of NJ
dennis hart
Executive Director
150 West State Street
Trenton, NEW JERSEY 08608
UNITED STATES
Dhart@chemistrycouncilnj.org

Chief Oil & Gas LLC
Kevin Sweeney
Law Office of Kevin M. Sweeney
1717 K Street, NW
Suite 900
Washington, DISTRICT OF COLUMBIA 20006
UNITED STATES
ksweeney@kmsenergylaw.com

Justin Clarke
Vice President and General Cou
Chief Oil & Gas LLC
8111 Westchester Drive
Suite 900
Dallas, TEXAS 75225
jclarke@chiefog.com

Chief Oil & Gas LLC
Andrew E Levine
Chief Oil & Gas LLC
6464 NORTHPORT DR
DALLAS, TEXAS 75230
alevine@chiefog.com

Columbia Gas of Virginia, Inc.
Meagan Moore
Senior Counsel
NISOURCE
121 Champion Way
Suite 100
Canonsburg, PENNSYLVANIA 15317
UNITED STATES
mbmoore@nisource.com

Philip Arthur
NISOURCE
290 W Nationwide Blvd
Columbus, OHIO 43215
parthur@nisource.com

Constellation Energy Generation, LLC
Carrie Allen
SVP & Deputy General Counsel

17

CONSTELLATION ENERGY CORPORATION
101 Constitution Ave. NW Suite 400 East
Washington, DISTRICT OF COLUMBIA 20001
UNITED STATES
carrie.allen@constellation.com

Christopher A Wilson
Director, Federal Regulatory A
Constellation Energy Generation, LLC
101 Constitution Ave, NW
Suite 400E
Washington, DISTRICT OF COLUMBIA 20001
FERCe-filings1@Constellation.com

Delaware Riverkeeper Network Kacy Manahan
Delaware Riverkeeper Network
Delaware Riverkeeper Network
925 CANAL ST STE 3701
BRISTOL, PENNSYLVANIA 19007
UNITED STATES
kacy@delawareriverkeeper.org

Maya van Rossum
Delaware Riverkeeper
Delaware Riverkeeper Network
Delaware Riverkeper Network
925 Canal St, suite 3701
Bristol, PENNSYLVANIA 19007
keepermaya@delawareriverkeeper.org

Duke Energy Carolinas, LLC, Duke Energy Progress, LLC, and Duke Energy
Florida, LLC
James Jeffries
McGuireWoods, LLP
201 North Tryon Street, Suite 3000

18

Charlotte, NORTH CAROLINA 28202
UNITED STATES
mferc@mcguirewoods.com

Blake Boecking
526 South Church St EC02F EC02F
Charlotte, ALABAMA 28202
blake.boecking@duke-energy.com

Elizabethtown Gas Company
Kirstin Gibbs
Partner
Morgan Lewis & Bockius, LLP
1111 Pennsylvania Avenue NW
Washington, DISTRICT OF COLUMBIA 20004
UNITED STATES
kirstin.gibbs@morganlewis.com

Pamela T. Wu
Partner
Morgan Lewis & Bockius, LLP
1111 PENNSYLVANIA AVE NW
WASHINGTON, DISTRICT OF COLUMBIA 20004
pamela.wu@morganlewis.com

Elizabethtown Gas Company
Van L McPherson, ESQ
Assistant General Counsel
South Jersey Industries, Inc.
1 South Jersey Plaza
Folsom, NEW JERSEY 08037
vmcpherson@sjindustries.com

Exelon Corporation
Gary Guy

Assistant General Counsel
Exelon Business Services Company
701 Ninth Street, NW
Suite 9426
Washington, DISTRICT OF COLUMBIA 20068
UNITED STATES
gary.guy@exeloncorp.com

Susan Bergles
Assistant General Counsel
Constellation Energy Generation, LLC
1310 POINT ST FL # 8TH
BALTIMORE, MARYLAND 21231
susan.bergles@constellation.com

Exelon Corporation
Christopher A Wilson
Director, Federal Regulatory A
Constellation Energy Generation, LLC
101 Constitution Ave, NW
Suite 400E
Washington, DISTRICT OF COLUMBIA 20001
FERCe-filings1@Constellation.com

Exelon Corporation
Lisa Simpkins
Director - Fuels Policy
1310 POINT ST # 9NW21
BALTIMORE, MARYLAND 21231
lisa.simpkins@constellation.com

Exelon Corporation
Brian Scheerer
Sr. Gas Supply and Transportat
Baltimore Gas & Electric Company

20

1699 Leadenhall St.
Baltimore, MARYLAND 21230
Brian.scheerer@bge.com

Exelon Corporation
Gina Calvert
gina.calvert@bge.com
Exelon Corporation

Brandon J. Pierce, ESQ
Assistant General Counsel
Exelon Corporation
2301 Market St.
S23-1
Philadelphia, PENNSYLVANIA 19103
Brandon.Pierce@exeloncorp.com

Exelon Corporation
Megan A McDevitt
PECO Energy Company
2301 Market Street
S14-2
Philadelphia, PENNSYLVANIA 19103
megan.mcdevitt@exeloncorp.com

Food and Water Watch
Adam Carlesco
Staff Attorney
Food & Water Watch
1616 P ST NW STE 300
WASHINGTON, DISTRICT OF COLUMBIA 20036
UNITED STATES
acarlesco@fwwatch.org

Adam Carlesco, ESQ

Staff Attorney
Food & Water Watch
1616 P ST NW STE 300
WASHINGTON, DISTRICT OF COLUMBIA 20036
acarlesco@fwwatch.org

International Union of Operating Engineers, Washington, DC
Robert Wilds
Director of Pipeline
International Union of Operating Engineers, Washington, DC
1125 seventeenth st. NW
Washington, DISTRICT OF COLUMBIA 20036
UNITED STATES
Rwilds@iuoe.org

Robert Wilds
Director of Pipeline
International Union of Operating Engineers, Washington, DC
1125 seventeenth st. NW
Washington, DISTRICT OF COLUMBIA 20036
Rwilds@iuoe.org

IUOE 825
Gregory Lalevee
INTERNATIONAL UNION OF OPERATING ENGINEERS LOCAL 825
96 Bates Gates Road
New Hampton, NEW YORK 10958
UNITED STATES
glalevee@iuoe825.org

gina sulllivan
Business Development
IUOE 825
65 SPRINGFIELD AVE STE 2
SPRINGFIELD, NEW JERSEY 07081

gsullivan@elec825.org

LABORERS INTERNATIONAL UNION OF NORTH AMERICA
Michard Johnson
International Representative,
LABORERS INTERNATIONAL UNION OF NORTH AMERICA
905 16th St NW
Washington, DISTRICT OF COLUMBIA 20006
UNITED STATES
ljohnson@liuna.org

Maya K. van Rossum, the Delaware Riverkeeper
Kacy Manahan
Delaware Riverkeeper Network
Delaware Riverkeeper Network
925 CANAL ST STE 3701
BRISTOL, PENNSYLVANIA 19007
UNITED STATES
kacy@delawareriverkeeper.org

Maya van Rossum
Delaware Riverkeeper
Delaware Riverkeeper Network
Delaware Riverkeper Network
925 Canal St, suite 3701
Bristol, PENNSYLVANIA 19007
keepermaya@delawareriverkeeper.org

National Grid Gas Delivery Companies
Kenneth Maloney
Cullen and Dykman
1101 Fourteenth Street, N.W.
Suite 750
Washington, DISTRICT OF COLUMBIA 20005
UNITED STATES

23

kmaloney@cullenllp.com

Gregory T. Simmons
Associate
Cullen and Dykman LLP
1101 14TH ST NW STE 750
WASHINGTON, DISTRICT OF COLUMBIA 20005
gsimmons@cullenllp.com

National Grid Gas Delivery Companies
Andrew MacBride
National Grid
40 Sylvan Road
Waltham, MASSACHUSETTS 02451
andrew.macbride@nationalgrid.com

National Grid Gas Delivery Companies
Patrick J. Tarmey
Senior Counsel, FERC Regulator
National Grid
40 Sylvan Rd.
Waltham, MASSACHUSETTS 02451
patrick.tarmey@nationalgrid.com

National Grid Gas Delivery Companies
Samara A Jaffe
Program Manager
National Grid Gas Delivery Companies
100 East Old Country Rd
Hicksville, NEW YORK 11021
samara.jaffe@nationalgrid.com

NATURAL GAS SUPPLY ASSOCIATION (DC)   NGSA NGSA
NATURAL GAS SUPPLY ASSOCIATION
900 17th Street NW

Suite 500
Washington, DISTRICT OF COLUMBIA 20002
UNITED STATES
intervenor@ngsa.org

New Jersey Board of Public Utilities
Paul Youchak
New Jersey Department of Law and Public Safety
25 Market Street
Trenton, NEW JERSEY 08611
UNITED STATES
paul.youchak@law.njoag.gov

Ian Oxenham, ESQ
New Jersey Board of Public Utilities
44 S CLINTON AVE FL 10
TRENTON, NEW JERSEY 08609
Ian.Oxenham@bpu.nj.gov

New Jersey Board of Public Utilities   David Schmitt
New Jersey Board of Public Uti
New Jersey Board of Public Utilities
44 S Clinton Ave
Trenton, NEW JERSEY 08625
UNITED STATES
David.schmitt@bpu.nj.gov

Ryann Reagan
Aide to the Commissioner
New Jersey Board of Public Utilities
44 S Clinton Ave
Trenton, NEW JERSEY 08638
ryann.reagan@bpu.nj.gov

New Jersey Conservation Foundation

25

Jennifer Danis
Senior Staff Attorney
820 1ST ST NE STE 675
WASHINGTON, DISTRICT OF COLUMBIA 20002
UNITED STATES
jdanis@niskanencenter.org

David Bookbinder
820 First Street, NE
Washington, MARYLAND 20002
dbookbinder@niskanencenter.org

New Jersey Conservation Foundation
Megan Gibson
820 1ST ST NE
WASHINGTON, DISTRICT OF COLUMBIA 20002
UNITED STATES
mgibson@niskanencenter.org

New Jersey Department of Environmental Protection
David Pepe
Env. Specialist III
New Jersey Department of Environmental Protection
401 E.State Str
Trenton, NEW JERSEY 08625
UNITED STATES
david.pepe@dep.nj.gov

New Jersey Division of Rate Counsel
Robert Glover
New Jersey Division of Rate Counsel
140 East Front Street
4th Floor
Trenton, NEW JERSEY 08625
UNITED STATES

rglover@rpa.nj.gov

T. David Wand
Division of Rate Counsel
New Jersey Division of Rate Counsel
140 E. Front St.
4th Flr.
Trenton, NEW JERSEY 08625
dwand@rpa.nj.gov

New Jersey Division of Rate Counsel
Maura Caroselli, ESQ
mcaroselli@rpa.nj.gov
New Jersey Division of Rate Counsel

Megan Lupo
New Jersey Division of Rate Co
New Jersey Division of Rate Counsel
140 E FRONT ST FL 4
TRENTON, NEW JERSEY 08608
mlupo@rpa.nj.gov

New Jersey Division of Rate Counsel
Brian O Lipman
Acting Director
140 East Front Street
4th Floor
Trenton, NEW JERSEY 08625
blipman@rpa.nj.gov

New Jersey Laborers' Employers' Cooperation and Education Trust
Steven Gardner
New Jersey Laborers' Employers' Cooperation and Education Trust
1 Tower Center Boulevard
24th Floor

East Brunswick, NEW JERSEY 08816
UNITED STATES
Sgardner@njlecet.org

New jersey League of Conservation Voters
Joseph Hendershot
707 STATE RD STE 223
PRINCETON, NEW JERSEY 08540
UNITED STATES
joe.hendershot@njlcv.org

New jersey League of Conservation Voters
Joseph Hendershot
707 STATE RD STE 223
PRINCETON, NEW JERSEY 08540
UNITED STATES
joe.hendershot@njlcv.org

New jersey League of Conservation Voters
Megan Gibson
820 1ST ST NE
WASHINGTON, DISTRICT OF COLUMBIA 20002
UNITED STATES
mgibson@niskanencenter.org

New Jersey Natural Gas Company
William Scharfenberg
Attorney
NJR Service Corporation
PO Box 1415
Wall,NEW JERSEY 07719
UNITED STATES
wscharfenberg@njresources.com

Doug Rudd

Gas Analyst
New Jersey Natural Gas Company
PO Box 1415
Wall,NEW JERSEY 07719
dcrudd@njresources.com

New Jersey Natural Gas Company
William Scharfenberg
Attorney
NJR Service Corporation
PO Box 1415
Wall,NEW JERSEY 07719
UNITED STATES
wscharfenberg@njresources.com

Barbara Saker
New Jersey Natural Gas Company
1415 Wyckoff Road
P.O. Box 1468
Wall, NEW JERSEY 07719
bsaker@njresources.com

NJR Energy Services Company
William Scharfenberg
Attorney
NJR Service Corporation
PO Box 1415
Wall,NEW JERSEY 07719
UNITED STATES
wscharfenberg@njresources.com

Angel A Velez
Director, Operations & Asset O
New Jersey Resources Corporation
1415 Wyckoff Road

Wall, NEW JERSEY 07719
avelez@njresources.com

Pennsylvania Manufacturers' Association
Carl Marrara
Executive Director
Pennsylvania Manufacturers' Association
PA Manufacturers Assoc.
225 State Street
Harrisburg, PENNSYLVANIA 17101
UNITED STATES
marrara@pamanufacturers.org

Philadelphia Gas Works
Joel Greene
Member
Jennings, Strouss & Salmon, P.L.C.
1300 I Street, NW
Suite 1120
Washington, DISTRICT OF COLUMBIA 20005
UNITED STATES
jgreene@jsslaw.com

Laura Storino
Manager, Gas Supply
Philadelphia Gas Works
800 W MONTGOMERY AVE
PHILADELPHIA, PENNSYLVANIA 19122
laura.storino@pgworks.com

Philadelphia Gas Works
Andrea Sarmentero
Jennings, Strouss & Salmon, P.
Jennings, Strouss & Salmon, P.L.C.
1300 I ST NW STE 1120

WASHINGTON, DISTRICT OF COLUMBIA 20005
UNITED STATES
asarmentero@jsslaw.com

Piedmont Natural Gas Company, Inc.
James Jeffries
McGuireWoods, LLP
201 North Tryon Street, Suite 3000
Charlotte, NORTH CAROLINA 28202
UNITED STATES
mferc@mcguirewoods.com

Joanna S Greene
Sr. Transport/Pipeline Svc. An
Piedmont Natural Gas Company, Inc.
4720 PIEDMONT ROW DR
CHARLOTTE, NORTH CAROLINA 28210
JOANNA.GREENE@DUKE-ENERGY.COM

Public Service Electric and Gas Company
Drake Kijowski
Gas Supply Manager
80 Park Plaza
Mail Code T - 19
Newark, NEW JERSEY 07102
UNITED STATES
drake.kijowski@pseg.com

Ana Murteira
Assistant Regulatory Counsel
80 PARK PLZ # T10
NEWARK, NEW JERSEY 07102
ana.murteira@pseg.com

Public Service Electric and Gas Company

31

Robert Gardinor
Paralegal
80 Park Plaza, T5
Newark, NEW JERSEY 07102
UNITED STATES
Robert.Gardinor@pseg.com

Michael A Merizio
Senior Gas Regulatory Analyst
80 Park Plaza
Newark, NEW JERSEY 07102
michael.merizio@pseg.com

Reading Blue Mountain and Northern Railroad Company
Robert Weishaar
McNees Wallace & Nurick LLC
1200 G Street, NW
Suite 800
Washington, DISTRICT OF COLUMBIA 20005
UNITED STATES
bweishaar@mcneeslaw.com

Christina Rogers
Ms. Christina Roger
Retired
2334 Mountain Laurel Drive
Effort, PENNSYLVANIA 18330
UNITED STATES
cpottger@aol.com

Sane Energy Project
Kim Fraczek
Director
Sane Energy Project
250 Moore St.

#410
Brooklyn, NEW YORK 11206
UNITED STATES
kim@saneenergyproject.org

Kim A Fraczek
Director
Sane Energy Project
250 Moore St.
#410
Brooklyn, NEW YORK 11206
kim@saneenergyproject.org

Sierra Club
Ankit Jain
Sierra Club
50 F Street NW
Eighth Floor
Washington, DISTRICT OF COLUMBIA 20001
UNITED STATES
ankit.jain@sierraclub.org

South Jersey Gas Company
Kirstin Gibbs
Partner
Morgan Lewis & Bockius, LLP
1111 Pennsylvania Avenue NW
Washington, DISTRICT OF COLUMBIA 20004
UNITED STATES
kirstin.gibbs@morganlewis.com

Pamela T. Wu
Partner
Morgan Lewis & Bockius, LLP
1111 PENNSYLVANIA AVE NW

33

WASHINGTON, DISTRICT OF COLUMBIA 20004
pamela.wu@morganlewis.com

South Jersey Gas Company
Van L McPherson, ESQ
Assistant General Counsel
South Jersey Industries, Inc.
1 South Jersey Plaza
Folsom, NEW JERSEY 08037
vmcpherson@sjindustries.com

South Jersey Resources Group, LLC
Kirstin Gibbs
Partner
Morgan Lewis & Bockius, LLP
1111 Pennsylvania Avenue NW
Washington, DISTRICT OF COLUMBIA 20004
UNITED STATES
kirstin.gibbs@morganlewis.com

Pamela T. Wu
Partner
Morgan Lewis & Bockius, LLP
1111 PENNSYLVANIA AVE NW
WASHINGTON, DISTRICT OF COLUMBIA 20004
pamela.wu@morganlewis.com

South Jersey Resources Group, LLC
Lauren Long
South Jersey Industries, Inc.
1 N. White Horse Pike
Hammonton, NEW JERSEY 08037
laurenlong@sjindustries.com

Southern New Jersey Development Council

34

Jane Asselta
Southern New Jersey Development Council
900 Route 168, Suite D-4
Turnersville, NEW JERSEY 08012
UNITED STATES
jane@snjdc.org

Symmetry Energy Solutions, LLC
James Jeffries
McGuireWoods, LLP
201 North Tryon Street, Suite 3000
Charlotte, NORTH CAROLINA 28202
UNITED STATES
mferc@mcguirewoods.com

jeffrey perryman
Symmetry Energy Solutions, LLC
1111 Louisiana St.
B-241
Houston, TEXAS 77002
jeff.perryman@symmetryenergy.com

Transcontinental Gas Pipe Line Company, LLC
Jordan Kirwin
Transcontinental Gas Pipe Line Company, LLC
2800 Post Oak Blvd
Houston, TEXAS 77056
UNITED STATES
Jordan.Kirwin@williams.com

Stephen Andrew Hatridge, ESQ
Vice President & Assistant Gen
Transcontinental Gas Pipe Line Corporation
2800 Post Oak Blvd
P.O. Box 1396

Houston, TEXAS 77056
stephen.a.hatridge@williams.com


Transcontinental Gas Pipe Line Company, LLC
Nicole M Turpen
Transcontinental Gas Pipe Line Company, LLC
2800 Post Oak Blvd
Houston, TEXAS 77055
nicole.turpen@williams.com


Transcontinental Gas Pipe Line Company, LLC
Nicholas J Baumann
Regulatory Analyst
Transcontinental Gas Pipe Line Company, LLC
2800 Post Oak Blvd
Houston, TEXAS 77056
nick.baumann@williams.com


Transcontinental Gas Pipe Line Company, LLC
Nicholas Kirkhorn
555 13TH ST NW
WASHINGTON, DISTRICT OF COLUMBIA 20004
nicholas.kirkhorn@williams.com


Transcontinental Gas Pipe Line Company, LLC
Brian Ham
Williams Gas Pipeline Company
2800 Post Oak Blvd
Houston, TEXAS 77056
brian.ham@williams.com


Transcontinental Gas Pipe Line Company, LLC
Andre Pereira
Regulatory Analyst Lead
Transcontinental Gas Pipe Line Company, LLC

36

2800 Post Oak Blvd
Houston, TEXAS 77056
andre.s.pereira@williams.com

UGI Utilities Inc.
Michael Swerling
UGI Corporation
UGI Corporation
460 N Gulph Road
King of Prussia, PENNSYLVANIA 19406
UNITED STATES
swerlingm@ugicorp.com

Alexandra Colaizzi
UGI Utilities, Inc.
145 Madison Way
Downingtown, PENNSYLVANIA 19335
acolaizzi@ugi.com

UGI Utilities Inc.
Jamie Jowers
Sr Supervisor Energy Supply an
UGI Utilities Inc.
1 UGI Drive
Denver, PENNSYLVANIA 17517
jharper@ugi.com

UGI Utilities Inc.
Jessica Rogers
Director - Regulatory Strategy
UGI Utilities, Inc.
1 UGI DR
DENVER, PENNSYLVANIA 17517
jrogers@ugi.com

UGI Utilities Inc.
Jesse Tyahla
Director of Energy Supply & Pl
UGI Utilities Inc.
1 UGI Drive
Denver, PENNSYLVANIA 17517
jtyahla@ugi.com

United Association of Journeymen and Apprentices of the Plumbing and
Pipefitting Industry of the United States and Canada, AFL-CIO
Anna Friedlander
5301 WISCONSIN AVE NW STE 800
WASHINGTON, DISTRICT OF COLUMBIA 20015
UNITED STATES
afriedlander@odonoghuelaw.com

Virginia Natural Gas, Inc.
Elizabeth Wade
Senior Counsel
Southern Company Gas
10 PEACHTREE PL NE
ATLANTA, GEORGIA 30309
UNITED STATES
ferclegal@southernco.com