# IN THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

◆

**No. 23-1064**
**(consolidated with 23-1074, 23-1077, 23-1129, 23-1130, 23-1137)**

◆

**NEW JERSEY CONSERVATION FOUNDATION, *ET AL*.,**
**Petitioners,**
**v.**
**FEDERAL ENERGY REGULATORY COMMISSION,**
**Respondent.**

◆

ON PETITION FOR REVIEW OF ORDERS ISSUED BY
FEDERAL ENERGY REGULATORY COMMISSION

◆

**BRIEF OF *AMICUS CURIAE* AMERICAN GAS ASSOCIATION**
**IN SUPPORT OF THE**
**INTERVENOR TRANSCONTINENTAL GAS PIPE LINE COMPANY,**
**LLC'S PETITION FOR PANEL REHEARING**
**AND REHEARING *EN BANC***

◆

Michael L. Murray
American Gas Association
400 N. Capitol Street, NW
Washington, DC 20001
(202) 824-7071
MMurray@aga.org

Matthew J. Agen
American Gas Association
400 N. Capitol Street, NW
Washington, DC 20001
(202) 824-7090
MAgen@aga.org

*Counsel for Amicus Curiae American Gas Association*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), *amicus curiae* American Gas Association certifies the following:

**Parties.** All parties and intervenors appearing in this case are listed in the Intervenor Transcontinental Gas Pipe Line Company, LLC's Petition for Rehearing and Rehearing En Banc filed on September 13, 2024 (Addendum p. 1).

**Panel opinion as to which rehearing is sought.** The panel opinion as to which rehearing is sought appears in the Intervenor Transcontinental Gas Pipe Line Company, LLC's Petition for Rehearing and Rehearing En Banc filed on September 13, 2024 (Addendum pp. 4 *et seq.*).

<div style="margin-left: 50%;">

*/s/ Matthew J. Agen*
Matthew J. Agen
American Gas Association
400 N. Capitol Street, NW
Washington, DC 20001
(202) 824-7090
MAgen@aga.org

</div>

## DISCLOSURE STATEMENTS

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and D.C. Circuit Rule 26.1, *amicus curiae* the American Gas Association hereby submits the following corporate disclosure statement:

The American Gas Association ("AGA") is an incorporated, not-for-profit trade association representing local energy companies that deliver natural gas in the United States. AGA has no parent companies, subsidiaries, or affiliates that have issued publicly traded stock. Some AGA member companies are corporations with publicly traded stock.

No counsel for a party authored this brief in whole or in part, and no person other than the amicus curiae, its members, or its counsel contributed money that was intended to fund the preparation or submission of this brief. *See* Fed. R. App. P. 29(a)(4)(E).

<div style="margin-left:40%">

*/s/ Matthew J. Agen*
Matthew J. Agen
American Gas Association
400 N. Capitol Street, NW
Washington, DC 20001
(202) 824-7090
MAgen@aga.org

</div>

Dated:  September 20, 2024

## STATEMENT REGARDING CONSENT TO FILE AND SEPARATE BRIEFING

Pursuant to Federal Rule of Appellate Procedure 29(a)(2), contemporaneously with this brief, AGA filed a motion for leave to file this *amicus* brief.

Pursuant to D.C. Circuit Rule 29(d), counsel for *amicus curiae* AGA certifies that a separate brief is necessary to provide the broad perspective of the companies that AGA represents. As the national advocate for natural gas utility companies, AGA is particularly well-suited to provide the Court important context on subjects at issue in this proceeding, which will assist the Court in resolving this case.

# TABLE OF CONTENTS

**Page**

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ............. i

DISCLOSURE STATEMENTS ................................................................. ii

STATEMENT REGARDING CONSENT TO FILE AND SEPARATE
BRIEFING ........................................................................................... iii

TABLE OF CONTENTS ....................................................................... iv

TABLE OF AUTHORITIES ....................................................................v

GLOSSARY ......................................................................................... vi

INTEREST OF *AMICUS CURIAE* ...........................................................1

SUMMARY OF THE ARGUMENT .........................................................2

ARGUMENT .......................................................................................3

I.     The Court Should Reverse its Market Need Findings, Whose Implicit
       Standard Would Fundamentally Alter the Basis for a NGA Section
       7(c) Certificate Serving LDCs. .......................................................3

       A.     FERC Adequately Supported the Need for Long-term, Firm
              Capacity to Meet LDC's Peak Day Obligations. ...................3

       B.     FERC Properly Declined to Allow State Law to Govern the
              Outcome of the Market Need Analysis. ...............................7

II.    Vacatur is Inappropriate Given the Potential Harm to Captive
       Consumers. ..................................................................................9

CONCLUSION ....................................................................................11

CERTIFICATE OF COMPLIANCE .........................................................13

CERTIFICATE OF SERVICE .................................................................144

<u>**TABLE OF AUTHORITIES**</u>

<u>**Page**</u>

<u>**Cases**</u>

*Algonquin LNG v. Loqa*, 79 F. Supp. 2d 49 (D. R.I., 2000)...................................8

*ANR Pipeline Co. v. Corporation Comm. of Oklahoma*,
860 F.2d 1571 (10th Cir. 1988)...................................................................8

*Environmental Defense Fund v. FERC*, 2 F. 4th 953, 973
(D.C. Cir. 2021) ............................................................................................9

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29, 43 (1983)...............................................................................3

*Northern Natural Gas Co. v. Iowa Utils. Bd.,* 377 F.3d 817 (8th Cir. 2004)..........8

*Rural Cellular Ass'n v. FCC*, 588 F.3d 1095, 1105 (D.C. Cir. 2009)....................6

*Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293 (1988) ......................................8

*United States Telecom Ass'n v. FCC*, 825 F.3d 674, 689, 697
(D.C. Cir. 2016) ........................................................................................3

**Statutes and Other Authorities**

15 U.S.C. §§ 717, *et seq*..........................................................................................2

Order on Rehearing, Granting Clarification, Denying Stay, and
Dismissing Waiver, Transcontinental Gas Pipe Line Co.,
182 FERC ¶ 61,148 (Mar. 17, 2023) ....................................................4, 5, 6, 7, 8

# GLOSSARY

| | |
|---|---|
| AGA | American Gas Association |
| APA | Administrative Procedures Act |
| Board | New Jersey Board of Public Utilities |
| Certificate Order | *Transcontinental Gas Pipe Line Co.*, 182 FERC ¶ 61,006 (2023). |
| Dekatherms per day | Dth/d |
| FERC | Federal Energy Regulatory Commission |
| LDCs or natural gas utilities | Natural Gas Local Distribution Companies |
| NGA | Natural Gas Act, 15 U.S.C. §§ 717, *et seq.* |
| NJ Agencies Study | London Econ. Int'l, Final Report: Analysis of Natural Gas Capacity to Serve New Jersey Firm Customers (Nov. 5, 2021), filed as an attachment to New Jersey Parties' Mot. To Intervene & Lodge, Transcontinental Gas Pipe Line Co., Doc. Accession No. 20220711-5186, FERC Dkt. No. CP21-94 (July 11, 2022) |
| Orders | Certificate Order and Rehearing Order, collectively. |
| Project | Transcontinental Gas Pipe Line Company, LLC's Regional Energy Access Expansion |
| Rehearing Order | *Transcontinental Gas Pipe Line Co.*, 182 FERC ¶ 61,148 (2023) |
| Schneidewind | *Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293 (1988) |
| Skipping Stone Study | Skipping Stone, Capacity Sufficiency Study for Proposed Regional Energy Access Expansion Project (Sept. 8, 2022), filed as Exhibit A to |

Comments on Behalf of NJCF et al. Lodging Expert Report Regarding Capacity Sufficiency, Transcontinental Gas Pipe Line Co., Doc. Accession No. 20220909- 5000, FERC Dkt. No. CP21-94 (Sept. 9, 2022)

Transco

Intervenor Transcontinental Gas Pipe Line Company, LLC

## INTEREST OF *AMICUS CURIAE*

The *amicus curiae* American Gas Association ("AGA") represents critical domestic infrastructure – namely, local natural gas distribution companies that deliver natural gas to homes and businesses. There are more than 78 million residential, commercial, and industrial natural gas customers in the U.S., of which 95 percent – more than 74 million customers – receive their gas from AGA members. AGA is an advocate for natural gas utility companies and their customers, and provides a broad range of programs and services for member natural gas pipelines, marketers, gatherers, international natural gas companies, and industry associates. Today, natural gas meets one-third of the United States' energy needs.[1]

AGA's member natural gas local distribution companies ("LDCs" or "natural gas utilities") own and operate local natural gas distribution pipeline systems that typically receive natural gas supplies that have been transported on the interstate pipeline system. LDCs deliver natural gas under locally regulated rates, terms and conditions, directly to residential, commercial, and industrial customers, including electric generators. AGA members take service from virtually every interstate

---

[1] *See* AGA, *About AGA,* https://www.aga.org/about/ (last visited September 20, 2024). According to the U.S. Energy Information Administration, in 2022 approx. 60% of U.S. homes used natural gas for space and water heating, cooking, and drying clothes. U.S. Energy Information Administration, "Natural Gas Explained," https://www.eia.gov/energyexplained/natural-gas/use-of-natural-gas.php        (last visited September 20, 2024).

natural gas pipeline regulated by FERC under the Natural Gas Act, 15 U.S.C. §§ 717, *et seq*.

This brief should be of assistance to the Court because it provides information about the natural gas distribution industry, which depends on interstate transmission of natural gas.[2]  Judicial decisions affecting LDCs' ability to acquire new interstate pipeline capacity, and the continuation of firm service to LDCs and their customers, should be made in light of the impact of such decisions on the functioning of the national energy system and on the energy needs of consumers.

## SUMMARY OF THE ARGUMENT

The Court concluded that FERC issued the certificate in question "arbitrarily" because "it did not respond to some of the material challenges to its finding of market need for the Project."  Opinion at 21.  The Court should grant rehearing.  FERC adequately explained its basis for the three determinations faulted in the Opinion. Secondly, the Court's conclusions underpinning this analysis would in practical effect establish a new standard for assessing market need as to LDCs – one inconsistent with the operation and regulation of LDCs, with harmful effects on LDCs' ability to serve their customers reliably and securely in the future. Instead, the Opinion's market need findings appear to substitute the Court's judgement for

---

[2]  Contemporaneously with this brief, AGA filed a motion for leave to file this *amicus* brief.

that of the agency.  Inquiry under the arbitrary and capricious standard is to ensure that the agency "examined the relevant data and articulated a satisfactory explanation for its action" and will not "substitute [our] judgment for that of the agency."[3]  Finally, the Court should reverse the decision to vacate the Orders,[4] in light of the significant potential harm to LDCs and their captive customers, including LDCs not subscribing to the Project.

## ARGUMENT

I.     **The Court Should Reverse its Market Need Findings, Whose Implicit Standard Would Fundamentally Alter the Basis for a NGA Section 7(c) Certificate Serving LDCs.**

   A.     **FERC Adequately Supported the Need for Long-term, Firm Capacity to Meet LDC's Peak Day Obligations.**

AGA is concerned that the market need standard required by the Opinion could have a significant negative impact on LDCs nationwide that seek to contract for and acquire firm transportation service to meet future service demand.  The LDCs in New Jersey, as well as other states, and their captive retail customers, have a compelling need to acquire firm, long-term capacity to meet future demand.

The highest priority for a natural gas utility is the ability to deliver natural gas

---

[3] *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  *See also United States Telecom Ass'n v. FCC*, 825 F.3d 674, 689, 697 (D.C. Cir. 2016).
[4] *Transcontinental Gas Pipe Line Co., LLC*, 182 FERC ¶ 61,006 (2023)("Certificate Order"), *order on reh'g,* 182 FERC ¶ 61,148 (2023)("Rehearing Order"), collectively "Orders").

to its customers safely, reliably, responsibly, and at just and reasonable rates. Natural gas utilities must, under state law and regulatory requirements, distribute natural gas to retail, residential, commercial, governmental, and industrial customers. In order to meet this statutory obligation to serve, LDCs develop and rely upon detailed long-term supply and transportation plans with the goal of ensuring that they can reliably meet the physical demand for service in the present and the future. The core and most critical element of that process is ensuring that the utility can meet its peak day obligations – *i.e.*, to reliably meet their projected natural gas demand, through periods of high demand and/or severe weather, based on historical weather and demand data. LDCs build and manage portfolios of physical natural gas supply involving contracts for firm storage, firm transportation and potentially firm peaking services in order to meet anticipated peak day retail customer needs. In its Rehearing Order, at n. 79, FERC expressly described the nature of the peak day planning and acquisition process in the industry.

The Court concluded that FERC failed to justify its conclusion that the subscribing utilities would not have assured access to off-system supplies available only on a short-term basis, Opinion at 22, or that subscribing utilities would not have access to downstream capacity held by other customers pursuant to long-term contracts. Opinion at 23.

To the contrary, FERC analyzed in detail the two studies that the Court cites,

*i.e.,* the NJ Agencies Study and Skipping Stone Study, exhaustively addressed the contentions discussed by the Court, (*see* Rehearing Order at P 30 through P 57), and responded in detail to the claims and conclusions of the studies proffered by opponents of the Project. FERC found that the NJ Agencies Study erred in its "key assumption" that off-system peaking capacity could be counted upon for peak day needs, Rehearing Order at P 38, noting *inter alia* that, such capacity "is uncertain because it is not contracted for on a long-term firm basis … [t]ypically, these arrangements are relatively short-term and dependent on pipeline capacity being available year-to-year." FERC therefore concluded, consistent with utilities' planning procedures, that the long-term, firm capacity needs met by the Project could not be met with short-term contracts that might not be available on peak days in the future.

Regarding the Skipping Stone Study's reliance on downstream capacity, FERC held that "[d]esign day planning principles consider the obligation of LDCs to provide reliable service, which necessarily entails the ownership of firm transmission capacity rights and the availability of that capacity to meet demand on design days." Rehearing Order at P 47 (footnotes omitted). Contrary to the Court's finding that failed to explain its reliance on an "unprecedented scenario," Opinion at 23, FERC found as to capacity owned by others, that "[o]n a day of extremely high demand, the LDCs would have to compete for any capacity that they do not hold

5

themselves with other demand sectors and are not assured of obtaining needed capacity," and that "the study's conclusions do not take due account of the need for reliability and effectively ignore circumstances during capacity-constrained periods."  Rehearing Order at P 48.  By dismissing FERC's rationale because of historical capacity availability, the Opinion effectively imposes on FERC an evidentiary burden of proof with respect to potential future events that is inconsistent with the Administrative Procedures Act ("APA").  This Court has held that, "[i]n circumstances involving agency predictions of uncertain future events, 'complete factual support in the record for the Commission's judgment or prediction is not possible or required' since 'a forecast of the direction in which future public interest lies necessarily involves deductions based on the expert knowledge of the agency,' and that "when an agency's decision is primarily predictive, our role is limited; we require only that the agency acknowledge factual uncertainties and identify the considerations it found persuasive." (citations omitted) *Rural Cellular Ass'n v. FCC*, 588 F.3d 1095, 1105 (D.C. Cir. 2009).  FERC manifestly has ample experience with assessing the outcomes of "capacity-constrained periods."[5]

---

[5]  *See e.g.*, https://www.ferc.gov/media/february-2021-cold-weather-outages-texas-and-south-central-united-states-ferc-nerc-and (last visited September 20, 2024); FERC-NERC-Regional Entity Joint Inquiry Into Winter Storm Elliott (Presentation) (September 21, 2023) available at https://www.ferc.gov/news-events/news/elliott-report-complete-electricity-standards-implement-gas-reliability-rules (last visited September 20, 2024).

Regarding FERC's partial reliance on precedent agreements, the Opinion focuses heavily on a theory advanced without any record evidence by certain intervenors that LDCs have the motive and opportunity to intentionally over-subscribe for capacity, flow the costs through to their customers, and then profit by re-selling the under-used capacity on the market. Opinion at 25-26. The Court stated that FERC's only response was to note that the presence of excess capacity suggested that selling excess capacity at supra-market prices would be futile, *citing* Rehearing Order n. 191. Yet, in that same cited footnote, FERC explained that "[f]urthermore, retail regulators tend to require the sharing of revenues from such off-system resales of capacity with the captive customers who paid for the underlying assets," which "further undercuts NJCF's assertion that profiteering on behalf of shareholders is the motive for the LDCs to contract for this capacity." *Id*. FERC more broadly recognized the right of state regulators to review LDCs' purchase agreements for prudency, Rehearing Order at P 28, emphasizing in the market need discussion that its Orders and findings "do not preclude New Jersey from undertaking an after-the-fact prudency review of any purchase agreement by a New Jersey LDC." Rehearing Order at P 71. FERC thus fully addressed the "LDC profiteering" hypothesis.

**B.     FERC Properly Declined to Allow State Law to Govern the Outcome of the Market Need Analysis.**

The Opinion also found that FERC made a mistake as to state law that "led it to arbitrarily discount the effect of the state's energy laws in assessing market

demand for the Project," Opinion at 27, citing state law mandating reductions in natural gas use over stated periods of time, as well as energy efficiency program mandates. The Orders did effectively address these state laws, noting that the method for achieving any reductions was not determined, Rehearing Order at P 70, and that the ultimate deadlines in the statutes are decades away. Rehearing Order at P 71. FERC sought to balance the exercise of its obligations as to Section 7(c) of the Natural Gas Act ("NGA") while allowing the state to address the LDCs' decision to acquire contract rights in the Project in later state proceedings. Otherwise, FERC would have allowed a state statute to govern the outcome of its analysis under the NGA, raising serious issues of federal preemption.[6] The Court's ruling, and the standard that it suggests – *i.e.*, that no market need can rationally be found for new interstate pipeline capacity intended for delivery into a state whose laws require natural gas use reductions – would require FERC to limit its NGA Section 7(c) authority based on generalized state law goals, despite record support from LDCs that have contracted for capacity. Under FERC's approach in the Orders, the meaning and effect of state law would be resolved at the state level, rationally balancing the requirements of the NGA and the potential need for resolution under

---

[6] *See Schneidewind v. ANR Pipeline Co*., 485 U.S. 293 (1988) ("Schneidewind"); *see also generally, ANR Pipeline Co. v. Corporation Comm. of Oklahoma*, 860 F.2d 1571 (10th Cir. 1988); *Algonquin LNG v. Loqa*, 79 F. Supp. 2d 49 (D. R.I., 2000); *Northern Natural Gas Co. v. Iowa Utils*. *Bd.,* 377 F.3d 817 (8th Cir. 2004).

8

state law later in time.

As discussed above, the market need standard implicit in the Opinion would significantly change assessment of proposed LDC capacity in NGA certificate proceedings. LDCs will continue to need substantial new capacity to meet their obligations to supply retail customers' natural gas needs, and unless rehearing is granted, the Opinion may create barriers to acquiring needed infrastructure.

## II.    Vacatur is Inappropriate Given the Potential Harm to Captive Consumers.

The Opinion vacated and remanded the Orders, finding that it was unlikely that FERC would be able to remedy the deficiencies identified in the Opinion, Opinion at 30-31, and that the disruption that would accompany vacatur would be "significantly outweighed" by the "core deficiencies in FERC's orders, Opinion at 31-33. AGA agrees with Transcontinental Gas Pipe Line Company, LLC ("Transco") that the analysis erred in relying on the conclusions in *Environmental Defense Fund v. FERC*, 2 F. 4th 953, 973 (D.C. Cir. 2021), which involved very different facts.

If the vacatur mandate were to issue without further FERC action, it risks substantial harm to the LDCs and their captive customers.

The LDCs that subscribed to the Project have relied on the now-operational Project facilities to help meet their obligations this winter. Alternative supplies to

meet a sudden decrease in firm supply resulting from vacatur may not be available in an extreme weather circumstance over the next several winter seasons.

This Court's vacatur of the certificate for the Project could shut down pipeline capacity critical to the winter supply of natural gas to the LDCs' core customers, who themselves lack alternative supplies, including potential loss of life-preserving heat to households, schools, hospitals, providers of municipal services, and industries. In the worst case, should an LDC lose service during a peak period due to the loss of Project capacity, the effects could be severe.

One important aspect for the Court to consider is that the facilities subject to vacatur are part of an overall system that, for example, includes replacements/upgrades of compressors on the Transco system. Transco has raised the prospect that facilities subject to vacatur may be intertwined with other parts of the system and removal of these facilities could raise broader reliability concerns. Therefore, the Opinion should have fully examined the impact of vacatur on Project shippers, as well as others that have contracts with Transco, prior to vacating the relevant FERC orders.

Unlike loss of electric service, which can simply be turned on when the electric supply returns, once a natural gas outage occurs, service technicians would have to go door-to-door to insure safe reconnection at each impacted home or business to physically shut off the meter prior to re-establishment of gas into the

system.   When gas flow is re-established, a utility technician must return to physically turn on the meter for the customer, purge the customer's fuel lines of any air, complete a shut-in pressure test, and re-light all gas appliances – a potentially massive and lengthy undertaking.

The severity of potential gas shortages resulting from vacatur supports the conclusion that the potential for "disruption" weighs in favor of remand rather than vacatur.   The Opinion erred in its conclusion that deficiencies in the Orders outweighed operational concerns.   *See* Opinion at 32-33.   Transco's capacity is critical to providing service to various customers and the Opinion's decision to vacate the FERC Orders for an in-service project sets a concerning precedent as the winter heating season approaches.

## CONCLUSION

For the foregoing reasons, this Court should grant the rehearing request.

Respectfully Submitted,

*/s/ Matthew J. Agen*
Matthew J. Agen
American Gas Association
400 N. Capitol Street, NW
Washington, DC 20001
(202) 824-7090
MAgen@aga.org

Michael L. Murray
American Gas Association
400 N. Capitol Street, NW
Washington, DC 20001
(202) 824-7071
MMurray@aga.org

*Counsel for American Gas Association*

Dated:  September 20, 2024

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), I certify the following:

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 29(b) for and, because this brief contains 2,503 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and D.C. Circuit Rule 32(e)(1).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and D.C. Circuit Rule 32(b), and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6), because this brief has been prepared in a proportionately spaced typeface using Microsoft Word in 14-point Times New Roman font.

> */s/ Matthew J. Agen*
> Matthew J. Agen
> American Gas Association
> 400 N. Capitol Street, NW
> Washington, DC 20001
> (202) 824-7090
> MAgen@aga.org

Dated:  September 20, 2024

13

**CERTIFICATE OF SERVICE**

I hereby certify that on September 20, 2024, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all registered CM/ECF users.

*/s/ Matthew J. Agen*
Matthew J. Agen
American Gas Association
400 N. Capitol Street, NW
Washington, DC 20001
(202) 824-7090
MAgen@aga.org

Dated: September 20, 2024