No. 23-1064
(Consolidated with 23-1074, 23-1077, 23-1129, 23-1130, 23-1137)

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

NEW JERSEY CONSERVATION FOUNDATION; NEW JERSEY LEAGUE OF
CONSERVATION VOTERS; AQUASHICOLA POHOPOCO WATERSHED
CONSERVANCY; CATHERINE FOLIO, Affected Landowner,

*Petitioners,*

*- v. -*

FEDERAL ENERGY REGULATORY COMMISSION,

*Respondent,*

NEW JERSEY DIVISION OF RATE COUNSEL,

*Intervenor for Petitioner,*

TRANSCONTINENTAL GAS PIPE LINE COMPANY, LLC; EXELON
CORPORATION,

*Intervenors for Respondent.*

On Petition for Review of Orders of the
Federal Energy Regulatory Commission

**BRIEF OF *AMICUS CURIAE* EQT CORPORATION
IN SUPPORT OF PETITION FOR REHEARING**

Zach ZhenHe Tan
Akin Gump Strauss Hauer &
  Feld LLP
100 Pine Street, Suite 3200
San Francisco, CA 94111
(415) 765-9500

Z.W. Julius Chen
Emily P. Mallen
Lide E. Paterno
Akin Gump Strauss Hauer &
  Feld LLP
2001 K Street NW
Washington, DC 20006
(202) 887-4000
chenj@akingump.com

*Counsel for* Amicus Curiae *EQT Corporation*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

**A.**    **Parties and *Amici***

Except for the following, all parties, intervenors, and *amici* appearing in this Court are listed in the Brief of Petitioners:  EQT Corporation.

Pursuant to Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rules 26.1 and 28(a), counsel for *amicus curiae* states that EQT Corporation is a publicly traded corporation and one of the largest producers of natural gas in the United States.  EQT Corporation does not have any parent corporation.  T. Rowe Price Group, Inc., a publicly held corporation (Nasdaq:  TROW), holds 10% or more of EQT Corporation stock.

**B.**    **Rulings Under Review**

References to the rulings at issue appear in the Brief for Petitioners.

**C.**    **Related Cases**

Counsel is not aware of related cases.

*/s/ Z.W. Julius Chen*
Z.W. Julius Chen

**TABLE OF CONTENTS**

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES.................i

GLOSSARY ......................................................................................................v

IDENTITY AND INTEREST OF *AMICUS CURIAE*...............................................1

INTRODUCTION AND SUMMARY OF ARGUMENT ........................................2

ARGUMENT ...................................................................................................4

      I.    VACATUR DISRUPTS THE ORDERLY DEVELOPMENT OF
           CRITICAL NATURAL GAS INFRASTRUCTURE ..........................4

      II.   DISRUPTING THE BUILDOUT OF NATURAL GAS
           INFRASTRUCTURE WILL HARM CONSUMERS, THE
           NATION'S ENERGY SECURITY, AND THE GLOBAL
           CLIMATE........................................................................................8

CONCLUSION ..............................................................................................13

# TABLE OF AUTHORITIES

<u>CASES</u>:

*American Bankers Ass'n v. National Credit Union Admin.*,
   934 F.3d 649 (D.C. Cir. 2019)................................................................2

*Black Oak Energy v. FERC*,
   725 F.3d 230 (D.C. Cir. 2013)..............................................................2

*Federal Power Comm'n v. Hope Nat. Gas Co.*,
   320 U.S. 591 (1944)..............................................................................9

*Federal Power Comm'n v. Sierra Pac. Power Co.*,
   350 U.S. 348 (1956)..............................................................................7

*In re Permian Basin Area Rate Cases*,
   390 U.S. 747 (1968)..............................................................................7

*Morgan Stanley Cap. Grp. Inc. v. Public Util. Dist. No. 1 of
   Snohomish Cnty.*,
   554 U.S. 527 (2008)..............................................................................7

*NAACP v. Federal Power Comm'n*,
   425 U.S. 662 (1976)..............................................................................9

*New York v. EPA*,
   781 F. App'x 4 (D.C. Cir. 2019)..........................................................3

*Potomac Elec. Power Co. v. FERC*,
   210 F.3d 403 (D.C. Cir. 2000)..............................................................7

*Shafer & Freeman Lakes Env't Conservation Corp. v. FERC*,
   992 F.3d 1071 (D.C. Cir. 2021)............................................................3

*Sugar Cane Growers Coop. of Fla. v. Veneman*,
   289 F.3d 89 (D.C. Cir. 2002)................................................................3

*United Gas Pipe Line Co. v. Mobile Gas Serv. Corp.*,
   350 U.S. 332 (1956)..............................................................................7

*XO Energy MA, LP v. FERC*,
   77 F.4th 710 (D.C. Cir. 2023)..............................................................3

iii

**STATUTES:**

15 U.S.C. § 717f(e) ...........................................................................................5

**OTHER AUTHORITIES:**

Central Intelligence Agency, The World Factbook (2021 Archive),
  *Natural gas—proved reserves* ...............................................................11

FED. R. APP. P. 29................................................................................................1

International Energy Agency, *Global Energy Review:  CO2 Emissions
  in 2021* (March 2022), .............................................................................10

U.S. Energy Information Administration, *Annual Energy Outlook
  AEO2023* (Mar. 2023) ..............................................................................11

U.S. Energy Information Administration, *Frequently Asked Questions
  (FAQs):  What is U.S. electricity generation by energy source?*
  (Feb. 29, 2024)..........................................................................................11

U.S. Energy Information Administration, *Natural gas explained—
  Factors affecting  natural gas prices* (Oct. 25, 2023) .........................6

U.S. Energy Information Administration, *Today in Energy* (June 9,
  2021) .........................................................................................................10

U.S. Energy Information Administration, *U.S. Energy-Related
  Carbon Dioxide Emissions, 2019* (Sept. 30, 2020) ............................10

**GLOSSARY**

| | |
|---|---|
| EQT | EQT Corporation |
| FERC | Federal Energy Regulatory Commission |
| Project | Regional Energy Access Expansion Project |
| Transco | Transcontinental Gas Pipe Line Company, LLC |

## IDENTITY AND INTEREST OF *AMICUS CURIAE*[1]

EQT Corporation ("EQT") is one of the largest natural gas producers in the United States.  EQT's mission is to provide energy security to the United States and lower global carbon emissions by reducing the world's reliance on coal and other carbon-intensive energy sources.  To fulfill these critical goals, EQT relies on an integrated system of interstate pipelines to transport natural gas from its asset base in the Appalachian Basin to millions of residential, commercial, and industrial customers in markets across the East Coast, Midwest, Mid-Atlantic, and the Gulf Coast.

Given its position in the natural gas industry, EQT can speak to the immensely disruptive consequences of the panel's order vacating the Federal Energy Regulatory Commission's ("FERC") approval of the construction, siting, and operation of the Regional Energy Access Expansion Project, which (absent the panel's ruling) would provide a necessary expansion to relieve our nation's constrained natural gas transportation infrastructure.

---

[1] Pursuant to Federal Rule of Appellate Procedure 29, counsel for EQT states that: (i) no counsel for any party authored this brief in whole or in part; (ii) no party or counsel for a party contributed money intended to fund the preparation or submission of this brief; and (iii) no person other than *amicus curiae* or its counsel contributed money intended to fund the brief's preparation or submission.

1

## INTRODUCTION AND SUMMARY OF ARGUMENT

As set out fully by Petitioner-Intervenor Transcontinental Gas Pipe Line Company, LLC ("Transco"), the panel erred in first finding that FERC overlooked significant environmental consequences when approving the Regional Energy Access Expansion Project, and then in separately determining that FERC improperly found market need, even though several unaffiliated local distribution companies had subscribed to nearly all of the Project's capacity.  But even setting aside those two manifest errors—either of which warrants rehearing—EQT submits this brief to emphasize the threats independently posed by the panel's remedial decision to vacate FERC's approval of the Project, and by its rejection of the more modest remedy of remanding without vacatur.

As the panel acknowledged (but then largely disregarded), circuit precedent imposes a "two-factor test" to determine whether a challenged agency action should be vacated, or whether remand without vacatur is the more appropriate remedy. Specifically, courts "must evaluate (1) the likelihood that deficiencies in an order can be redressed on remand and (2) the disruptive consequences of vacatur."  Op. 30-31 (internal quotation marks omitted) (quoting *Black Oak Energy v. FERC*, 725 F.3d 230, 244 (D.C. Cir. 2013)).  As this Court has emphasized, the test is "equitable" in nature, requiring a court to "balance" the appropriate weight of the two factors. *American Bankers Ass'n v. National Credit Union Admin.*, 934 F.3d

649, 674 (D.C. Cir. 2019); *see XO Energy MA, LP v. FERC*, 77 F.4th 710, 719 (D.C. Cir. 2023); *New York v. EPA*, 781 F. App'x 4, 7 (D.C. Cir. 2019).

Here, the panel's cursory justification for ordering vacatur departs from circuit precedent not only by imposing a new, heightened standard for redressability. The panel also failed to meaningfully balance that factor against the gravity of the disruption vacatur would cause.

For starters, the panel itself acknowledged that "at this stage," it was only uncertain, as opposed to impossible, that FERC would be able to address the supposed inadequacies in its orders with further explanation. *See* Op. 31 (finding FERC's task "[o]n remand" is to "revisit its underlying market need finding to properly consider" additional studies, "which *may* require it to assess its ultimate" conclusions) (emphasis added). Circuit precedent is clear that the "possib[ility]" that FERC can redress its alleged failures on remand is enough to render vacatur inappropriate. *Shafer & Freeman Lakes Env't Conservation Corp. v. FERC*, 992 F.3d 1071, 1096 (D.C. Cir. 2021); *see also Sugar Cane Growers Coop. of Fla. v. Veneman*, 289 F.3d 89, 98 (D.C. Cir. 2002) (remanding without vacatur where it was "at least possible" that the agency could justify its decision). Accordingly, by the panel's own admission, this case presents a textbook scenario for remand without vacatur.

Making matters worse, the panel all but ignored the disruptive consequences of vacatur. The panel merely repeated the general warning that "customers are counting on" continued service from the Project "for the 2023/2024 heating season," before summarily concluding that such consequences were "not dispositive" to its choice of remedy. Op. 31-32. Such reasoning gives short shrift to the massive disruption that vacatur would cause, especially in the regions of the country where EQT ships natural gas.

At bottom, vacatur throws into question whether Transco can continue to operate the Project, which supports the transportation of thousands of dekatherms of EQT's domestically produced natural gas, in advance of the winter heating season. Beyond the particular effects of this case, the panel's remedial ruling also sets an alarming precedent that undermines FERC's statutory authority to ensure the orderly development of the natural gas industry. If left uncorrected, that ruling threatens harm to the thousands of industry participants and millions of customers that rely on stability and certainty in the build-out of critical natural gas infrastructure, to the detriment of our nation's energy security and the global climate.

## ARGUMENT

## I.    VACATUR DISRUPTS THE ORDERLY DEVELOPMENT OF CRITICAL NATURAL GAS INFRASTRUCTURE

The panel's remedial ruling lacks any cognizance of key characteristics of our nation's natural gas infrastructure. As one of the country's largest natural gas

4

producers, EQT's experience demonstrates that the disruptive consequences of vacating FERC approval of an integrated, in-service natural gas transportation project are far-reaching.

*First*, natural gas pipelines like the Project are the only practical means of transporting natural gas across interstate markets. Unlike other piped energy resources like oil, natural gas cannot be economically barged, trucked, or railed across the country. Pipelines like the Project are thus *indispensable* to natural gas producers' ability to be able to deliver that energy source to the millions of customers who depend on it. This is why the Natural Gas Act authorizes privately-owned pipelines to act in service of the public interest. *See* 15 U.S.C. § 717f(e).

*Second*, FERC-certificated pipelines are part of an integrated, interstate system that allows natural gas to be transported from production basins to customers across the country. For example, EQT relies on a vast network of pipelines to transport natural gas it produces in the Appalachian Basin to markets across the East Coast, Midwest, Mid-Atlantic, and Gulf Coast. But interconnectivity is not synonymous with redundancy. Constraints on any one of EQT's transportation paths will limit whether it can economically serve its various customers. New

infrastructure reduces bottlenecks, allowing natural gas supplies to reach consumers while reducing costs.[2]

*Third*, the interstate pipeline network used by EQT is constrained, with insufficient capacity to meet the current and future projected gas demand. To ensure adequate and reliable market access at reasonable transportation costs, EQT must enter into a mix of long-term tariff and negotiated-rate contracts with interstate pipelines, some extending out over a decade. *See, e.g.*, Texas Eastern Transmission, LP, Docket No. RP15-1165-000, Letter Order (issued August 25, 2015) (accepting non-conforming negotiated rate agreement with primary term of ten years).

For entities like EQT, contractual certainty is essential. Natural gas production is a capital-intensive business, with the level of upstream investment determinative of access to a pipeline system that supports customer commitments at downstream delivery points. Put another way, without certainty that they can deliver natural gas to market at just and reasonable rates, entities like EQT cannot properly decide whether to build out and invest in production and exploration facilities. That in turn leads to further scarcity of energy recourses—and higher prices for

---

[2] U.S. Energy Information Administration, *Natural gas explained—Factors affecting natural gas prices* (Oct. 25, 2023), https://www.eia.gov/energyexplained/natural-gas/factors-affecting-natural-gas-prices.php (recognizing that "[i]ncreases in natural gas supply generally result in lower natural gas prices" and that the "[a]mount of natural gas production" is a "major supply-side factor[]" that "affect[s] prices").

consumers.  The inextricable link between contractual certainty, price stability, and the "public interest" is well established within the Supreme Court's *Mobile-Sierra* doctrine.  *See Morgan Stanley Cap. Grp. Inc. v. Public Util. Dist. No. 1 of Snohomish Cnty.*, 554 U.S. 527, 551 (2008) (finding that "contract stability ultimately benefits consumers"); *In re Permian Basin Area Rate Cases*, 390 U.S. 747, 784 (1968) (recognizing that "the Natural Gas Act is premised upon a continuing system of private contracting," which can be limited only when FERC has made a finding that the private contract contravenes the public interest) (citing *United Gas Pipe Line Co. v. Mobile Gas Serv. Corp.*, 350 U.S. 332 (1956); *Federal Power Comm'n v. Sierra Pac. Power Co.*, 350 U.S. 348 (1956))); *see also Potomac Elec. Power Co. v. FERC*, 210 F.3d 403, 409 (D.C. Cir. 2000) ("The court has repeatedly emphasized the importance of contractual stability in a number of cases involving the *Mobile-Sierra* doctrine.").

The panel's cursory remedial analysis acknowledged none of the foregoing realities of the natural gas industry and the interstate pipeline system.  By disrupting the build-out and operation of FERC-approved pipeline infrastructure, the panel blunts any beneficial aspects of EQT's contractual certainty, turning the acceptable business risks made when executing such agreements into unmitigable force majeures.  But the cascading effects reach beyond those distributors linked directly to the Project.  In addition to the loss of 829,400 dekatherms per day in incremental

firm capacity that the Project created specifically for Project shippers, vacatur removes from service approximately 1,235,000 dekatherms per day of existing capacity on Transco's pipeline system that services customers like EQT. *See* Transco Pet. 15.

In other words, even entities like EQT that have not directly subscribed for the capacity on the Project will nevertheless suffer from an overall decrease in transportation capacity on the integrated pipeline network. And even if the volume of necessary replacement capacity were available on an alternative pipeline system, the increased scarcity likely would prevent EQT from securing rates as favorable as could be negotiated in a less-constrained environment. Accordingly, vacatur not only constrains EQT's upstream production, but also forces entities like EQT to bear the compounding costs for each molecule that does not ship on downstream contracted capacity or reach downstream customers.

## II.  DISRUPTING THE BUILDOUT OF NATURAL GAS INFRASTRUCTURE WILL HARM CONSUMERS, THE NATION'S ENERGY SECURITY, AND THE GLOBAL CLIMATE

The increased scarcity of pipeline capacity caused by unnecessary vacaturs will have direct harms on the very consumers that the Natural Gas Act was principally intended to protect. As the Supreme Court has long recognized, the Natural Gas Act, including its provisions requiring that natural gas companies attain a certificate for public convenience and necessity, were "plainly designed to protect

8

the consumer interests." *Federal Power Comm'n v. Hope Nat. Gas Co.*, 320 U.S. 591, 611-612 (1944). That "principal purpose" of protecting consumers is served by "encourag[ing] the *orderly* development of *plentiful* supplies of *** natural gas at reasonable prices." *NAACP v. Federal Power Comm'n*, 425 U.S. 662, 669-670 (1976) (emphases added).

Vacatur directly undermines those goals by injecting disorder and scarcity into our nation's natural gas supply and infrastructure. Make no mistake: The panel's abstract recognition that "customers are counting on" this specific Project, Op. 31, is an abject understatement. By departing from this circuit's standard for ordering vacatur, the decision drastically increases risks to customers relying on the Project and the many others who depend on integrated natural gas infrastructure. Millions of residential households have subscribed to natural gas services to heat their homes on the coldest days of winter. Likewise, critical infrastructure such as hospitals, factories, and data centers also depend exclusively on natural gas as the only economic energy source available to operate their facilities.

Vacatur also undermines the broader "public interest" purpose of the Natural Gas Act, which has taken on even greater significance today. Over the last 15 years, the United States has led the world in reducing carbon emissions, with a switch from

coal to American natural gas driving over 60% of those reductions.[3] In fact, coal-to-gas switching has represented the single largest contributor to the global effort to reduce carbon emissions, as natural gas produces half the amount of carbon dioxide per unit of energy than coal.[4]

In addition, natural gas has been called the greatest incubator of carbon reduction technologies because it supports the development of renewable energy sources that alone are incapable of offsetting emissions from coal consumption while still ensuring adequate supplies of energy.[5] Indeed, EQT anticipates it will meet its net zero goal this year, making it the first energy company of scale in the world to do so. Unnecessary disruption of the key infrastructure improvements, like the one caused by the panel's vacatur orders, hampers the ability of the natural gas industry to contribute positively to emissions-reductions efforts.[6]

---

[3] *See* U.S. Energy Information Administration, *U.S. Energy-Related Carbon Dioxide Emissions, 2019* (Sept. 30, 2020), https://www.eia.gov/environment/emissions/carbon/archive/2019/.

[4] *See* U.S. Energy Information Administration, *Today in Energy* (June 9, 2021), https://www.eia.gov/todayinenergy/detail.php?id=48296.

[5] *See, e.g.*, U.S. Energy Information Administration, *U.S. Energy-Related Carbon Dioxide Emissions, 2019*, *supra* note 3; International Energy Agency, *Global Energy Review: CO2 Emissions in 2021* (March 2022), https://iea.blob.core.windows.net/assets/c3086240-732b-4f6a-89d7-db01be018f5e/GlobalEnergyReviewCO2Emissionsin2021.pdf.

[6] For those reasons, the panel's heavy reliance on New Jersey's efforts to transition to renewable resources is misguided. Given the significant uncertainty over whether such attempts to transition to renewables will succeed, the vacatur blocks a

Finally, natural gas plays a crucial role in ensuring our nation's energy security. Domestically, natural gas provides about 43% of utility-scale electricity generation.[7] At the same time, U.S. power demand is expected to double by 2050 in part due to increased electrification, AI-related data center development, and onshoring of manufacturing.[8] To meet the increased power demand and mitigate power-sector emissions from prolonged coal usage, natural gas must continue to play a predictable and consistent role, particularly in serving variable loads and meeting rapid increases in demand for firm power by data centers.

Ensuring the adequate and stable supply of natural gas is also a global (and national security) concern. Two-thirds of the world's natural gas supply is concentrated in the United States, Russia, Iran, and Qatar.[9] Given the increasing global demand for natural gas due to its emissions-reduction benefits, artificially limiting the United States' ability to produce and transport it domestically empowers

---

significant mechanism for reducing emissions without any guarantee of a sufficient alternative.

[7] U.S. Energy Information Administration, *Frequently Asked Questions (FAQs): What is U.S. electricity generation by energy source?* (Feb. 29, 2024), https://www.eia.gov/tools/faqs/faq.php?id=427&t=3.

[8] U.S. Energy Information Administration, *Annual Energy Outlook AEO2023*, at 14 (Mar. 2023), https://www.eia.gov/outlooks/aeo/pdf/AEO2023_Narrative.pdf.

[9] Central Intelligence Agency, The World Factbook (2021 Archive), *Natural gas— proved reserves*, https://www.cia.gov/the-world-factbook/about/archives/2021/field /natural-gas-proved-reserves/country-comparison.

state actors whose actions go against our national interests. The unnecessary disruption of improvements in natural gas infrastructure caused by vacatur orders only exacerbates the problem. The panel did not address any of those serious harms—let alone weigh them against the possibility that the supposed deficiencies in FERC's decision could be redressed on remand without vacatur.

*     *     *

The panel's remedial ruling calls out for rehearing. The ruling fails to understand the consumer interests served by the orderly development of the nation's interstate pipeline system, fails to appreciate the full extent of disruption caused by vacatur, and fails to meaningfully balance any of these harms, thereby effectively creating a new remand-without-vacatur standard. If left uncorrected, the panel's ruling would set a dangerous new precedent that allows for unwarranted vacaturs in the specific context of FERC approvals of natural gas infrastructure improvements—an area where disruption and disorder are particularly harmful to the public interest.

## CONCLUSION

This Court should grant the petition for rehearing.

Respectfully submitted,

/s/ *Z.W. Julius Chen*

Zach ZhenHe Tan
AKIN GUMP STRAUSS HAUER &
  FELD LLP
100 Pine Street, Suite 3200
San Francisco, CA 94111
(415) 765-9500

Z.W. Julius Chen
Emily P. Mallen
Lide E. Paterno
AKIN GUMP STRAUSS HAUER &
  FELD LLP
2001 K Street NW
Washington, DC 20006
(202) 887-4000
chenj@akingump.com

*Counsel for* Amicus Curiae *EQT Corporation*

September 20, 2024

13

## CERTIFICATE OF COMPLIANCE

The brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7) and D.C. Cir. R. 28(c) because this brief contains 2,578 words, excluding the partes of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 in Times New Roman 14-point font.

/s/ *Z.W. Julius Chen*
Z.W. Julius Chen

## CERTIFICATE OF SERVICE

I hereby certify that on September 20, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the D.C. Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ *Z.W. Julius Chen*
Z.W. Julius Chen