Nos. 23-1064, 23-1074, 23-1077, 23-1129, 23-1130, 23-1137 (consolidated)

─────────────────────────────

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

─────────────────────────────

NEW JERSEY CONSERVATION FOUNDATION, *ET AL.*,
*Petitioners*,

NEW JERSEY DIVISION OF RATE COUNSEL,
*Intervenor,*

v.

FEDERAL ENERGY REGULATORY COMMISSION,
*Respondent*,

TRANSCONTINENTAL GAS PIPELINE COMPANY, LLC, *ET AL.*,
*Intervenors.*

On Petition for Review of Orders of the Federal Energy Regulatory Commission

─────────────────────

***AMICI CURIAE* BRIEF OF THE AMERICAN PETROLEUM INSTITUTE, THE AMERICAN EXPLORATION & PRODUCTION COUNCIL, AND THE NATIONAL ASSOCIATION OF MANUFACTURERS IN SUPPORT OF RESPONDENT-INTERVENOR'S REHEARING REQUEST**

─────────────────────

Grace D. Soderberg
AMERICAN PETROLEUM INSTITUTE
200 Massachusetts Ave., NW
Washington, DC 20001
Tel.: (202) 682-8000
SoderbergG@api.org
*Counsel for the American Petroleum Institute*

Varu Chilakamarri
Timothy Furdyna
David L. Wochner
K&L Gates LLP
1601 K Street, N.W.
Washington, DC  20006
(202) 778-9165
varu.chilakamarri@klgates.com
*Counsel for the Amici Curiae*

*(additional counsel listed on next page)*

Erica Klenicki
Michael A. Tilghman II
The NAM Legal Center
733 10th Street, N.W.
Suite 700
Washington, D.C. 20001

*Counsel for the National Association
of Manufacturers*

Dated:  September 20, 2024

# RULE 26.1 CORPORATE DISCLOSURE STATEMENTS

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and Circuit Rule 26.1, the American Petroleum Institute ("API"), American Exploration & Production Council ("AXPC") and National Association of Manufacturers ("NAM") respectfully submit these Disclosure Statements.

**American Petroleum Institute**

API certifies that it is incorporated under the laws of the District of Columbia.  API has no parent entity, and no publicly held corporation or similarly situated legal entity has 10% or greater ownership of API.

**American Exploration & Production Council**

AXPC certifies that it is incorporated under the laws of New York and is a national trade association representing 31 leading independent oil and natural gas exploration and production companies in the United States.  AXPC has no parent corporation, and no publicly held corporation owns more than 10% of its stock.

**National Association of Manufacturers**

The NAM certifies that is incorporate under the laws of New York.  The NAM has no parent corporation and no public held corporation owns has 10% or greater ownership of the NAM.

**CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES**

Pursuant to Circuit Rule 28 and 35, API, AXPC, and the NAM state that all the parties, intervenors, and *amici* appearing in this Court thus far are listed in the Rehearing Petition filed by Intervenor Transcontinental Gas Pipe Line Company, LLC.

This case is a petition for review of agency orders issued by FERC and was filed directly in this Court. Accordingly, the requirement of Circuit Rule 28(a)(1)(A) to list the parties, intervenors, and *amici* that appeared below does not apply. There are no known related cases within the meaning of Circuit Rule 28(a)(1)(c).

/s/ *Varu Chilakamarri*
Varu Chilakamarri

K&L Gates LLP
1601 K Street, N.W.
Washington, DC  20006
Phone: (202) 778-9165
Email:  varu.chilakamarri@klgates.com

iii

# TABLE OF CONTENTS

RULE 26.1 CORPORATE DISCLOSURE STATEMENTS .................................. ii

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES .......... iii

TABLE OF AUTHORITIES ....................................................................v

GLOSSARY........................................................................................ vii

IDENTITY AND INTEREST OF AMICI CURIAE ...............................................1

SUMMARY OF THE ARGUMENT ....................................................................2

ARGUMENT ....................................................................................................3

    I.  The NGA Effectuates Congress's Intent And Goal Of Ensuring That FERC Acts As The Nation's Sole Regulator Of The Interstate Natural Gas Transportation Market. ....................................................................3

    II.  The Panel's Decision Undercuts Congress's Intent And Goals By Requiring FERC To Give Undue Weight To A Single State's Policies And Energy Forecasts…………………………………………………………………..5

        A.  FERC appropriately weighed state law issues in assessing the Project's market need…………………………………………………7

        B.  The panel's decision warrants further review because it implicates serious and recurring issues about states' role in national energy policy. .....................................................................................10

CONCLUSION...................................................................................12

CERTIFICATE OF COMPLIANCE.......................................................13

CERTIFICATE OF SERVICE ............................................................13

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*City of Oberlin v. FERC,*
   937 F.3d 599 (D.C. Cir. 2019)...................................................................6

*Del. Riverkeeper Network v. FERC,*
   45 F.4th 104 (D.C. Cir. 2022)...................................................................6

*Food & Water Watch v. FERC,*
   104 F.4th 336 (D.C. Cir. 2024).................................................................11

*Illinois Natural Gas Co. v. Public Service Co.,*
   314 U.S. 498 (1942) ................................................................................4

*Motor Vehicle Mfrs. Assn. of U.S. v. State Farm Mut. Automobile Ins.,*
   463 U.S. 29 (1983)..................................................................................8

*NAACP v. Fed. Power Comm'n,*
   425 U.S. 662 (1976)............................................................................4, 11

*Northern Natural Gas Co. v. Kansas Comm'n,*
   372 U.S. 84 (1963) .................................................................................5

*Pub. Utils. Comm'n of Cal. v. FERC,*
   900 F.2d 269 (D.C. Cir. 1990).................................................................4

*Schneidewind v. ANR Pipeline Co.,*
   485 U.S. 293 (1988).........................................................................5, 9, 11

*Sierra Club v. FERC,*
   867 F.3d 1357 (D.C. Cir. 2017)...............................................................6

## Statutes

15 U.S.C. §§ 717-717w................................................................................2

15 U.S.C. § 717(a) ......................................................................................3

15 U.S.C. § 717(c) ...........................................................................................4

15 U.S.C. § 717b-1 ..........................................................................................5

15 U.S.C. § 717j ..............................................................................................5

N.J.S.A. § 48:3-87.9(A) ..................................................................................9

**Other Authorities**

Statement of Policy (FERC Certificate Policy Statement),

88 FERC ¶ 61,227 (1999) .......................................................................5

H.R. Rep. No. 709, 75th Cong., 1st Sess. 2 (1937) ......................................4

# GLOSSARY

| | |
|---|---|
| API | American Petroleum Institute |
| AXPC | American Exploration & Production Council |
| FERC | Federal Energy Regulatory Commission |
| JA | Joint Appendix |
| NAM | National Association of Manufacturers |
| NGA | Natural Gas Act |
| Transco | Transcontinental Gas Pipe Line Company |

## IDENTITY AND INTEREST OF *AMICI CURIAE*[1]

API, AXPC, and the NAM have members that will be directly affected by the disposition of this appeal.

API is a national trade association that represents nearly 600 members involved in all segments of the oil and natural gas industries.  API's members include corporations that produce, process, store, transport, and market oil and natural gas products, as well as companies that support the oil and natural gas sectors.  API harnesses its members' expertise to research and advocate for economically efficient and environmentally sound approaches to the production and supply of energy resources.

AXPC is a national trade association representing 31 of the largest independent oil and natural gas exploration and production companies in the United States.  AXPC companies are among the leaders in the cleanest and safest onshore production of oil and natural gas, while supporting millions of Americans in high-paying jobs.  Dedicated to safety, science, and technological advancement,

---

[1] Pursuant to Rule 29(c)(5), counsel for *amici* certifies that counsel for the Parties did not author this brief in whole or in part; no Party or its counsel contributed money intended to fund preparation or submission of this brief; and no person—other than API, AXPC, and NAM their members, or their counsel—contributed money intended to fund preparation or submission of this brief.

AXPC's members strive to deliver affordable, reliable energy while positively impacting the communities in which they live and operate.

The NAM is the largest manufacturing association in the United States, representing small and large manufacturers in all 50 states and in every industrial sector, including the producers, transmitters and end users of natural gas. Manufacturing employs nearly 13 million people, contributes $2.87 trillion to the U.S. economy annually, and has the largest economic impact of any major sector. The NAM is the voice of the manufacturing community and the leading advocate for a policy agenda that helps manufacturers compete in the global economy.

This case concerns legal and policy issues related to regulation of interstate natural gas pipeline facilities, to which the businesses of the members of the *amici* are inextricably linked. *Amici* and their members have substantial interests in natural gas pipeline development, continued investment in energy infrastructure, and ensuring predictable, consistent, and rational law and policy affecting natural gas transportation.

## SUMMARY OF THE ARGUMENT

Through the Natural Gas Act ("NGA"), Congress made clear that the nation requires a single, overarching regulator for the development of interstate natural gas infrastructure. 15 U.S.C. §§ 717-717w. This ensures that the country's long-term energy supply and security is not undercut by multiple state policies and

2

forecasts that cannot holistically account for the complex and shifting regional and temporal energy needs of the entire nation.

Against this backdrop, the panel's vacatur of the pipeline approval here—a pipeline already serving the public across five different states—is troubling for what it portends for the erosion of federal authority in the critical arena of national energy supply and security.  The panel's conclusion that the Federal Energy Regulatory Commission ("FERC") did not properly weigh one state's energy policies is factually incorrect and raises an issue of exceptional importance because it will allow individual states to override the energy infrastructure, reliability, and security decisions that Congress assigned to FERC alone.

## ARGUMENT

**I.  The NGA effectuates Congress's intent and goal of ensuring that FERC acts as the nation's sole regulator of the interstate natural gas transportation market.**

Given the critical importance of a reliable energy supply, Congress recognized that it was necessary to have a single federal regulator for the nation's interstate natural gas transportation market.  Through the NGA, Congress declared that the "business of transporting and selling natural gas" is "affected with a public interest" and thus must be federally regulated.  15 U.S.C. § 717(a).  The primary goal under the NGA is to "encourage the orderly development of plentiful supplies

3

of . . . natural gas at reasonable prices." *NAACP v. Fed. Power Comm'n*, 425 U.S. 662, 669–70 (1976).

By enacting this statutory scheme, Congress filled the "regulatory gap" to "occupy" a field which at one time states had repeatedly (and largely unsuccessfully) sought to regulate. *See* H.R. Rep. No. 709 at 2, 75th Cong., 1st Sess. 2 (1937); *Pub. Utils. Comm'n of Cal. v. FERC*, 900 F.2d 269, 274 (D.C. Cir. 1990) (citing *Illinois Natural Gas Co. v. Public Service Co.*, 314 U.S. 498, 504-06 (1942) (detailing early dormant Commerce Clause decisions)). The text and history of the NGA thus sets forth the strong federal policy that it is the duty of one regulator—*i.e.*, FERC—to see above regional and short-term energy variables and ensure that the public has access to affordable, reliable supplies of energy, wherever they live. *See NAACP*, 425 U.S. at 670.

The text and structure of the NGA provides a role for the states. But that role falls well short of allowing a single state to set policies for the nation or otherwise interfere with FERC's ability to ensure a reliable energy supply for the nation as a whole. In this respect, the NGA's statutory scheme provides a stark division: Congress carefully circumscribed the areas of "local concern" for which states retain authority, including the authority to regulate certain intrastate sales of natural gas. *See* 15 U.S.C. § 717(c). And for the remaining field under federal authority, Congress provided pathways by which the states could influence—but

4

not control—federal decision making, including requiring FERC to consult with states on certain local safety considerations, *see* 15 U.S.C. § 717b-1, and delineating a formal mechanism for states to enter interstate compacts relating to the conservation, production, and transportation of natural gas, *see* 15 U.S.C. § 717j.  But outside these strictures, states cannot interfere with FERC's role.

As the Supreme Court explained, when a "state regulation affects the ability of FERC to regulate comprehensively . . . the transportation and sale of natural gas," or presents even "the prospect of interference with the federal regulatory power," then federal law—and FERC's authority—must prevail.  *Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293, 309 (1988) (cleaned up) (*citing Northern Natural Gas Co. v. Kansas Comm'n*, 372 U.S. 84, 91-93 (1963)).

## II.  The panel's decision undercuts Congress's intent and goals by requiring FERC to give undue weight to a single state's policies and energy forecasts.

To implement its authority under the NGA, FERC has relied for over 20 years on its Certificate Policy Statement, 88 FERC ¶ 61,227 (1999), which provides a framework for determining whether an interstate natural gas pipeline project is required by the public convenience and necessity.  Under this Certificate Policy Statement, the Commission considers "all relevant factors reflecting on need for the project," which may include, but are not limited to, "precedent agreements, demand projections, potential cost savings to consumers, or a

5

comparison of projected demand with the amount of capacity currently serving the market." JA 810. Under that regime, FERC has consistently found that precedent agreements are the most reliable indicator of project need, and this Court has affirmed the same. *See, e.g.*, *Del. Riverkeeper Network v. FERC*, 45 F.4th 104, 114 (D.C. Cir. 2022); *City of Oberlin v. FERC*, 937 F.3d 599, 605-606 (D.C. Cir. 2019); *Sierra Club v. FERC*, 867 F.3d 1357, 1379 (D.C. Cir. 2017).

FERC followed this longstanding approach here and found that there was a "market need" for the Transcontinental Gas Pipe Line Company's ("Transco") Regional Energy Access Expansion Project, which created a pipeline that expanded the delivery of gas to the public across the five states of New Jersey, New York, Delaware, Maryland, and Pennsylvania, and for which Transco had secured long-term precedent agreements with unrelated affiliates for 100 percent of the Project's capacity. But in stark contrast to the deference that this Court has previously given to FERC's market need assessment, the panel rejected FERC's decision based on New Jersey state laws which mandate future "sizeable" reductions in natural gas usage by public utilities. Opinion at 3, 21-27. In vacating FERC's Order, the panel concluded that FERC failed to "give weight" to these state law requirements. *Id.* at 21.

The panel impermissibly substituted its own calculus about the role that individual states should play in deciding whether interstate natural gas

transportation infrastructure is needed—a calculus that contravenes Congress's clear intent that these decisions remain in the hands of the federal government.  As discussed below, the panel not only erred in its specific finding that FERC improperly weighed New Jersey law, but it also ignored the disruptive consequences that its decision will have on the broader federal-state balance of authority in this critical arena.

### A.    FERC appropriately weighed state law issues in assessing the Project's market need.

The panel erred in finding that FERC failed to "give weight" to New Jersey's statutory requirements for annual natural gas reductions because FERC "arbitrarily misconstrued" New Jersey's efficiency law as "unenforceable." Opinion at 21, 26-27.

*First*, as a factual matter, the panel misapprehended FERC's discussion of New Jersey's natural gas reduction measures.  Contrary to the panel's description, FERC did not simply reject or entirely discredit the state's energy reduction requirements.  Rather, FERC demonstrated appropriate discretion and nuance in considering the New Jersey statutory landscape.  FERC concluded that the state efficiency law did not, on balance, undermine a federal finding of market need for three distinct reasons:  (1) notwithstanding the state laws, Transco had been able to demonstrate market need by obtaining binding precedent agreements for 100% of

7

its Project's capacity, JA 813, 831; (2) even if New Jersey achieves its reduction targets, the Project would provide additional benefits such as "more reliable service on peak winter days and increased diversity of supply," JA 831-32, which was a need recognized by many shippers who were concerned about their ability "to respond to extreme weather events," JA 550; and (3) while explicitly acknowledging that the reduction goal "is a New Jersey statutory requirement," FERC also considered that there had not yet been any "mandated mechanisms to implement" these statutory goals, JA 809, and thus there remained "considerable uncertainty surrounding forecasts" relating to how local distribution companies will respond to the state laws, JA 556.  Thus, nothing in FERC's Order suggested an unreasoned rejection of New Jersey's energy reduction requirements.

Instead, as FERC explained, its analysis was consistent with how determinations had been made in other, similar proceedings, where a FERC-jurisdictional pipeline would service states with mandated emissions reduction programs.  JA 831.  In finding FERC's explanation arbitrary, the panel did not delve into the substance of FERC's explanation.  Instead, the panel violated a canonical principle of agency review by substituting its judgment for that of the agency.  *See Motor Vehicle Mfrs. Assn. of U.S. v. State Farm Mut. Automobile Ins. Co.,* 463 U.S. 29, 43 (1983).  In so doing, the panel placed inordinate emphasis on the position of a single state, frustrating Congress's grant of "exclusive"

8

jurisdiction to FERC regarding the interstate transportation of natural gas. *See Schneidewind*, 485 U.S. at 300-301.

*Second*, even though FERC's observation that New Jersey had not yet "prescribed methods for achieving" its natural gas reduction targets, JA808, was merely one aspect of FERC's overall consideration, the panel wrongly rejected FERC's authority to allocate less weight to such prospective state laws. While the panel correctly noted that New Jersey's laws are mandatory, Opinion at 26, FERC was also correct to note that it was yet to be seen how the state would effectuate its requirements, JA 808-809, 815 n.122; *see also* Transco's Petition for Panel Rehearing and Rehearing En Banc at 7-8, Doc. No. 2074528. Indeed, the New Jersey provisions require implementation by public utilities and provide a system of incentives and penalties for compliance, which for example, could in certain scenarios potentially result in the payment of penalties in lieu of reductions. *See* N.J.S.A. § 48:3-87.9(A). Moreover, merely mandating future reductions is not equivalent to on-the-ground reductions; history is replete with legislative measures that fall short in practice. FERC appropriately understood these possibilities and concluded that there was "considerable uncertainty" weighing against using New Jersey's forecasts to halt infrastructure needed today on the promise of what might be in several years. JA 809.

9

The panel's directive that "FERC needed to properly consider the effects of the New Jersey statute" effectively requires FERC to treat a state's goals as already accomplished, allowing a state to deprive FERC of making its own risk assessments about projected energy infrastructure needs. *See* Opinion at 26 & n. 10, 27 ("FERC's treatment of New Jersey law as merely suggestive was erroneous, and that mistake led it to arbitrarily discount the effect of the state's energy laws in assessing market demand for the Project."). In so holding, the panel effectively permitted a single state to disrupt and, in fact, trump FERC's federally mandated responsibility over interstate natural gas transportation. This decision cannot stand.

### B. The panel's decision warrants further review because it implicates serious and recurring issues about states' role in national energy policy.

This case illustrates the problematic yet real aspects of allowing individual states to unsettle expectations involving critical interstate energy infrastructure decisions. The Project here involves the expansion of Transco's existing interstate natural gas pipeline to deliver gas to locations in *five states*—New Jersey, New York, Delaware, Maryland, and Pennsylvania. Opinion at 8; JA543. Despite the interstate benefits of the Project—particularly in times of peak demand and unpredictable weather events—the panel vacated the Project's authorization based on one state's *projected* natural gas reductions. *See also* Transco's Rehearing

10

Petition at 4-5 (detailing impacts of loss of service to families, business, and communities across these states).

Under the panel's theory of federalism, FERC would have to let critical energy infrastructure benefiting the nation as a whole—and which is necessary for the broader transition to renewable energy—degrade or go unbuilt if the interstate pipeline were not consistent with the energy reduction goals and projections of the individual states through which it passes.  This is inconsistent not only with Congress's grant to FERC of "exclusive" jurisdiction over the issuance of certificates of public convenience and necessity for interstate natural gas pipeline facilities, *Schneidewind*, 485 U.S. 302, but also FERC's charge to "promote the orderly production of plentiful supplies of…and natural gas at just and reasonable rates."  *NAACP*, 425 U.S. at 670.

And while the Court previously deferred to the approach set forth in FERC's Certificate Policy Statement, the market need inquiry is increasingly becoming a new frontier for using state energy goals as a means of curtailing interstate pipeline infrastructure.  *See, e.g.*, *Food & Water Watch v. FERC*, 104 F.4th 336, 348 (D.C. Cir. 2024) (rejecting similar argument based on New York climate reduction laws).  Indeed, the growing importance of this issue is confirmed by the multi-state *amici* brief filed during the merits stage, where far-flung states that have absolutely no connection to nor are impacted by this specific Project advocated for their

11

"sovereign" right to similarly influence federal energy policy across the country through their state laws and urged that FERC must "harmonize" federal regulations with those of the states.  *See Amici Curiae* Brief of New Jersey, Washington, Connecticut, Maryland, Massachusetts, New York, Oregon, and Vermont in Support of Petitions and Reversal, Doc. No. 2011599.  This result is unsustainable and directly contrary to the intent of Congress.  The panel's decision thus presents an issue of exceptional importance that calls for the further review by the panel and en banc court.

## CONCLUSION

For the foregoing reasons, the API, AXPC, and NAM ask this Court to accept this matter for panel rehearing or rehearing en banc.

Respectfully submitted,

Grace D. Soderberg
American Petroleum Institute
200 Massachusetts Ave., NW
Washington, DC 20001
Tel.: (202) 682-8000
SoderbergG@api.org
*Counsel for the American Petroleum Institute*


Erica Klenicki
Michael A. Tilghman II

/s/ *Varu Chilakamarri*
Varu Chilakamarri
Timothy Furdyna
David L. Wochner
K&L Gates LLP
1601 K Street, N.W.
Washington, DC  20006
(202) 778-9165
varu.chilakamarri@klgates.com
*Counsel for the Amici Curiae*

The NAM Legal Center
733 10th Street, N.W.
Suite 700
Washington, D.C. 20001

*Counsel for the National Association
of Manufacturers*

Dated:  September 20, 2024

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32 and 29(b) because it contains 2591 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 365 in Times New Roman 14-point font.

/s/ *Varu Chilakamarri*
Varu Chilakamarri


## CERTIFICATE OF SERVICE

I hereby certify that on this 20th day of September 2024, I electronically filed the foregoing with the Clerk of the Court for the U.S. Court of Appeals for the D.C. Circuit using the appellate CM/ECF system and served copies of the foregoing via the Court's CM/ECF system on all ECF-registered counsel.

*/s/ Varu Chilakamarri*
Varu Chilakamarri
K&L Gates LLP
1601 K Street, N.W.
Washington, DC  20006
Phone: (202) 778-9165
Email:  varu.chilakamarri@klgates.com