**ORAL ARGUMENT WAS HELD ON MARCH 15, 2024**

IN THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

No. 23-1064 (consolidated with 23-1074, 23-1077, 23-1129, 23-1130 & 23-1137)

---

NEW JERSEY CONSERVATION FOUNDATION, *et al.*,
*Petitioners*,

*v.*

FEDERAL ENERGY REGULATORY COMMISSION,
*Respondent.*

---

ON PETITION FOR REVIEW OF ORDERS OF THE FEDERAL ENERGY REGULATORY COMMISSION

---

**BRIEF OF AMICUS CURIAE UNITED ASSOCIATION OF JOURNEYMEN AND APPRENTICES OF THE PLUMBING AND PIPE FITTING INDUSTRY OF THE UNITED STATES AND CANADA, AFL-CIO IN SUPPORT OF INTERVENOR'S PETITION FOR REHEARING *EN BANC***

---

|   |   |
|---|---|
|   | Ellen O. Boardman |
|   | Anna Friedlander |
|   | Kevin Dill |
|   | O'DONOGHUE & O'DONOGHUE LLP |
|   | 5301 Wisconsin Ave., NW, Ste. 800 |
|   | Washington, D.C. 20015 |
|   | (202) 362-0041 |
| DATED: September 20, 2024 | Counsel for Amicus Curiae |

# RULE 26.1 DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, the United Association of Journeymen and Apprentices of the Plumbing and Pipe Fitting Industry of the United States and Canada, AFL-CIO discloses that it is an unincorporated membership association which has no parent corporation, issues no stock, and that no public-held company has a 10% or greater interest in the entity.

# **TABLE OF CONTENTS**

**RULE 26.1 DISCLOSURE STATEMENT** ........................................................... i
**TABLE OF CONTENTS** .................................................................................... ii
**TABLE OF AUTHORITIES** ............................................................................. iii
**STATEMENT OF INTEREST OF *AMICUS CURIAE*** ........................................1
**I.   INTRODUCTION** ........................................................................................3
**II.  ARGUMENT** ................................................................................................4
   **A.  The Panel's Decision Is Contrary to Law.** ........................................4
   **B.  The Panel's Decision Threatens the Livelihood of Pipeline Workers.** ........6
   **C.  The Panel's Decision Compromises Public Safety.** ..........................8
   **D.  The Panel's Decision Will Harm Local Communities and Businesses.** ......9
**III. CONCLUSION** ............................................................................................12
**CERTIFICATE OF COMPLIANCE** .................................................................14
**CERTIFICATE OF SERVICE** ..........................................................................15

# **TABLE OF AUTHORITIES**

**Cases**

*Ctr. for Biological Diversity v. FERC*, 67 F.4th 1176 (D.C. Cir. 2023) ...................... 5

*Del. Riverkeeper Network v. FERC*, 45 F.4th 104 (D.C. Cir. 2022) .......................... 5

*Minisink Residents for Envtl. Pres. & Safety v. FERC*, 762 F.3d 97 (D.C. Cir. 2014) ............................................................................................................................. 5

*N.J. Conservation Found. v. FERC*, 111 F.4th 42 (D.C. Cir. 2024) ("Opinion") 3, 4, 5

*Nat'l Ass'n for Advancement of Colored People v. Fed. Power Comm'n*, 425 U.S. 662 (1976) ..................................................................................................................... 8

*Sierra Club v. FERC*, 867 F.3d 1357 (D.C. Cir. 2017) .............................................. 5

**Administrative Decisions**

FERC, *Order on Rehearing, Granting Clarification, Denying Stay, and Dismissing Waiver*, Doc. Accession No. 20230317-3056, at 16-38, *Transcon. Gas Pipe Line Co.*, FERC Dkt. No. CP21-94 (Mar. 17, 2023) ("Rehearing Order") ........... 3, 4, 11

**Rules**

49 C.F.R. Part 192 ....................................................................................................... 9

**Other Authorities**

Charles Hughes, *The Energy Bottleneck: Why America Needs More Pipelines*, MANHATTAN INSTITUTE (July 20, 2017) https://bit.ly/4evw1JN ............................ 8

*Construction Job Quality Across the US Energy Industries* at 15, North America's Building Trades Unions ("NABTU") (July 2020), https://bit.ly/304KyYO .......... 7

Jaclyn Diaz, *Texas officials put the final death toll from last year's winter storm at 246*, NAT'L PUB. RADIO (Jan. 3, 2022 6:55 PM ET), https://n.pr/3XOhFPk ........11

PIPELINE AND HAZARDOUS MATERIALS SAFETY ADMIN., *General Pipeline FAQs* (last updated Nov. 6, 2018), https://www.phmsa.dot.gov/faqs/general-pipeline-faqs ...................................................................................................................8

U.S. Forest Serv., *Record of Decision, Atlantic Coast Pipeline Project Special Use Permits/Land and Resource Management Plan Amendments* (Nov. 2017) .........10

UA, *Motion to Intervene of the United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry of the United States and Canada, AFL-CIO*, Doc. Accession No. 202190430-5487, *Transcon. Gas Pipe Line Co.*, FERC Dkt. No. CP21-94 (Apr. 30, 2021) .......................................................................1

*Use of natural gas-fired generation differs in the United States by technology and region*, U.S. ENERGY INFO. ADMIN. (Feb. 22, 2024), https://www.eia.gov/todayinenergy/detail.php?id=61444 ................................9, 11

## **STATEMENT OF INTEREST OF *AMICUS CURIAE***

The United Association of Journeymen and Apprentices of the Plumbing and Pipe Fitting Industry of the United States and Canada, AFL-CIO ("UA") is an international labor organization representing over 380,000 plumbers, pipefitters, sprinkler fitters, service technicians, and welders, including thousands who perform welding, pipefitting, and hydrostatic testing on pipelines. UA pipeliners have worked on every major pipeline project in the United States, including construction of the Regional Energy Access Expansion (the "Project"). The UA has been an Intervenor in the FERC proceeding since May 2021. *See* UA, *Motion to Intervene of the United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry of the United States and Canada, AFL-CIO*, Doc. Accession No. 202190430-5487, *Transcon. Gas Pipe Line Co.*, FERC Dkt. No. CP21-94 (Apr. 30, 2021).

Pipeliners represented by the UA worked on construction of the Project pursuant to Project Labor Agreements ("PLA") incorporating the terms of the National Pipe Line Agreement ("NPLA"), a collective bargaining agreement which guarantees hourly wages commensurate with UA members' specialized skills, as well as health insurance, hourly pension contributions and other fringe benefits, good working conditions, and job protections. As discussed in more detail below, hundreds of UA workers worked on the Project under these PLAs.

1

Pipeline projects allow UA-represented workers to enjoy a high standard of living, health benefits for themselves and their families, and pension contributions for all hours worked. The amounts contributed by Employers on pipeline projects to jointly administered training funds also ensure that experienced workers are trained in the skills necessary to build the safest pipelines incorporating the latest technology, and that new workers entering the trade develop these skills. In return, UA-represented pipeline workers ensure that the U.S. pipeline infrastructure is built and maintained according the most up-to-date, safe, and efficient standards—at a significant benefit to the public at large. The panel's decision threatens the livelihood of the thousands of pipeliners represented by the UA because it would disrupt the efficient and orderly permitting of the pipeline projects these workers rely on to provide for themselves and their families.[1]

---

[1] No party or their counsel authored this brief in whole or in part, and no person other than Amicus Curiae UA contributed money to preparing or submitting the brief.

I.  **INTRODUCTION**

This case concerns a challenge by Petitioners to the Federal Energy Regulatory Commission's ("FERC") authorization of Transcontinental Gas Pipe Line Company, LLC ("Transco") placing certain segments of the Project into service on October 20, 2023 to provide 450,000 dekatherms ("Dth/d") per day of firm natural gas transportation service to points in New Jersey, Pennsylvania, and Maryland.  FERC concluded there was a market need for the Project based on, *inter alia*, binding commitments from shippers for 100% of the Project's capacity and market studies submitted by Transco and other interested parties.  FERC, *Order on Rehearing, Granting Clarification, Denying Stay, and Dismissing Waiver*, Doc. Accession No. 20230317-3056, at 16-38, *Transcon. Gas Pipe Line Co.*, FERC Dkt. No. CP21-94 (Mar. 17, 2023) ("Rehearing Order").  FERC also analyzed the significance of the Project's greenhouse gas ("GHG") emissions in its Environmental Impact Statement and compared those projections of Project emissions to federal and state GHG emission inventories to provide context.  *Id.* at 59-61.

In its decision, the panel vacated FERC's authorizations while the agency complies with the panel's order to "revisit its underlying market need finding" and "meet certain obligations under NEPA."  *N.J. Conservation Found. v. FERC*, 111 F.4th 42, 64 (D.C. Cir. 2024) ("Opinion").  For the reasons explained below, the UA

3

respectfully submits that the Court should vacate the panel's judgment and grant panel rehearing or rehearing *en banc*, because the panel's legal conclusions are contrary to law, and because the panel overlooked the considerable harms that will result from vacating the authorization of an operational pipeline.

## II.     ARGUMENT

### A.     The Panel's Decision Is Contrary to Law.

The UA fully agrees with and joins the legal arguments set forth by Transco in its Petition for Panel Rehearing and Rehearing *En Banc*, Dkt. # 111.  The panel acknowledged this Circuit "generally afford[s] great deference to Commission determinations about the market it regulates based on its technical expertise and experience," Opinion, at 59, but failed to apply that "great deference" when it substituted its technical judgment for that of FERC's by concluding the agency "acted arbitrarily" in finding a need for the Project.  *Id.* at 58.  However, FERC's finding of need was based on a comprehensive review of record evidence, including binding agreements between Transco and non-affiliated utilities for 100% of the Project's capacity, an analysis of New Jersey's Clean Energy Act, and a detailed discussion of market studies—including those relied on by Petitioner.  Rehearing Order, at 16-38.  Therefore, consistent with Circuit precedent, this Court should find that FERC's analysis of market need was reasonable, not arbitrary, and worthy of

4

deference. *See Del. Riverkeeper Network v. FERC*, 45 F.4th 104, 114 (D.C. Cir. 2022); *Minisink Residents for Envtl. Pres. & Safety v. FERC*, 762 F.3d 97, 111 (D.C. Cir. 2014).

The other major issue identified by the panel is FERC's perceived failure "to meet certain obligations under NEPA." Opinion, at 64. However, as explained by Transco, the panel's suggestion that FERC failed to meet its NEPA obligations because it declined to label the Project's GHG emissions as significant or insignificant is contrary to law and Circuit precedent. *See Ctr. for Biological Diversity v. FERC*, 67 F.4th 1176, 1184-86 (D.C. Cir. 2023); *Sierra Club v. FERC*, 867 F.3d 1357, 1374-75 (D.C. Cir. 2017). Because FERC appropriately analyzed and discussed the significance of the Project's GHG emissions, this Court should find that FERC satisfied its obligations under NEPA.

While discussing whether to vacate FERC's authorizations, the panel correctly noted the relevance of "the disruptive consequences of vacatur." Opinion, at 64 (internal citation omitted). However, the panel failed to meaningfully discuss the "disruptive consequences" of its decision, only acknowledging that interim service currently provided by the Project would be disrupted. *Id.* The remainder of this brief focuses on the severe and disruptive consequences of the panel's decision.

5

### B. The Panel's Decision Threatens the Livelihood of Pipeline Workers.

The UA members who work on pipeline construction reap significant economic and career benefits from doing so, including good wages, health coverage for themselves and their families, retirement security, and funding for their own training. As explained above, UA workers on the Project worked under PLAs incorporating the NPLA's hourly wage and fringe benefit rates. The Project is therefore an excellent example of the value of this work to UA members. Construction of the Pennsylvania components of the Project alone employed a total of 361 UA pipeliners who earned nearly $11 million in wages collectively over the course of five to six months. In addition, the contractors who employed these workers made hourly contributions to health and welfare, retirement, and training funds on behalf of each worker totaling $6.125 million.

While critics of pipeline construction may attempt to devalue these jobs by labeling them as "temporary," this ignores that temporary jobs are the norm in the construction industry and that workers therefore rely on a steady stream of such projects to support themselves and their families. Every opportunity for construction work that is delayed or denied is devastating because of the reliance on a steady stream of these "temporary" projects to provide complete incomes and retirement savings.

6

For these reasons, pipeline workers depend on efficient and orderly permitting of projects. The panel's decision threatens the orderliness of FERC's permitting process because it suggests that courts may substitute their technical and policy judgments for those of FERC's, to the point that it allows courts to vacate authorizations of projects that have been placed into service based on those judgments. As a result, companies in the pipeline industry may be reticent to seek permits for the projects on which UA pipeline workers, and many construction workers in other industries, depend for their livelihoods.

In response to these concerns, industry critics may suggest that pipeline workers should obtain jobs outside of the natural gas industry, such as in the renewable energy industry. However, those jobs—particularly if they are not covered by a collective bargaining agreement—often do not compare in terms of wages and benefits to the skilled pipeline construction jobs for which pipeliners are trained. Moreover, the trades most in demand for renewable energy are not aligned with the jobs most in demand in the natural gas industry. *Construction Job Quality Across the US Energy Industries* at 15, North America's Building Trades Unions ("NABTU") (July 2020), https://bit.ly/304KyYO. To transition to jobs in the renewable energy industry, many pipeline workers would need to re-train in entirely new skill sets, losing the careers for which they have received extensive training in exchange for jobs that provide inferior wages and benefits.

7

The panel's decision would inject considerable uncertainty into the permitting process under the Natural Gas Act, contrary to Congress's intent. *See Nat'l Ass'n for Advancement of Colored People v. Fed. Power Comm'n*, 425 U.S. 662, 669-70 (1976) (identifying the purpose of the Natural Gas Act as "encourag[ing] the orderly development of plentiful supplies of…natural gas"). This would likely result in fewer permits being sought and therefore fewer jobs for pipeline workers. As explained herein, the consequences of this approach would be devastating to the pipeline workers who depend on these jobs for their livelihood.

### C. The Panel's Decision Compromises Public Safety.

Pipelines are inherently one of the safest and most cost-effective ways to transport natural gas. For example, between 2007 and 2016, oil and natural gas pipelines had lower average annual accident rates—at 0.66 and 0.73 per billion ton-miles of oil and gas transported, respectively—than rail (2.20 accidents) and road (7.11 accidents).[2] Modern natural gas pipelines are even safer and incorporate more advanced technology than older pipelines. Modern pipelines include safety features such as improved pipe coating that protects against corrosion, more secure welding

---

[2] Charles Hughes, *The Energy Bottleneck: Why America Needs More Pipelines*, MANHATTAN INSTITUTE, at 4 (July 20, 2017), https://bit.ly/4evw1JN. *See also* PIPELINE AND HAZARDOUS MATERIALS SAFETY ADMIN., *General Pipeline FAQs* (last updated Nov. 6, 2018), https://www.phmsa.dot.gov/faqs/general-pipeline-faqs ("Pipeline systems are the safest means to move [natural gas] products.").

8

techniques, and mechanical devices that travel through the pipelines to identify safety risks. Federal regulations also now require that the integrity of new pipelines be tested at the mill before they are installed. *See* 49 C.F.R. Part 192.

The chilling effect on pipeline permitting that is likely to result from the panel's decision will not prevent natural gas from being transported to the regions where it is needed. There is substantial market demand for natural gas, in part, because it is the single largest source of electrical generation in the United States.[3] Shippers who find there is inadequate pipeline capacity for natural gas will therefore simply use less efficient—and less safe—methods of transporting their products. This impact on public safety illustrates why it is ill-advised for a court to rely on its policy priorities to vacate FERC's expert analysis and findings of market need.

### D. The Panel's Decision Will Harm Local Communities and Businesses.

The harmful economic impacts of the panel's decision are not limited to pipeline operators and workers but would also extend to local communities and businesses. Communities located near pipeline construction benefit from local

---

[3] *See Use of natural gas-fired generation differs in the United States by technology and region*, U.S. ENERGY INFO. ADMIN. (Feb. 22, 2024), https://www.eia.gov/todayinenergy/detail.php?id=61444 (explaining that natural gas "is the single-largest source of energy used to generate electricity in the United States, making up 43% of electricity generation in 2023" and that "[a]ll 11 major electricity regions in the United States rely on natural gas to meet a significant share of their power load").

9

spending, tax revenue, business development, and savings on energy costs. For example, a host of companies ranging from large prime contractors to smaller service providers and material suppliers may contractually commit to perform work on a pipeline project once the project receives the necessary permits and authorizations. Materials and services such as sand, gravel, lumber, concrete, automotive and equipment repair services, fuel, oil, welding gas, ice, office supplies, and waste removal services are typically purchased in local areas where available, creating a significant economic stimulus for communities located near pipeline construction. Workers on the pipeline also spend earnings locally, including on lodging and other necessities of everyday life. These economic benefits for local communities are threatened by the chilling effect on permitting that is likely to result from the panel's decision.

The economic benefits for local communities also extend into the operational phase of a pipeline. For example, one study analyzing a different pipeline estimated that operations would result in a total economic impact of $69.2 million in spending on labor, equipment maintenance, routine capital expenditure, supplies, and profits, and $418,443 in income tax revenue to State governments. U.S. Forest Serv., *Record of Decision, Atlantic Coast Pipeline Project Special Use Permits/Land and Resource Management Plan Amendments* (Nov. 2017). These benefits for local communities

10

are directly threatened when a court vacates the authorization of an operational pipeline, but they are not acknowledged let alone discussed in the Opinion.

Finally, it should be noted that the domestic production and transportation of natural gas produces significant economic, energy security, and social benefits. It is indisputable that natural gas is essential for meeting the country's current energy needs.[4] While the U.S. is fortunate to have plentiful natural supplies of this resource, those resources are only useful to the extent they can be transported to where they are needed. When the supply of natural gas is disrupted, the consequences can be devastating. For example, when the Texas electrical grid reached a point of "near-collapse" in 2021 during an extreme cold weather event, 246 people across 77 counties in Texas died as a result of the weather and corresponding loss of power in much of the state.[5] Events such as this illustrate the importance of FERC considering factors such as the coldest weather historically experienced in the Project area when making its determination of need and to discount market studies, such as those relied on by Petitioners, that do not consider these impacts on energy supply. *See* Rehearing Order, at 29 (discounting the "Skipping Stone Study," in part, because it

---

[4] U.S. ENERGY INFO. ADMIN., *supra,* note 3.

[5] Jaclyn Diaz, *Texas officials put the final death toll from last year's winter storm at 246*, NAT'L PUB. RADIO (Jan. 3, 2022 6:55 PM ET), https://n.pr/3XOhFPk.

11

does not consider the possibility of increased demand during "extreme weather events").

### III. CONCLUSION

The UA does not believe that pipelines should be approved without any scrutiny or with less scrutiny than the law currently requires. However, the UA is concerned that the panel appeared to give little to no consideration to the severe disruption that will result from inserting unnecessary obstruction and inefficiency into the permitting process and by failing to afford the appropriate deference to FERC's expert analysis of market need and balancing of interests. As outlined here, the panel's decision will have real and tangible effects not only for the many thousands of skilled workers that rely on pipeline construction projects to support themselves and their families, but also for local communities, businesses, and any individual who places a high priority on the steady and uninterrupted supply of energy. The UA therefore respectfully requests that the Court vacate the panel's judgment and grant panel rehearing or rehearing *en banc*.

DATED: September 20, 2024            Respectfully Submitted,

/s/ Ellen O. Boardman_____
Ellen O. Boardman
eboardman@odonoghuelaw.com
Anna Friedlander
afriedlander@odonoghuelaw.com
Kevin Dill

12

kdill@odonoghuelaw.com
O'DONOGHUE & O'DONOGHUE LLP
5301 Wisconsin Ave. NW, Ste. 800
Washington, D.C. 20015
(202) 362-0041

*Counsel for the UA*

13

# **CERTIFICATE OF COMPLIANCE**

This document complies with the type-volume limit of Fed. R. App. P. 29(b)(4) because, excluding parts of the document exempted by Fed. R. App. P. 32(f), it contains 2,579 words. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word and Times New Roman 14-point font.

Dated:      September 20, 2024

/s/ Ellen O. Boardman\_\_\_\_
Ellen O. Boardman

# CERTIFICATE OF SERVICE

I hereby certify that on September 20, 2024, the foregoing Brief of Amicus Curiae United Association of Journeymen and Apprentices of the Plumbing and Pipe Fitting Industry of the United States and Canada, AFL-CIO in Support of Intervenor's Petition for Rehearing *En Banc* was served electronically through the Court's CM/ECF system on counsel for all parties of record.

Dated:   September 20, 2024

/s/ Ellen O. Boardman_____
Ellen O. Boardman